1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

10  STATE OF WASHINGTON, STATE OF
   CALIFORNIA, STATE OF ARIZONA,
11  STATE OF CONNECTICUT, STATE OF
   ILLINOIS, STATE OF MAINE, STATE
12  OF MARYLAND, COMMONWEALTH
   OF MASSACHUSETTS, PEOPLE OF THE
13  STATE OF MICHIGAN, STATE OF
   MINNESOTA, STATE OF NEW JERSEY,
14  STATE OF OREGON, STATE OF RHODE
   ISLAND, STATE OF VERMONT, STATE
15  OF WISCONSIN,

16                      Plaintiffs,

17      v.

18  DONALD TRUMP, in his official capacity
   as President of the United States; DANIEL
19  DRISCOLL, in his official capacity as
   Secretary of the Army; LIEUTENANT
20  GENERAL WILLIAM H. GRAHAM, JR.,
   in his official capacity as Chief of Engineers
21  and Commanding General of the U.S. Army
   Corps of Engineers; U.S. ARMY CORPS
22  OF ENGINEERS; TRAVIS VOYLES, in
   his official capacity as Vice Chair of the
23  Advisory Council on Historic Preservation;
   and ADVISORY COUNCIL ON
24  HISTORIC PRESERVATION,

25                      Defendants.

26

NO. 2:25-cv-00869

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1   The States of Washington, California, Arizona, Connecticut, Illinois, Maine, Maryland,

2   the People of the State of Michigan,[1] Minnesota, New Jersey, Oregon, Rhode Island, Vermont,

3   Wisconsin, and the Commonwealth of Massachusetts (Plaintiff States), bring this action to

4   protect the States—including their citizens and their natural resources—from the federal

5   government's unlawful use of emergency permitting procedures that bypass critical ecological,

6   historical, and cultural resource review.

7                                    **INTRODUCTION**

8       1.      This case concerns an Executive Order issued on January 20, 2025, EO 14156,

9   90 Fed. Reg. 8433 (2025), entitled "Declaring a National Energy Emergency" (Executive

10  Order).[2] Despite the fact that U.S. energy production is at an all-time high, and growing,

11  President Trump (the President) invoked authority under the National Emergencies Act,

12  50 U.S.C. §§ 1601 *et seq.*, to declare a national energy "emergency." As relevant here, based on

13  that declaration, the Executive Order commands the heads of executive departments and federal

14  agencies, including the United States Army Corps of Engineers (the Corps), the Department of

15  Interior (Interior), and the Advisory Council on Historic Preservation (ACHP), to issue permits

16  and other approvals necessary for energy-related projects on an expedited and emergency basis.

17      2.      The Executive Order is unlawful, and its commands that federal agencies

18  disregard the law and in many cases their own regulations to fast-track extensive categories of

19  activities will result in damage to waters, wetlands, critical habitat, historic and cultural

20  resources, endangered species, and the people and wildlife that rely on these precious resources.

21      3.      The Plaintiff States agree energy production, the infrastructure needed to support

22  it, and a reliable and affordable supply of electricity are of critical importance to both the States

23

24  _____

       [1] Plaintiff People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney
25  General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People
    of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.
26     [2] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-
    emergency/. Attached as Exhibit A.

COMPLAINT FOR DECLARATORY                    2            ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                                    Ecology Division
                                                                    1125 Washington St. SE
                                                                         P.O. Box 40100
                                                                     Olympia, WA 98504
                                                                        (360) 753-6200

1    and the Nation. The invocation of the Nation's emergency authorities, however, is reserved for

2    actual emergencies—not changes in Presidential policy.

3        4.    And for good reason. The shortcuts inherent in rushing through emergency

4    processes fundamentally undermine the rights of States. The Clean Water Act, 33 U.S.C. §§

5    1251 *et seq.*, for example, enshrined state rights to protect water quality within their borders.

6    And such shortcuts, even when properly invoked, irreparably harm the states, their residents, and

7    their environments. As a result, and for just one example, the Corps's regulations authorize

8    "emergency procedures" *only* when normal procedures would result in unacceptable hazard to

9    human life, significant loss of property, or immediate, unforeseen, and significant economic

10   hardship.

11       5.    Indeed, to date, the Corps and other agencies have limited use of emergency

12   procedures to projects necessary during or in the aftermath of natural or human-made disasters

13   like hurricanes, flooding, or the 2010 Deepwater Horizon explosion and oil spill in the Gulf of

14   Mexico. But now, prodded onto the shakiest of limbs by the President's unsupported and

15   unlawful Executive Order, multiple federal agencies now seek to broadly employ these

16   emergency procedures in non-emergency situations to, among other actions, permit discharges

17   of dredged or fill material into waters of the United States. That unlawful process is facilitated

18   by other agencies, like the ACHP and the U.S. Fish and Wildlife Service, who have themselves

19   overextended their own emergency procedures to short-change or completely skip critical

20   environmental review under the Executive Order's directive.

21       6.    Unlawfully bypassing proper permitting procedures for hundreds of projects

22   currently proposed in and around the Nation—and presumably many more in the future—will

23   result in significant and irreparable harm to state natural and historic resources and the people

24   and biota that rely on those resources for drinking, farming, recreating, and habitat.

25       7.    To prevent these harms to Plaintiff States from rushed review untethered to any

26   actual emergency, the Court should declare that the Executive Order is unlawful, that the agency

COMPLAINT FOR DECLARATORY                3        ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                        Ecology Division
                                                         1125 Washington St. SE
                                                              P.O. Box 40100
                                                          Olympia, WA 98504
                                                            (360) 753-6200

1    defendants' proposed and effectuated efforts to carry it out are arbitrary, capricious, and not in

2    accordance with law, and enjoin any actions by the agency defendants to pursue emergency

3    permitting for non-emergency projects.

### JURISDICTION AND VENUE

5        8.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). The

6    Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a)

7    and 2202. The Court also has jurisdiction under the judicial-review provisions of the APA.

8    5 U.S.C. § 702.

9        9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).

10   Defendants are United States agencies or officers sued in their official capacities. The State of

11   Washington is a resident of this judicial district and a substantial part of the events or omissions

12   giving rise to this Complaint occurred within the Seattle Division of the Western District of

13   Washington. The Corps's Seattle District, which is currently fast-tracking permitting pursuant

14   to the Executive Order, is also located within the Seattle Division.

### PARTIES

16       10.    Plaintiff States are sovereign states of the United States of America. Plaintiffs

17   bring this action in their sovereign and proprietary capacities. As set out below, Defendants'

18   actions directly harm the States' interests, including, but not limited to, environmental and

19   financial harms that flow from the President's unlawful declaration of an energy "emergency,"

20   the Corps's unlawful implementation of the Executive Order under its Clean Water Act

21   Section 404 authority, and the ACHP's unlawful implementation of the Executive Order under

22   its authority under Section 106 of the National Historic Preservation Act of 1966 (NHPA), 54

23   U.S.C. § 306108. The States also bring this action to protect their quasi-sovereign interests in

24   the public health, safety, and welfare of their residents, as well as in their waters, natural

25   resources, environment, and their economies.

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1
2

11.     Defendant Donald Trump is President of the United States. He is sued in his official capacity.

3
4
5
6

12.     Defendant Daniel Driscoll is United States Secretary of the Army. He may, acting through the Army Corps's Chief of Engineers, issue permits to discharge dredged or fill material into waters of the United States pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344. He is sued in his official capacity.

7
8
9
10

13.     Defendant Lieutenant General William H. "Butch" Graham, Jr., is Commanding General of the United States Army Corps of Engineers. He is delegated authority to issue permits to discharge dredged or fill materials into waters of the United States pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344. He is sued in his official capacity.

11
12
13
14

14.     Defendant United States Army Corps of Engineers is a branch of the United States Army. The Corps is responsible for issuing permits to discharge dredge or fill materials into waters of the United States pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

15
16
17

15.     Defendants Daniel Driscoll, Defendant Lieutenant General William H. Graham, Jr., and Defendant United States Army Corps of Engineers are collectively referred to herein as the Corps.

18
19
20
21
22

16.     Defendant Travis Voyles is Vice Chairman of the Advisory Council on Historic Preservation. He, or his designee, is responsible for assuring federal agency compliance with Section 106 of the National Historic Preservation Act of 1966 (NHPA), 54 U.S.C. § 306108. The position of Chair of the Advisory Council on Historic Preservation is currently vacant. He is sued in his official capacity.

23
24

17.     Defendant Advisory Council on Historic Preservation is responsible for assuring federal agency compliance with Section 106 of the NHPA.

25
26

18.     Defendants Travis Voyles and Defendant Advisory Council on Historic Preservation are collectively referred to herein as ACHP.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          5          ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1

**ALLEGATIONS**

2

**A.      Relevant Statutory Provisions**

3

<u>The National Emergencies Act</u>

4

19.      Congress enacted the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601 *et*

5

*seq.*, in 1976 to create a transparent and accountable procedure for the President's declaration of

6

a national emergency.

7

20.      In enacting the NEA, Congress recognized that presidents had overused

8

authorities granted by Congress for quick action in situations where Congress lacked adequate

9

time to act. The primary purpose of the NEA was to prevent the President from exercising

10

unbounded authority to declare states of emergency and continue them in perpetuity.

11

Accordingly, the NEA terminated then-existing declared emergencies (some having persisted

12

for decades) and created a new legal framework to cabin the President's emergency authority.

13

21.      Specifically, the NEA was intended to ensure that presidential emergency powers

14

would "be utilized only when emergencies actually exist." S. Rep. No. 94-1168, at 2 (1976).

15

Senator Frank Church, who was instrumental in developing the NEA, testified on legislation that

16

became the NEA that "the President should not be allowed to invoke emergency authorities or

17

in any way utilize the provisions of this Act for frivolous or partisan matters, nor for that matter

18

in cases where important but not 'essential' problems are at stake." *Hearing on H.R. 3884 Before*

19

*the S. Comm. of Governmental Operations*, 94th Cong. 7 (1976). Senator Church further

20

explained that "[t]he Committee intentionally chose language which would make clear that the

21

authority of the Act was to be reserved for matters that are 'essential' to the protection of the

22

Constitution and the people." *Id.*

23

22.      Under the NEA, the President may only invoke the emergency powers Congress

24

has authorized in other federal statutes when there is a national emergency. 50 U.S.C. § 1621(a)

25

("With respect to Acts of Congress authorizing the exercise, during the period of a national

26

emergency, of any special or extraordinary power, the President is authorized to declare such a

6

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40117
Olympia, WA 98504
(360) 753-6200

national emergency"). As the Ninth Circuit recognized, the NEA does not enlarge the powers of the Executive Branch beyond authorities in existing statutes and regulations. *Sierra Club v. Trump*, 977 F.3d 853, 864–65 (9th Cir. 2020), *vacated on other grounds*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021).

23.    The NEA further requires the President to specify the statutory emergency authorities he or she intends to invoke upon declaring a national emergency, and to publish the proclamation of a national emergency in the Federal Register and transmit it to Congress. *Id.* "When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other offices will act. Such specification may be made either in the declaration of a national emergency, or by one or more contemporaneous or subsequent executive orders published in the Federal Register and transmitted to Congress." 50 U.S.C. § 1631.

24.    Congress has specifically authorized the use of emergency powers by the Executive Branch upon declaration of a national emergency and has provided the parameters of such emergency powers in numerous statutes. For example, 10 U.S.C. § 2808(a) provides, "[i]n the event of a declaration. . . by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects." Similarly, 50 U.S.C. § 1515 provides, "[a]fter [the effective date], the operation of this section. . . or any portion thereof, may be suspended by the President during the period of . . . any national emergency declared by Congress or by the President."

**The Clean Water Act**

25.    The Clean Water Act's objective is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

26.     To achieve that goal, Clean Water Act Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person into waters of the United States unless that discharge is authorized by a permit issued under, *inter alia*, Clean Water Act Section 404, 33 U.S.C. § 1344.

27.     Clean Water Act Section 404(a) authorizes the Secretary of the Army, acting through the Chief of Engineers of the Corps, to issue permits to discharge dredged or fill material into navigable waters at specified disposal sites. 33 U.S.C. § 1344(a).

28.     Each disposal site must be specified for each permit through application of and compliance with the United States Environmental Protection Agency's (EPA) Section 404(b)(1) Guidelines, 40 C.F.R. Part 230. *See* 33 U.S.C. § 1344(b)(1).

29.     The Corps has promulgated regulations governing its process to review applications for and issue Clean Water Act Section 404 permits. *See generally* 33 C.F.R. §§ 320, 323, 325.

30.     The Corps's standard procedures for processing a Section 404 permit application are set out in 33 C.F.R § 325.2(a). For discharges requiring a standard permit (i.e., an individual permit), the Corps receives a permit application,[3] and if/when the application is complete, issues a public notice of the application soliciting comments from the public, adjacent property owners, interested groups and individuals, local agencies, state agencies, and federal agencies. The Corps considers all comments and the applicant's responses to those comments, if any, and determines whether the proposed project will require either an Environmental Assessment or, if there are significant environmental impacts, an Environmental Impact Statement under the National Environmental Policy Act (NEPA). *See* 33 C.F.R § 325.2(a)(1)–(5). These processes ensure that the Corps fully considers the project's environmental impacts and reasonable alternatives before making a decision.

---

[3] The Corps generally recommends a pre-application consultation and makes itself available to advise potential applicants of studies or other information foreseeably required for later federal action. *See* 33 C.F.R. § 325.1(b) (pre-application consultation for major applications).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

31.    The Corps is required to conduct a public interest review, which involves an extensive evaluation of the "probable impacts, including cumulative impacts, of the proposed activity . . . on the public interest," and careful weighing of the "reasonably foreseeable detriments" against benefits from the project that "reasonably may be expected to accrue." 33 C.F.R § 320.4(a)(1).

32.    The Corps's decision on an application for a Section 404 permit "should reflect the national concern for both protection and utilization of important resources" and must consider a many factors including "conservation, economics, aesthetics, general environmental concerns, [impacts to] wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

33.    The Corps's regulations also reflect the numerous statutory obligations it must fulfill before issuing a Section 404 permit to ensure the authorized discharge of dredge and/or fill materials do not undermine the overall goals of the Clean Water Act and comply with other statutory requirements regarding the protection of environmental and cultural resources. For example, the Corps must comply with, among other things, NEPA, 42 U.S.C. §§ 4321 *et seq.*, the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.*, the Coastal Zone Management Act (CZMA) 16 U.S.C. §§ 1451 *et seq.*, and the NHPA, 54 U.S.C. §§ 300101 *et seq.*, as well as other provisions of the Clean Water Act itself—namely, Section 401.

34.    Clean Water Act Section 404(e) authorizes the Corps to issue Section 404 permits on a state, regional, or nationwide basis for certain categories of activities involving discharges of dredged or fill material. 33 U.S.C. § 1344(e); *see also* 33 C.F.R. §§ 325.5, 330. When the Corps proposes issuing state, regional, or nationwide permits (collectively, general permits), the Corps evaluates the categories of activity proposed for coverage under those permits to determine environmental effects and uses procedures similar to those used during the standard

9

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

permitting process. *See* 33 U.S.C. § 1344(e)(1) (requiring compliance with Section 404(b)(1) guidelines); 33 C.F.R. § 325.5(c); 33 C.F.R. Part 330. Entities proposing to discharge subject to general permits need not submit individual permit applications to obtain permit coverage. *See* 33 C.F.R. §§ 325.2(e), 330.6. As a result, discharges authorized under general permits are subject to less individual scrutiny, but substantial limitations remain to prevent the Corps from authorizing discharges under general permits that risk impacts to water quality, coastal zones, endangered species, and historic properties. *See* 33 C.F.R. §§ 325.2, 330.4, 330.5.

35.    For example, where an applicant for a federal license or a permit is seeking to conduct an activity "which may result in any discharge into the navigable waters" of a state, the applicant *must* receive a water quality certification decision from the state in which the discharge will occur under Section 401 of the Clean Water Act unless the state waives certification.[4] 33 U.S.C. § 1341; *see also* 33 C.F.R. §§ 320.4(d), 325.2(b)(1). Under the Clean Water Act Section 401 certification process, states evaluate the applicant's proposed project for compliance with applicable state effluent limitations and water quality standards. Having conducted this review, states can deny, condition, or approve the application for water quality certification depending on the water quality impacts of the proposed activity. 33 U.S.C.§ 1341(a); 33 C.F.R. § 325(b)(1)(ii).

36.    The authority reserved to states in Section 401 is meaningful and significant. In enacting Section 401, Congress sought to ensure that all activities authorized by the federal government that may result in a discharge would comply with "State law" and that "Federal licensing or permitting agencies [could not] override State water quality requirements." S. Rep. 92-313, at 69, *reproduced in* 2 Legislative History of the Water Pollution Control Act Amendments of 1972 ("Legislative History Vol. 2"), at 1487 (1973). "Congress intended that [through Section 401] the states would retain the power to block, for environmental reasons,

---

[4] Some tribal governments have obtained "treatment as a state" status. Tribes with such status are the certifying authority within the boundaries of their respective reservation.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                              10                    ATTORNEY GENERAL OF WASHINGTON
                                                                       Ecology Division
                                                                       1125 Washington St. SE
                                                                       P.O. Box 40100
                                                                       Olympia, WA 98504
                                                                       (360) 753-6200

1    local water projects that might otherwise win federal approval." *Keating v. FERC*, 927 F.2d 616,

2    622 (D.C. Cir. 1991); *see also PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S.

3    700, 721–23 (1994).

4        37.    This authority is foundational to the Clean Water Act's system of "cooperative

5    federalism" and Congress's preservation of State authority over the waters within their borders.

6    *United States v. Cooper*, 482 F.3d 658, 667 (4th Cir. 2007).

7        38.    Under the Section 401 regulations, the Corps and certifying State may agree on a

8    reasonable period of time, not to exceed one year, for the certifying authority to act on the request

9    for certification. 40 C.F.R. § 121.6. If no agreement is made, the reasonable period defaults to

10    six months. State analysis under Section 401 can be a highly complex process that can take

11    months to accomplish after a complete application is received by the state agency with delegated

12    Clean Water Act permitting authority.

13        39.    Additionally, the Corps must seek 401 certification before issuing or reissuing

14    any general permit, and, although programmatic water quality certifications are often provided,

15    States retain the right to deny a water quality certification for an activity otherwise meeting the

16    terms and conditions of a particular general permit. In such instances, the authorization for all

17    such activities within a state will be denied without prejudice until the state issues an individual

18    Section 401 certification applicable to such activities or waives the right to do so. *See* 33 C.F.R.

19    § 330.4(c)(3).

20        40.    The Corps must also ensure that permits issued pursuant to Section 404 have been

21    evaluated for compliance with the CZMA. 16 U.S.C. §§ 1451 *et seq.* The CZMA was enacted

22    "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the

23    Nation's coastal zone for this and succeeding generations[,]" and to "encourage the participation

24    and cooperation of the public, state and local governments, and interstate and other regional

25    agencies, as well as of the Federal agencies having programs affecting the coastal zone, in

26    carrying out the purposes of this chapter[.]" 16 U.S.C. § 1452(1), (4).

COMPLAINT FOR DECLARATORY                    11                    ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                                      Ecology Division
                                                                      1125 Washington St. SE
                                                                          P.O. Box 40100
                                                                        Olympia, WA 98504
                                                                          (360) 753-6200

1    41.    To that end, the CZMA requires applicants for federal licenses and permits whose

2    activities will "affect[] any land or water use or natural resource of the coastal zone" of a state—

3    such as Section 404 permits—to provide "a certification that the proposed activity complies with

4    the enforceable policies of the State's approved [Coastal Zone Management Program] and that

5    such activity will be conducted in a manner consistent with the program." 16 U.S.C.

6    § 1456(c)(1)(A), (c)(3)(A). The State may then concur with the applicant's certification, or

7    object. 16 U.S.C. § 1456(c)(3)(A). "No license or permit shall be granted by the Federal agency

8    until the state or its designated agency has concurred with the applicant's certification . . . unless

9    the Secretary [of Commerce] . . . finds, after providing a reasonable opportunity for detailed

10    comments from the Federal agency involved and from the state, that the activity is consistent

11    with the objectives of [the CZMA] or is otherwise necessary in the interest of national security."

12    *Id.*

13    42.    The CZMA ensures coastal States can review Corps permits and projects to

14    determine compliance with their respective Coastal Zone Management Plans, with Corps

15    regulations governing the Coastal Zone Management consistency review process for Section 404

16    permit applications. 33 C.F.R. § 325.2(b)(2). If the applicant is a federal agency and the State

17    objects to the proposed federal activity on the basis that its inconsistent with its approved CZM

18    Program, the Corps cannot make a final decision on the application until the parties have had an

19    opportunity to utilize the procedures specified by the CZMA for resolving such disagreements,

20    or the Secretary of Commerce determines that the proposed activity is consistent with the

21    purposes of the CZMA or necessary in the interest of national security. 33 C.F.R.

22    §§ 325.2(b)(2)(i), (ii).

23    43.    The Corps also must consult with relevant agencies to determine whether any

24    historic or archeological sites will be impacted by the permitted activity, pursuant to the NHPA,

25    33 C.F.R. § 325.2(b)(3), 36 C.F.R. § 800.2(c)(1); *see also* 54 U.S.C. § 306108 (Section 106).

26    This involves consultation with state and local government representatives, the ACHP, and tribes

COMPLAINT FOR DECLARATORY                    12                    ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                                    Ecology Division
                                                                        1125 Washington St. SE
                                                                        P.O. Box 40100
                                                                        Olympia, WA 98504
                                                                        (360) 753-6200

1   where the project may impact tribal lands or historic properties to which tribes attach religious

2   or cultural significance. 36 C.F.R. § 800.2(c), (c)(2)(ii). "The fundamental purpose of the NHPA

3   is to ensure the preservation of historic resources." *Te-Moak Tribe of Western Shoshone of*

4   *Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (citations omitted). Section

5   106 of the NHPA "is a 'stop, look, and listen' provision that requires each federal agency to

6   consider the effects of its programs" and is an important step in ensuring compliance with the

7   fundamental purpose of the NHPA. *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d

8   800, 805 (9th Cir. 1999) (quoting *Apache Survival Coalition v. United States*, 21 F.3d 895, 906

9   (9th Cir. 1994)).

10      44.      For its part, the ACHP is required to provide federal agencies with advice and

11   guidance on proper compliance with Section 106 of the NHPA.

12      45.      The Corps also must review the application for "potential impact on threatened

13   or endangered species pursuant to section 7 of the Endangered Species Act." 33 C.F.R.

14   § 325.2(b)(5). Where the Corps determines that a proposed activity "may affect an endangered

15   or threatened species or their critical habitat," it must consult with the U.S. Fish and Wildlife

16   Service and/or the National Marine Fisheries Service. *Id.* § 325.2(b)(5); *see also id.* § 320.4(c).

17   This consultation is required by the ESA. 16 U.S.C. § 1536.

18      46.      These statutorily mandated protections serve a vital role in protecting the Nation's

19   waters, coastlines, endangered species, and historic sites, among other resources, and properly

20   account for the rights of States to ensure water quality within their borders.

21   **The Endangered Species Act**

22      47.      The ESA, 16 U.S.C. §§ 1531, *et seq.*, is designed to ensure the conservation and

23   preservation of threatened and endangered plants and animals, as well as the habitats upon which

24   they rely.

25      48.      Section 7 of the ESA, 16 U.S.C. § 1536, requires that each federal agency "in

26   consultation with and with the assistance of the [Secretaries of Interior and Commerce], insure

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

13

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). In doing so, the statute commands agencies to "use the best scientific and commercial data available." *Id.*

49.    In practice, Section 7 consultation has been delegated by the Secretaries of Interior and Commerce to the U.S. Fish and Wildlife Service and National Marine Fisheries Service respectively. Section 7 consultation is mandatory "if the applicant has any reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3).

50.    The ESA's sole reference to any alteration of normal ESA procedures for Section 7 consultation in an emergency is limited to projects involving an area "declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act." 16 U.S.C. § 1536(p). Even then, these procedures (allowing the President to exercise the duties of the Endangered Species Committee) can only be invoked when the President determines such action "(1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of [Section 7] to be followed." *Id.*

51.    Implementing regulations are in accord. Regulations applicable to the U.S. Fish and Wildlife Service limit ESA emergency procedures to situations involving "acts of God, disasters, casualties, national defense or security emergencies, etc." 50 C.F.R. § 402.05(a). Regulations applicable to National Marine Fisheries Service regulations limit ESA emergency procedures to situations involving "response to natural disasters, or actions to protect public safety." 50 C.F.R. § 600.920(a)(1).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

**The National Environmental Policy Act**

52.    NEPA, 42 U.S.C. §§ 4321, *et seq.*, sets forth a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

53.    To effectuate this goal, NEPA establishes procedural requirements applicable to all proposals for major federal actions significantly affecting the quality of the human environment by requiring agencies to prepare a "detailed statement" including, among other information, the "reasonably foreseeable environmental effects" of such actions, "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;" and a "reasonable range of alternatives . . . that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C).

54.    On February 25, 2025, the Council on Environmental Quality (CEQ) published a notice that it was rescinding its decades-old regulations that provided guidance to federal agencies for implementing NEPA. *See* 90 C.F.R. 10610. CEQ also advised federal agencies to revise their own NEPA-implementing regulations and provided additional guidance for NEPA compliance in the interim.[5] CEQ's guidance Memorandum instructs federal agencies to "continue to follow their existing practices and procedures for implementing NEPA consistent with the text of NEPA" and "agencies should consider voluntarily relying on [CEQ's now-rescinded] regulations in completing ongoing NEPA reviews."[6]

55.    While CEQ's now-rescinded regulations do not define "emergency," CEQ guidance describes use of alternative arrangements in the case of an emergency as "situations involving immediate threats to human health or safety, or immediate threats to valuable natural

---

[5] CEQ Memorandum, "Implementation of the National Environmental Policy Act." Available at: https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf.
[6] *Id.*

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

resources."[7] As examples, CEQ guidance points to emergency circumstances such as "natural disasters, catastrophic wildfires, threats to species and their habitat, economic crisis, infectious disease outbreaks, potential dam failures, and insect infestations."[8]

**B.    Federal Laws and Applicable Regulations Limit the Use of Emergency Procedures to Actual Emergencies and Do Not Authorize Agencies to Take Action in the Manner Contemplated by the Executive Order**

**Corps's Emergency Procedures**

56.    Section 404 of the Clean Water Act does not authorize the Corps or any other agency to issue Section 404 permits on an emergency basis. *See* 33 U.S.C. § 1344.

57.    Section 404 exempts specific discharges of dredged or fill material "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures" from the requirement to obtain a permit.[9] 33 U.S.C. § 1344(f)(1)(B).

58.    The single reference to "emergency" in Section 404 thus does not authorize the Corps to issue emergency dredge and fill permits.

59.    Discharges of dredged or fill material for "emergency" maintenance of the type described in Section 404(f)(1)(B) are simply not subject to section 404's permit requirements. Such discharges are exempt from permitting under the exclusive list of Section 404(f) exemptions (i.e., discharges of dredged or fill material that are not prohibited by or subject to regulation under Section 404. 33 U.S.C. § 1344(f)).

60.    No other section of the Clean Water Act authorizes emergency permits to discharge dredged or fill material into navigable waters. *See* 33 U.S.C. §§ 1251 *et seq.*

---

[7] Emergencies and the National Environmental Policy Act Guidance, available at: https://ceq.doe.gov/docs/nepa-practice/emergencies-and-nepa-guidance-2020.pdf.
   [8] *Id*.
   [9] Clean Water Act Section 404(f) exempted discharges of dredged or fill material may still be subject to regulation under Section 307, 33 U.S.C. § 1317. *See* 33 U.S.C. § 1344(f)(1)(F).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

61.     The Clean Water Act's only "Emergency Powers" provision authorizes the EPA Administrator to "bring suit on behalf of the United States . . . to immediately restrain any person causing or contributing" to pollution "presenting an imminent and substantial endangerment to the health . . . or to the welfare of persons where such endangerment is to the livelihood of such persons, such as inability to market shellfish, to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary." *See* 33 U.S.C. § 1364. This statutory language demonstrates that Congress contemplated the potential need for emergency action under the Clean Water Act and expressly authorized only those powers it thought necessary. Importantly, the emergency powers Congress granted are for the purpose of protecting waters of the United States and furthering the Clean Water Act's goals.

62.     Although the Clean Water Act does not provide authority for emergency Section 404 permitting, the Corps has adopted "emergency procedures" in its regulations governing the processing of Section 404 permit applications. 33 C.F.R. § 325.2(e)(4). This regulation purports to authorize the Corps "to approve special processing procedures in emergency situations." *Id*. But this regulation does not authorize broad use emergency permits to discharge dredged or fill material into navigable waters. *See id*.

63.     Under the Corps's regulations, "Emergency" is defined as "a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures." *Id*.

64.     In an emergency, "the district engineer will explain the circumstances and recommend special procedures to the division engineer who will instruct the district engineer as to further processing of the application." *Id*.

65.     Even in an emergency, the Corps will make "reasonable efforts . . . to receive comments from interested Federal, state, and local agencies and the affected public." *Id*.

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

66.    The Corps will also publish "notice of any special procedures authorized" under 33 C.F.R. § 325.2(e)(4), along with their rationale for utilizing "emergency procedures" as soon as practicable. *Id.*

67.    Several Corps Districts and Divisions have developed guidance, or adopted guidance from other Districts, on implementing that limited "emergency procedures" provision. These guidance documents confirm and further elucidate the provision's narrow scope and applicability. Specifically, "emergency procedures" are just that—*procedures*—and they are intended to be used only in the event of a real emergency.[10]

68.    Guidance from the South Pacific Division, for example, which several Districts have adopted, reiterates that the Corps's regulations "provide for *abbreviated procedures* for the review, coordination and decision-making with respect to permit applications *in emergency situations*, defined as situations that '. . . would result in an unacceptable hazard to life, a significant loss of property or an immediate, unforeseen and significant economic hardship.'" (emphasis added). A true and correct copy of the South Pacific Division guidance is attached hereto as Exhibit B.

69.    Other Corps guidance similarly clarifies the limited scope and applicability of the "emergency procedures" provision. For example, the Fort Worth District has issued guidance stating that "emergency situations" warranting the use of "emergency procedures" are "very serious situations." The Fort Worth District guidance provides instructive examples of qualifying emergency situations, such as "emergencies due to a natural disaster (e.g., flood, hurricane, earthquake, etc.) or a catastrophic (sudden and complete) failure of a facility due to an external cause (e.g., a bridge collapse after being struck by a barge)." A true and correct copy of the Fort Worth District guidance is attached here as Exhibit C.

---

[10] The Corps's regulations provide other "Alternative Procedures," none of which would be appropriate to issue "emergency permits" directed by Executive Order. *See* 33 C.F.R. § 325.2(e)(1)-(3).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

70.    The Forth Worth District guidance further confirms that in real emergency situations, "[Corps] Division Engineers, in coordination with the [Corps] District Engineers, are authorized to approve special processing *procedures* to expedite permit issuance." (emphasis added). Exhibit C.

71.    Other informal guidance from the Corps is in accord. For example, the Seattle District website states that permit applicants must notify the Corps of "the need to perform emergency work," the Corps "has the responsibility to determine if the proposed work is consistent with the Corps's definition of an emergency," and the Corps "may not view an action as an emergency if the applicant has known of the deficient condition of the *failing structure* and has not made reasonable attempts to secure appropriate permits and conduct timely repairs." (emphasis added). Importantly, the Seattle District states that emergency decisions "are made on a case-by-case basis."[11]

72.    Historic permitting data confirms that the Corps utilizes emergency procedures sparingly and in response to actual emergencies that pose real safety concerns. Online permitting records dating back to 2010 demonstrate that the Corps has limited use of its emergency procedures to respond to catastrophic events such as oil spills and natural disasters (e.g., the Deepwater Horizon disaster in the Gulf of Mexico, Hurricane Floyd, and the devastating 2013 flooding in Colorado's front range).[12]

73.    "Emergency procedures" may also be used to avoid dangerous situations where work stoppage required under a Cease & Desist Order issued by the Corps or EPA could result in a safety issue. 33 C.F.R. § 326.3(c)(4). Even then, the Corps must make a determination, and publish its rationale for doing so, that the situation was an "emergency" as defined by 33 C.F.R. § 325.2(e)(4) (i.e., one that "would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action

---

[11] Available at: https://www.nws.usace.army.mil/Missions/Civil-Works/Regulatory/Emergencies/.
[12] List of Corps's projects previously approved under emergency procedures available at https://permits.ops.usace.army.mil/orm-public

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    19                    ATTORNEY GENERAL OF WASHINGTON
                                                                 Ecology Division
                                                                 1125 Washington St. SE
                                                                 P.O. Box 40100
                                                                 Olympia, WA 98504
                                                                 (360) 753-6200

1    requiring a permit is not undertaken within a time period less than the normal time needed to

2    process the application under standard procedures").

3        74.    Nothing in the Corps's permitting history suggests the Corps has applied—or is

4    authorized to apply—emergency procedures to issue permits in the manner commanded by the

5    Executive Order. Indeed, the South Pacific Division guidance explicitly states that "[t]he

6    regulations make no provision for issuing an 'Emergency Permit' however that term might be

7    defined." Moreover, "emergency procedures" "are not to be utilized to avoid providing prior

8    public notice of a proposed project or to bypass other procedural requirements," including but

9    not limited to, obtaining water quality certification under Clean Water Act Section 401.

10   Exhibit B.

11       75.    The South Pacific Division guidance further states that "[t]he Clean Water Act at

12   33 U.S.C. § 1341(a) and 33 C.F.R. § 325.2(b)(1)(ii) preclude the Army Corps from issuing a

13   permit until Section 401 water quality certification has been obtained or has been waived or if

14   401 certification has been denied. *This remains true in emergency situations.*" (emphasis added).

15   Exhibit B.

16       76.    Finally, other guidance references the use of "after the fact" permitting in the case

17   of emergencies. For example, the Albuquerque District notes that "[a]n After the Fact Permit

18   may be used to authorize emergency work that meets the emergency situation definition at

19   33 C.F.R. § 325.2(e)(4), and where the work is needed to be performed immediately for safety

20   reasons and it is not feasible to contact the Corps or the Corps has not responded within an

21   acceptable time prior to work being conducted."[13]

22       77.    The Corps's "after the fact" permitting allows environmental review of projects

23   that would ordinarily require a Section 404 permit to occur after the work is already completed.

24   Such procedures are typically utilized as an enforcement tool to rectify unauthorized activities.

25   33 C.F.R. § 326.3(e).

26

---

[13] https://www.spa.usace.army.mil/Missions/Regulatory-Program-and-Permits/Emergency-Permitting/.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
20
ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

**Interior's Emergency Procedures**

78.    Interior's "emergency responses" authority only allows circumventing standard NEPA procedures with regard to actions needed to control the immediate impacts of threat to life, property, or important resources.

79.    Interior has adopted regulations governing the use of emergency authority in the preparation of a NEPA analysis and documentation. 43 C.F.R. § 46.150. These provisions allow designated Interior Responsible Officials to "determine that an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and documentation." 43 C.F.R. § 46.150. The regulations effectively bypass Interior's otherwise applicable responsibility to comply with NEPA prior to undertaking agency action.

80.    This authority is highly circumscribed, applying only to "those actions necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources." 43 C.F.R. § 46.150(a). In these limited circumstances, Responsible Officials must "take into account the probable environmental consequences of [actions taken in response to an emergency] and mitigate foreseeable adverse environmental effects *to the extent practical*." *Id*. (emphasis added).

81.    The regulations further require the Responsible Official to "document in writing the determination that an emergency exists and describe the responsive action(s) taken at the time the emergency [i.e., urgently needed actions to mitigate harm to life, property, or important natural, cultural, or historic resources] exists." 43 C.F.R. § 46.150(a)-(b).

82.    If further emergency actions are required following those needed to control the *immediate* impacts of a threat to life, property, or important natural, cultural, or historic resources, the regulations contemplate two paths. 43 C.F.R. § 46.150(c)-(d).

83.    Where such follow-on actions are not likely to have significant environmental impacts, the Responsible Official must document that determination "in an environmental assessment and a finding of no significant impact . . . unless categorically excluded." 43 C.F.R.

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

§ 46.150(c). If the Responsible Official determines subsequent actions related to the emergency require action prior to completing an environmental assessment and finding of no significant impact, the Responsible Official must "consult with [Interior's] Office of Environmental Policy and Compliance about alternative arrangements for NEPA compliance." *Id*.

84.    Where such follow-on actions are likely to have significant environmental impacts, Interior's ability to bypass NEPA requirements are limited. In such circumstances, Interior must "consult with [the Council on Environmental Quality] about alternative arrangements as soon as possible." 43 C.F.R. § 46.150(d). Even where alternative arrangements are developed, "[s]uch alternative arrangements will apply only to the proposed actions necessary to control the immediate impacts of the emergency" with all other proposed actions remaining "subject to NEPA analysis and documentation in accordance with [Interior's standard NEPA procedures]." *Id*.

**U.S. Fish and Wildlife and National Marine Fisheries Service Emergency Procedures**

85.    Both the U.S. Fish and Wildlife Service and the National Marine Fisheries Service have adopted provisions regarding the ESA consultation process during emergency situations. Emergency procedures for ESA consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service are limited to situations involving acts of God, disasters, casualties, and other exigencies.

86.    Promulgated by the Secretary of the Interior, U.S. Fish and Wildlife Service regulations contain an exception to the ESA consultation requirement when "emergency circumstances mandate the need to consult in an expedited manner." 50 C.F.R. § 402.05(a). These provisions allow ESA consultation to be conducted informally through procedures the Director of the U.S. Fish and Wildlife Service determines to be consistent with the ESA. *Id*. Even then, however, these procedures apply only to "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." *Id*. Moreover, the regulations require

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

formal consultation to occur "as soon as practicable after the emergency is under control." 50 C.F.R. §402.05(b).

87.     National Marine Fisheries Service regulations also allow after-the-fact consultation in the event of an emergency. 50 C.F.R. § 600.920(a)(1). Again, however, that authority is narrowly drawn. These regulations define "emergency" circumstances as actual emergencies "such as hazardous material clean-up, response to natural disasters, or actions to protect public safety." *Id*.

88.     Other agency guidance documents confirm the limited applicability of U.S. Fish and Wildlife Service and National Marine Fisheries Service emergency provisions. For example, in the Endangered Species Consultation Handbook, jointly issued by the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, emergencies are described (echoing the definition in 50 C.F.R. § 402.05) as exigent situations, such as those "involving an act of God, disasters, casualties, national defense or security emergencies, etc., and includes response activities that must be taken to prevent imminent loss of human life or property."[14] Critically, the Handbook expands on this point by clarifying that "[p]redictable events … usually do not qualify as emergencies . . . unless there is a significant unexpected human health risk."[15]

89.     Additionally, in the National Marine Fisheries Service documentation on ESA consultations, NOAA Fisheries describes invocation of ESA emergency consultation as applicable to exigent situations where "wildfires, flooding, and other emergency situations involving national security and other interests require *immediate response*."[16]

---

[14] Endangered Species Consultation Handbook, available at: https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.
[15] *Id*.
[16] Endangered Species Act Emergency Consultations on the West Coast, available at: https://www.fisheries.noaa.gov/west-coast/consultations/endangered-species-act-emergency-consultations-west-coast.

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

**ACHP's Emergency Procedures**

90.    The ACHP has adopted regulations regarding the application of Section 106 of the NHPA during emergency situations. 36 C.F.R. § 800.12. ACHP's emergency procedures are limited to situations involving immediate threats to life or property and are time-restricted to actions implemented within 30 days of the emergency.

91.    The ACHP's regulations first encourage federal agency officials, in consultation with appropriate state and tribal historic preservation officers and the ACHP, to develop procedures for taking historic resources into account during an emergency. Such procedures only purport to apply to "operations which respond to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or which respond to *other immediate threats to life or property.*" 36 C.F.R. § 800.12(a) (emphasis added). These procedures must be approved by the ACHP before being applied. *Id*.

92.    Where an agency has not developed approved emergency procedures under 36 C.F.R. § 800.12(a), the agency may comply with Section 106 by either: "(1) Following a programmatic agreement . . . that contains specific provisions for dealing with historic properties in emergency situations; or (2) Notifying [the ACHP], the appropriate [state or tribal historic preservation officer(s)], and any Indian tribe or Native Hawaiian organization that may attach religious and cultural significance to historic properties likely to be affected prior to the undertaking and affording them an opportunity to comment within seven days of notification" unless circumstances do not permit seven days. 36 C.F.R. § 800.12(b)(1)-(2). These procedures are limited to "emergency undertaking[s] as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State *or another immediate threat to life or property*." 36 C.F.R. § 800.12(b) (emphasis added).

93.    In all events, the emergency compliance with Section 106 "applies only to *undertakings* that will be implemented within 30 days after the disaster or emergency has been formally declared by the appropriate authority." 36 C.F.R. § 800.12(d) (emphasis added). Use

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

of emergency procedures can be extended to individual emergency undertakings, but only if an agency requests an extension prior to the expiration of the 30-day period. *Id*.

**C.    The President Declares a National "Energy Emergency" Despite the Absence of Any Emergency**

94.    The President issued Executive Order 14156 on January 20, 2025—day one of his new Administration. The Executive Order declares a national energy emergency pursuant to the NEA, 50 U.S.C. §§ 1601 *et seq*. But the circumstances described in the Executive Order do not meet even an expansive definition of the term "emergency."

95.    The Executive Order's emergency declaration claims a need to remediate an alleged shortage of energy supplies and shore up an "unreliable" grid to meet the Nation's needs. It provides no support for these assertions. It also irrationally proposes actions antithetical to those alleged needs.

96.    The Executive Order asserts that "energy and critical minerals [] identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs." 90 Fed. Reg. 8433 (2025). The Executive Order's emergency declaration cites no facts or evidence to support these claims, nor could it, as domestic energy production is at an all time high and the U.S. is a net-exporter of energy products.

97.    The Executive Order further asserts that "precariously inadequate and intermittent energy supply, and an increasingly unreliable grid, require swift and decisive action" and that "[w]ithout immediate remedy, [the] situation will dramatically deteriorate." The Executive Order's emergency declaration cites no facts or evidence to support these claims, nor could it.

98.    Plaintiff States fully support taking appropriate action to ensure a reliable grid that provides all Americans with affordable energy but, simply put, there is no basis for the President's emergency declaration. To the extent they have any merit, concerns about the current

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                          25                ATTORNEY GENERAL OF WASHINGTON
                                                                              Ecology Division
                                                                         1125 Washington St. SE
                                                                              P.O. Box 40100
                                                                           Olympia, WA 98504
                                                                             (360) 753-6200

state of grid reliability and affordability can, and should, be addressed in the course of existing regulatory proceedings by technical experts that understand the nuances of our complicated energy systems and with input from the affected public.

99.    Moreover, the EO itself is internally inconsistent, claiming that our nation suffers from inadequate energy supplies in one breath while urging actions that would reduce the availability of those resources for domestic uses in the next.

100.    In reality, domestic energy production is at an all-time high, thriving due to a diverse mix of fossil and non-fossil fuel resources, and the Nation's bulk power system is resilient.

101.    The United States is producing record quantities of crude oil and natural gas, and experts predict additional production growth through at least 2026.[17]

102.    Given this ample production, oil prices fell for the third consecutive year in 2024 and are forecast to decline again in 2025.

103.    The United States produces so much oil and natural gas, in fact, that companies have said they will not increase output in response to the President's declaration of a national energy emergency because it is not economical to do so.[18]

104.    The United States also already produces more oil and gas than it uses. It is the world's largest exporter of liquified natural gas and exports millions of barrels a day of crude oil. It has been a net energy exporter since 2019, when President Trump declared the nation had achieved energy independence.[19]

---

[17] U.S. Energy Information Admin., Short-Term Energy Outlook (Feb. 11, 2025). Available at https://www.eia.gov/outlooks/steo/data/browser.

[18] Wall Street Journal, U.S. Frackers and Saudi Officials Tell Trump They Won't Drill More (Feb. 3, 2025). Available at https://www.wsj.com/business/energy-oil/trump-oil-drilling-saudi-arabia-71c095ff?reflink=desktopwebshare_permalink.

[19] U.S. Energy Information Admin., In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023 (Apr. 1, 2024). Available at https://www.eia.gov/todayinenergy/detail.php?id=61683.
U.S. Energy Information Admin., U.S. Exports of Crude Oil (Jan. 31, 2025), Available at https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

26

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

105.    Confoundingly, the Executive Order claims the Nation has insufficient energy supplies to meet its needs and address an affordability crisis, while simultaneously proposing to increase the export of those very same (and allegedly limited) supplies. As the U.S. Department of Energy recently found, increasing exports will drive up domestic prices for Americans. President Trump has approved five additional liquified natural gas export terminals since January 2025 yet has no explanation for increasing exports during an alleged national shortage, nor any explanation of how ramping up exports will decrease prices for Americans struggling with energy costs.[20]

106.    The Executive Order also excludes solar and wind production from its definition of "energy," despite the importance of wind and solar power to grid reliability, energy security, and affordability.

107.    Wind and solar power are consistently among the cheapest sources of electricity.[21] They also improve the reliability and affordability of our Nation's energy supply by tempering the impact of international commodity price swings on crude oil and natural gas prices and reducing electric grid operators' reliance on interruptible natural gas deliveries.[22]

108.    Indeed, the United States Department of Energy has acknowledged that "[t]he rise of renewable power, which comes from unlimited energy resources, like wind, sunlight, water, and the Earth's natural heat, has the potential to vastly improve the reliability of the American energy system."[23] Indeed, the U.S. Department of Energy estimates that the United

---

U.S. Energy Information Admin., U.S. Energy Facts Explained (July 15, 2024), Available at https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php; U.S. Energy Independence Set New Record In 2023

[20] See, Trump administration approves Venture Global LNG exports from Louisiana project | Reuters
[21] See https://www.lazard.com/media/xemfey0k/lazards-lcoeplus-june-2024-_vf.pdf
[22] U.S. Dep't of Energy, Energy Reliability and Resilience (last accessed March 11, 2025). Available at https://www.energy.gov/eere/energy-reliability-and-resilience.
U.S. Fed. Energy Reg. Comm'n et al., The February 2021 Cold Weather Outages in Texas and the South Central United States (Nov. 2021), at 172 https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and ("Natural gas fuel supply issues alone caused 27.3 percent of the generating unit outages" during Winter Storm Uri).
[23] U.S. Dep't of Energy, Energy Reliability and Resilience (last accessed March 11, 2025). Available at https://www.energy.gov/eere/energy-reliability-and-resilience.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1   States has enough renewable energy potential to meet 100 times the annual nationwide energy

2   demand.[24]

3   109.   The Executive Order emphasizes the need for more "domestic energy resources,"

4   but wind and solar resources are produced domestically, too.

5   110.   The Executive Order's myopic focus on fossil fuels further contradicts our

6   Nation's goal of promoting reliable, diverse, and affordable energy. Burning fossil fuels

7   increases the instances of severe and extreme weather events that damage our Nation's

8   infrastructure and threaten human life. Experts agree that extreme weather fueled by climate

9   change—not the underproduction of fossil fuels—poses the most urgent challenge to our

10   Nation's electric grid.[25]

11   111.   A diverse portfolio of generation sources that includes local, renewable energy

12   sources such as solar and wind enhances grid reliability. Wind and solar are also essential to

13   bolstering local energy generation in regions of the country that do not have abundant fossil fuel

14   resources. Because fossil fuels must be transported to these regions from other parts of the

15   country, they are often exposed to the price volatility and reliability risks inherent in purchasing

16   fuel on an open market. Renewables help to moderate this risk by generating electricity using

17   locally available resources—wind and solar power.

18   112.   In addition, although the Executive Order is purportedly based on a need to assist

19   Americans living on low- and fixed-incomes, that rationale is undermined by other actions of

20   the Administration that make it harder for those individuals to pay their electricity and heating

21   bills by freezing federal funding for and otherwise impeding programs designed to help low-

22   income households do just that.

23

24   [24] U.S. Dep't of Energy, Renewable Energy Resource Assessment Information for the United States (Mar. 2022), at 57. Available at https://www.energy.gov/sites/default/files/2022-03/Renewable%20Energy%20Resource%20Assessment%20Information%20for%20the%20United%20States.pdf

25   [25] Congressional Res. Serv., Natural Gas Reliability: Issues for Congress (July 15, 2024), at 16-17. Available at https://sgp.fas.org/crs/misc/R48127.pdf.

26   National Aeronautics and Space Administration, The Causes of Climate Change (last accessed Mar. 11, 2025), https://science.nasa.gov/climate- change/causes/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          28          ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

113.    For example, the Administration unlawfully froze funds to administer: (i) the Low Income Home Energy Assistance program, 42 U.S.C. § 8621(a), which is designed to help States ensure that low-income residents have heat and power in the winter, (ii) the Solar for All program, 42 U.S.C. § 7434(a)(1), which funds rooftop solar panels and storage systems for installation in low-income and disadvantaged communities, and (iii) the High-Efficiency Electric Home Rebate Act, 42 U.S.C. § 18795a, which provides rebates for low- and moderate-income households for heat pumping and cooling and electrification projects. Funding under those programs was ordered to be restored pursuant to court order.[26]

114.    And, on or around April 1, 2025, the Department of Health and Human Services laid off the entire staff of the Low Income Home Energy Assistance Program.

115.    The Executive Order's emergency declaration is not based on any real emergency, nor does the Executive Order attempt to address one. Rather, it is based on the assertion of an unfounded, false "emergency" declared largely in response to disagreement with "the policies of the previous administration" and of states in the Northeast and West Coast. 90 Fed. Reg. 8433 (2025).

**D.    Under the Guise of a National "Energy Emergency," Executive Order 14156 Commands Unlawful Action**

116.    In response to the alleged energy emergency, the Executive Order directs federal agencies to "identify *and exercise* any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands." *Id.* (emphasis added).

117.    The Executive Order requires agencies to "identify *and use* all relevant lawful emergency and other authorities . . . to expedite the completion of all authorized and

---

[26] *See* Memorandum and Order on Motion for a Preliminary Injunction in *State of New York, et al. v. Donald Trump* (D.R.I. No. 1:25-cv-00039), ECF Doc. No. 161 (filed Mar. 6, 2025)

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

appropriated infrastructure, energy, environmental, and natural resources projects that are within" their respective authorities. *Id.* (emphasis added).

118.    Of particular note, the Executive Order specifically directs that "[t]o protect the collective national and economic security of the United States, agencies shall identify *and use* all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States, Northeast of the United States, and Alaska." *Id.* (emphasis added).

119.    According to the Executive Order, the Nation's energy related problems are "most pronounced" in the Northeast and West Coast due to "State and local policies" that the Administration disagrees with. Not only does the Order fail to reference any specific policy or explain how such policies create or exacerbate the Nation's energy-related problems, but the President has no authority under the NEA or otherwise to order the use of emergency authorities in specific regions of the United States based merely on policy disagreements. *Id.*

120.    Moreover, the assertion that state and local energy policies in the Northeast and on the West Coast "jeopardize our Nation's core national defense and security needs and devastate the prosperity of not only local residents but the entire United States population" is completely unsupported. *Id.* Washington State has some of the lowest energy prices in the Nation (and also some of the cleanest energy).[27] New York has the most energy-efficient state economy in the Nation and consumes less total energy per capita than every state but Rhode Island.[28] For years, Massachusetts has consistently ranked as the most or one of the most energy efficient states in the Nation, recognized for its "efforts to transition its utility energy efficiency programs

---

[27] U.S. Bureau of Labor Statistics, Western Information Office, Average Energy Prices, Seattle-Tacoma-Bellevue–December 2024 (December 2024), ("The 13.9 cents per kWh Seattle households paid for electricity in December 2024 was 21.0 percent less than the nationwide average of 0.176 cents per kWh. Last December, electricity costs were 24.9 percent lower in Seattle compared to the nation. In the past five years, prices paid by Seattle area consumers for electricity were less than the U.S. average by 16.2 percent or more in the month of December."), https://www.bls.gov/regions/west/news-release/averageenergyprices_seattle.htm#:~:text=The%2013.9%20cents%20per%20kWh,(See%20chart%202.

[28] U.S. Energy Information Admin., New York State Energy Profile, (last updated Jan. 16, 2025), https://www.eia.gov/state/analysis.php?sid=NY.

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

to reduce harmful pollution in the state and ensure the benefits of energy efficiency are distributed more equitably among residences and businesses, . . . [as well as] for its pioneering work to align its energy efficiency targets with efforts to transition off fossil fuels."[29]

121.    These Northeastern and West Coast states have cut harmful emissions from the power sector while growing their economies at a greater rate than the national average.[30]

122.    The Executive Order does not explain, nor could it, how reduced emissions from the power sector has any effect on national security, let alone jeopardizing it, nor how our growing state economies devastate anyone's prosperity.

123.    The Executive Order goes on to specifically command the Corps to, within thirty (30) days of the Order's execution, "identify planned or potential actions to facilitate the Nation's energy supply that may be subject to emergency treatment pursuant to the regulations and nationwide permits promulgated by the Army Corps . . . pursuant to section 404 of the Clean Water Act, 33 U.S.C. 1344," and other Army Corps permitting authorities.[31] 90 Fed. Reg. 8433 (2025).

124.    The Executive Order further directs agencies to "use, to the fullest extent possible and consistent with applicable law, the emergency Army Corps permitting provisions to facilitate the Nation's energy supply." *Id.*

---

[29] *See* Massachusetts Recognized as National Leader in Energy Efficiency: Takes One of Top Spots for Programs that Reduce Energy Costs, Improve Living Conditions and Create Jobs, Massachusetts Department of Energy Resources press release (March 20, 2025), available at https://www.mass.gov/news/massachusetts-recognized-as-national-leader-in-energy-efficiency, citing The American Council for an Energy-Efficient Economy (ACEEE) annual State Energy Efficiency Scorecard, available at https://www.aceee.org/state-policy/scorecard.

[30] *See e.g.*, Analysis Group, The Economic Impacts of the Regional Greenhouse Gas Initiative on Ten Northeast and Mid-Atlantic States (May 2023), at 12 (over 12-year period, program resulted in 46% reduction in greenhouse gas emissions, raised $3.8 billion in allowance revenues, generated net economic benefits of $5.7 billion, and added about 48,000 jobs), https://www.analysisgroup.com/Insights/publishing/the-economic-impacts-of-the-regional-greenhouse-gas-initiative-on-ten-northeast-and-mid-atlantic-states2/#:~:text=The%20study%20also%20found%20that,and%20added%2048%2C000%20job%2Dyears.

[31] The Corps also has, and the Executive Order purports to apply to, permitting authority under section 10 of the Rivers and Harbors Act, 33 U.S.C. 403, and section 103 of the Marine Protection Research and Sanctuaries Act, 33 U.S.C. 1413.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

31

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

125.    The Executive Order directs agencies "to use, to the maximum extent permissible under applicable law, the ESA regulation on [ESA] consultations in emergencies, to facilitate the Nation's energy supply." *Id*. The Executive order identifies the ESA emergency regulations as those "promulgated by the Secretary of the Interior and the Secretary of Commerce" pursuant to the ESA. *Id*.

126.    In short, based on nothing but the unsupported Emergency Declaration, the Executive Order illegally commands federal agencies, including the Corps, Interior, and ACHP, to disregard laws critical to protecting the environment, historic and cultural resources, and State sovereignty.

**E.    Federal Agencies Are Currently Implementing, or Are Planning to Implement, the Executive Order in Ways That Exceed Their Statutory Authority**

<u>Corps's implementation of the Executive Order</u>

127.    As particularly relevant here, the Executive Order directs the Secretary of the Army, acting through the Assistant Secretary of the Army for Civil Works, to "identify planned or potential actions to facilitate the Nation's energy supply that may be subject to emergency treatment pursuant to the regulations and nationwide permits promulgated by the [Army] Corps, or jointly by the Corps and EPA, pursuant to section 404 of the Clean Water Act, 33 U.S.C. 1344, section 10 of the Rivers and Harbors Act of March 3, 1899, 33 U.S.C. 403, and section 103 of the Marine Protection Research and Sanctuaries Act of 1972, 33 U.S.C. 1413." 90 Fed. Reg. 8433 (2025).

128.    The Corps is actively implementing that directive in the Executive Order.

129.    The Corps maintains an online database of "Regulatory and Section 408 Publicly Available Data" (Permitting Database).[32] Among other information, the Permitting Database contains Clean Water Act Section 404 projects and proposals, including final individual permits,

---

[32]Available at https://permits.ops.usace.army.mil/orm-public

32                    ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

pending individual permits, permits in various stages of environmental review, and permits pending or issued using the Corps's emergency procedures.

130.    The Permitting Database allows users to view "emergency" permit data filtered by "event." It also allows users to download permit data in spreadsheet form, including for projects approved under emergency procedures.

131.    Historically, the Permitting Database "events" field for emergency permit data identified prior emergencies caused by hurricane, storm, and flood events, as well as the Deepwater Horizon oil spill in the Gulf of Mexico.

132.    On or around February 17, 2025, the Army Corps added to the Permitting Database a new event type under its emergency list: "EO 14156 Declaring a National Energy Emergency." This new category listed 688 permits for various projects across the country. A true and correct copy of permit data available on February 19, 2025, is attached hereto as Exhibit D (Project List).

133.    Many of the projects on the Project List were identified as qualifying for authorization under various general permits. However, approximately 80 projects were listed as proceeding under an individual permit or the permitting procedure was listed as "unknown."

134.    For example, the list included the Cascade Renewable Transmission LLC Columbia River Project. This project is a significant undertaking that has been years in the making and involves installation of an underground, in-water transmission line traversing approximately 100 miles of the Columbia River between Washington and Oregon. Because of the potential impacts to the River, the project was appropriately identified as requiring extensive environmental review. According to the project proponent, "the entire project will undergo multi-year public reviews and will be required to obtain multiple federal, state, and local environmental permits. The project will be responsive to tribal concerns, and qualified scientists and environmental and cultural resource specialists will advise each aspect of the project

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
33
ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

construction and operation."[33] This will include site certification processes in both Washington and Oregon that will include water quality certifications from both states pursuant to Section 401 of the Clean Water Act.

135.    The project is currently in the pre-application stage. Given the size and complexity of this project, it is expected that the state Section 401 certification processes will take six or more months once a completed application for certification is received. Permitting this project without the rigorous environmental review previously identified as necessary and required would represent a radical—and unlawful—departure from the anticipated plan and the Corps permitting procedures for projects of this scale and undermine the Washington's and Oregon's rights and abilities to ensure that sufficient water quality protections are in place to protect the States' resources and residents.

136.    The Corps's Project List was not limited to energy related proposals. The list of emergency projects included permitting related the West Coyote Hills housing development in California, a joint project between Chevron and Pacific Coast Homes to redevelop a former oil field for residential use.

137.    On or around February 20, 2025, as media reports began to circulate around the Project List and the Corps's response to the Executive Order, the vast majority of projects on the Project List disappeared from the Permitting Database altogether, including projects that had been identified as needing individual permits, creating uncertainty about the Corps's plans for these proposed projects.

138.    However, on February 13, 2025, the Corps emailed officials for the State of Connecticut indicating the Corps's "intent to establish emergency permitting procedures across the New England District, pursuant to the National Energy declaration in Executive Order 14156." A true and correct copy of this email is attached hereto as Exhibit E. The email included the Executive Order as an attachment. *Id.*

---

[33] https://www.cascaderenewable.com/faq.

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

139.    On February 21, 2025, the Corps followed up on this email with a list of questions regarding the Executive Order. Specifically, the Corps stated that it "is working on expedited procedures with a goal to implement [emergency permitting] by Feb. 28th" and that, for those projects identified, "we'll be asking for a response from the state within a limited number of days, example water quality certification." The Corps then inquired as to whether Connecticut had "procedures in place you utilize in an emergency" and asked "[w]hat do you normally do during an emergency (i.e. flood event)." A true and correct copy of this email is attached hereto as Exhibit F.

140.    On February 21, 2025, the Corps sent Connecticut a spreadsheet "of pending permit applications in Connecticut that [the Corps] has currently identified as meeting the intent of Executive Order 14156 for energy emergency projects." The list of projects in the spreadsheet included all of the projects previously identified for Connecticut in the Project List and expanded on the Project List by adding four additional projects. A true and correct copy of this email is attached hereto as Exhibit F.

141.    On March 4, 2025, the Corps sent officials for the Commonwealth of Massachusetts an email regarding emergency permitting under the Executive Order. A true and correct copy of this email is attached hereto as Exhibit G.

142.    The Corps's email to Massachusetts included a copy of the Executive Order and indicated the Corps's commitment to immediately implementing its directives, stating that "[g]oing forward energy actions will be treated as emergencies under EO 14156," and that there was a need to "significantly shorten" regulatory review periods. While the Corps has acknowledged that Massachusetts is entitled to a six-month time frame for Section 401 water quality certifications under EPA's Section 401 regulations, in its email, the Corps also asserted that it "will have more energy actions in the future and need[s] a path forward." Exhibit G.

143.    The email to Massachusetts also included a spreadsheet identifying thirteen projects that the Corps intended to approve using emergency procedures under the Executive

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

35

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

Order. Approximately half of the projects had been included in the Project List for Massachusetts. The other projects in the spreadsheet were newly identified.

144.    The Corps has requested that Massachusetts issue Clean Water Act Section 401 certifications for these "emergency" projects (a process that typically takes weeks or even months) in two to three days, though the Corps recently admitted that Massachusetts is entitled to a six-month time frame for Section 401 water quality certifications under EPA's Section 401 regulations.

145.    Upon information and belief, Plaintiff States understand that similar lists identifying, and expanding upon, projects first identified in the Project List have been provided to other states.

146.    On or around April 1, 2025, numerous Army Corps Districts posted "Special Public Notice" documents on official websites announcing that "special emergency processing procedures" had been approved and that final guidance on their use would be posted on District websites by April 15, 2025.

147.    As of April 15, 2025, the Army Corps has now issued final guidance on the use of emergency processing procedures in response to Executive Order 14156 (Energy Emergency Guidance). The guidance has largely been issued on a District-by-District basis, although some Energy Emergency Guidance documents purport to cover multiple Districts within a Division.

148.    Specifically, for Plaintiff States, the following Districts have issued or adopted Energy Emergency Guidance applicable to Plaintiff States: Seattle District, Portland District, Omaha District, Kansas City District, San Francisco District, Sacramento District, Los Angeles District, Albuquerque District, St. Paul District, Rock Island District, Detroit District, New York District, New England District, Philadelphia District, Baltimore District, and Chicago District (Energy Emergency Guidance).

149.    While there are some differences between Districts, the Energy Emergency Guidance documents largely contain the same key elements, indicating that the Energy

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                          36                 ATTORNEY GENERAL OF WASHINGTON
                                                                                        Ecology Division
                                                                                   1125 Washington St. SE
                                                                                        P.O. Box 40100
                                                                                   Olympia, WA 98504
                                                                                     (360) 753-6200

1    Emergency Guidance documents issued by the Districts were pursuant to a common template
2    issued by Corps headquarters.

3        150.    For example, Energy Emergency Guidance purports to apply to "special
4    emergency processing procedures . . . to authorize energy related activities . . . under E.O.
5    14156, Declaring a National Energy Emergency." *See, e.g.,* Exhibit H at 1 (Seattle Guidance).
6    The Energy Emergency Guidance provides that "for the reasons stated in [the Executive Order]
7    the President has found that insufficient energy production, transportation, refining, and
8    generation constitutes an unusual and extraordinary threat to our Nation's economy, national
9    security, and foreign policy." *See, e.g., id*.

10        151.    The Energy Emergency Guidance further states that special emergency
11    procedures are "approved for activities associated with the identification, siting, production,
12    transportation, refining, and generation of domestic energy sources, including energy
13    infrastructure" requiring permitting by the Corps under "Section 404 of the Clean Water Act,
14    and/or "Section 103 of the Marine Research, Protection, and Sanctuaries Act of 1972, as
15    amended, where there would be an unacceptable hazard to life, a significant loss of property, or
16    an immediate, unforeseen, and significant economic hardship if the action requiring a permit is
17    not undertaken within a time period less than the normal time needed to process the application
18    under standard procedures." *See, e.g., id*.

19        152.    Despite this language, as well as the Corps's regulations expressly defining an
20    "emergency" as "a situation which would result in an unacceptable hazard to life, a significant
21    loss of property, or an immediate, unforeseen, and significant economic hardship," 33 C.F.R. §
22    325.2(e)(4), the Energy Emergency Guidance does not require a separate finding that the
23    regulatory definition is met for a project to qualify for emergency procedures. *Id*. Instead, the
24    Energy Emergency Guidance simply requires the Corps to "[c]onfirm whether the activity meets
25    the criteria for an energy-related emergency per the E.O." *See, e.g., id.* at 14.

26

COMPLAINT FOR DECLARATORY                    37                    ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                                      Ecology Division
                                                                    1125 Washington St. SE
                                                                       P.O. Box 40100
                                                                     Olympia, WA 98504
                                                                       (360) 753-6200

153.    In terms of process, the Energy Emergency Guidance notes that Districts will "fulfill as many standard procedures … as are reasonably tailored to the energy emergency situation," but that Districts "will not delay a timely response because of any standard procedures." *Id*. at 4. For applications requiring an individual permit, Districts will "potentially" include public notice "up to" 15 days. *Id*. at 5.

154.    In no case are public notice and comment periods guaranteed, even for large projects that require an individual permit.

155.    For water quality certifications under Section 401 of the Clean Water Act, the Energy Emergency Guidance largely defers to EPA's Section 401 Rule. While the Energy Emergency Guidance acknowledges that projects approved pursuant to emergency procedures require a water quality certification from the applicable certifying authority, the Guidance requires districts to seek 25-day turn-arounds from the applicable state or tribal authority.

156.    For ESA compliance, the Energy Emergency Guidance, in line with other Corps emergency guidance documents and citing to 50 C.F.R. § 402.05, allows formal consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service to occur *after* the "emergency" response. *See, e.g.,* Exhibit H at 6–7 (Seattle Guidance).

157.    For compliance with Section 106 of the NHPA, the Corps's guidance references use of the ACHP emergency provisions drafted in response to the Executive Order (described below). *See, e.g.*, Exhibit H at 7–8.

158.    The day after the Corps finished rolling out its Energy Emergency Guidance, April 16, 2025, the Corps began moving forward with identifying and approving projects not currently identified by any party as constituting an emergency to be permitted pursuant to emergency procedures as directed by the Executive Order.

159.    In Washington State, there are already at least four projects that will use the Corps's emergency procedures pursuant to the Executive Order. Specifically, Northwest Pipeline LLC has four proposed projects in Washington that have already received the Corps's

38

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

approval that the projects meet the Executive Order and that the Corps it will use emergency procedures to permit.

160.    The two projects that have received approval to use emergency processing procedures issued by the Corps's Seattle District are the Tributary to Gosnell Creek Project and the Chehalis to Washougal Anomaly Digs Pipeline Repair Project.

161.    The Corps issued a Public Notice for the Tributary to Gosnell Creek Project on April 25, 2025, with an expiration date, or deadline to comment date, of May 5, 2025. Exhibit I. The Tributary to Gosnell Creek Project involves channel realignment of a tributary and grading activity to lower and widen the stream floodplain. The Project will fill nearly six hundred square feet of the existing channel, and about 681 feet of new channel will be created as part of the channel realignment. The south bank of the stream will be graded on top of the pipeline. *Id.*  This project is expected to be constructed sometime between July 15 through September 15, 2026, and will require an individual 401 water quality certification from the Washington State Department of Ecology.

162.    According to the Biological Opinion for the Gosnell Creek Project, three federally threatened species and two proposed threatened species have the potential to occur in the project area. While no critical habitat for threatened species exists within the proposed project area, critical habitat for Puget Sound winter steelhead (a federally threatened species) occurs as close as 350 feet downstream of the proposed project area and indirect impacts on steelhead and its critical habitat are anticipated.

163.    The Chehalis to Washougal Anomaly Digs Pipeline Repair Project involves repairs of an existing 30-inch natural gas pipeline in the Little Washougal River in Clark County, Washington. Construction for this project was anticipated to go from August 1 through August 31, 2027 but now is anticipated to go through the month of August in 2026, based on the use of the Executive Order emergency procedures. Exhibit J. The project is about 1.8 acres in size and, while fish salvage is to be conducted to remove fish that have the potential to be

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    impacted by construction, the biological assessment shows that there will be adverse impacts to

2    ESA threatened species and critical habitat, as well as essential fish habitat designated under the

3    Magnuson-Stevens Act. An individual 401 water quality certification will also be required for

4    this project.

5        164.    The third Northwest Pipeline LLC project in Washington that will use the

6    Executive Order emergency procedures is the Kelso Beaver Reliability Project. This project in

7    Cowlitz County will involve converting 3.27 acres of property to industrial use for a new electric

8    moto-driven compressor station, modifications to an existing meter station, and modifications to

9    existing above ground facilities. The anticipated construction for this project is in the third

10   quarter of 2026 with operations to begin in November 2028. The Project requires a FERC license

11   and will need an individual 401 water quality certification from Washington.

12       165.    The fourth project that Northwest Pipeline LLC plans to use the Executive Order

13   emergency procedures process for is the Columbia River Portland Lateral Horizontal Directional

14   Drilling Project. This project involves decommissioning an existing 16-inch pipeline that crosses

15   beneath the Columbia River from Washington to Oregon, and installing an approximately 4,670

16   foot-long, 18-inch pipeline in its place. The new pipeline would be installed via horizontal

17   directional drilling with an additional 280 feet of pipeline being installed via conventional open-

18   trench installation in upland areas on both sides of the Columbia River to connect the new

19   pipeline segment to the existing Portland Lateral Pipeline. Segments of the Columbia River near

20   the project area provide important habitat for multiple endangered and threatened species,

21   including chinook and coho salmon as well as steelhead. This project involves work in water

22   and is expected to have impacts to over five acres of wetlands in Washington State. It will require

23   an individual 401 water quality certification from Washington.

24       166.    Based on the Corps's actions, Plaintiff States anticipate that the Corps will

25   continue to use emergency procedures to issue Section 404 permits for many projects

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

40

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

nationwide, circumventing applicable laws and requirements, and harming the Nation's waters and Plaintiff States' interests.

**Interior's implementation of the Executive Order**

167.    On April 23, 2025, and citing the Executive Order, Interior issued a press release entitled "Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply," announcing its intent to "accelerate the development of domestic energy resources and critical minerals."[34] The press release touted that "[t]he new permitting procedures will take a multi-year process down to just 28 days at most."[35] The press release stated that the procedures would apply to: crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal energy, kinetic hydropower, and critical minerals.[36]

168.    The same day, April 23, 2025, Interior simultaneously announced the adoption of "alternative arrangements for NEPA compliance" (Alternative Arrangements), attached hereto as Exhibit K. In doing so, Interior cited the Executive Order as the basis for the Alternative Arrangements. Purporting to act pursuant to Interior's emergency NEPA provisions in 43 C.F.R. § 46.150, the Alternative Arrangements note that they were adopted in coordination with and the authorization of the CEQ.

169.    The Alternative Arrangements do not follow Interior's own regulations governing when alternative NEPA procedures can be adopted.

170.    The Alternative Arrangements also represent a radical departure from normal NEPA procedure that show little ability to satisfy NEPA statutory requirements, including NEPA's basic command that Interior assess the environmental effects of its actions prior to undertaking them.

---

[34] Available at: https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.
[35] *Id.*
[36] *Id.*

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    171.    First, the Alternative Arrangements include an application form requiring project

2    applicants wishing to invoke Alternative Arrangements for qualifying projects with project

3    information, including the proposed plan of operation or underlying permit application. *Id*.

4    Regardless of the level of detail provided, the Responsible Official has little time to consider the

5    project prior to making a decision. For projects that the Responsible Official determines not

6    likely to have significant environmental impacts, the Responsible Official must prepare an

7    environmental assessment within "approximately 14 days" of receipt of the application. *Id*. at 2.

8    The Responsible Official will "concurrently within the same period" prepare documentation

9    supporting a "finding of no significant impact." *Id*. No public comment is required from at any

10    stage of this process up to and including the final decision. *Id*.

11    172.    Even for projects likely to have significant environmental impacts, the process is

12    hardly more robust. The Responsible Official will "publish a notice of intent to prepare an

13    environmental impact statement … soliciting written comments and announcing a public

14    meeting." *Id*. The Responsible official exercises complete discretion over the length of the public

15    comment period but, in any event, Interior "anticipates that most comment periods will be

16    approximately 10 days." *Id*. After publishing the notice of intent, the Responsible Official has a

17    mere 28 days to prepare an environmental impact statement. *Id*. The environmental impact

18    statement itself must be "concise," containing only "a brief description of environmental

19    effects." *Id*. There is no obligation to "publish a draft environmental impact statement" for public

20    review prior to finalizing and recording the agency's final decision. *Id*.

21    173.    On or around April 23, 2025, Interior also adopted "Alternative Procedures for

22    Informal Section 7 Consultation" (Alternative ESA Procedures) pursuant to the Executive Order.

23    Attached hereto as Exhibit L.

24    174.    The Alternative ESA Procedures require the Secretary of Interior, the appropriate

25    Assistant Secretary, their acting equivalents, or those officials exercising the delegated authority

26

COMPLAINT FOR DECLARATORY          42          ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                        Ecology Division
                                                          1125 Washington St. SE
                                                              P.O. Box 40100
                                                          Olympia, WA 98504
                                                            (360) 753-6200

1    of these positions "approve coverage of [projects covered by the Executive Order] under the
2    alternative procedures for informal, expedited section 7 consultation." *Id.* at 1.

3        175.    The Alternative ESA Procedures, thus, completely skip otherwise required
4    formal consultation under the ESA entirely and only require "[a]s soon as practicable under the
5    circumstances," ESA consultation "following termination or expiration of the national energy
6    emergency." *Id.* at 2.

7        176.    As of the time of filing, Plaintiff States are not aware of Interior's application of
8    its NEPA Alternative Arrangements or Alternative ESA Procedures for projects located within
9    Plaintiff States. Should Interior move forward with Alternative Arrangements for such projects,
10   Plaintiff States will seek to amend this complaint accordingly.

11   **ACHP's implementation of the Executive Order**

12       177.    On or around March 27, 2025, the ACHP published on its website a document
13   titled "Section 106 Emergency Provisions and the Executive order Declaring a National
14   Emergency." Attached hereto as Exhibit M. This guidance purports to provide information "to
15   assist agencies in implementing the terms of the Executive Order in regard to historic
16   preservation reviews." *Id.* at 1.

17       178.    Pursuant to this guidance, the ACHP directs "for any proposed undertaking that
18   falls within the scope of the Executive Order, agencies should follow the terms of any applicable
19   Section 106 agreement that contains emergency provisions." *Id.* Where such agreements do not
20   exist, the guidance states that "agencies can avail themselves of the expedited emergency
21   provisions in Section 800.12(b)(2) of the Section 106 regulations." *Id.*

22       179.    In terms of the length of time applicable to use of emergency Section 106
23   provisions, the guidance provides that "[w]hile Section 800.12 only applies for 30 days following
24   an emergency declaration, pursuant to Section 800.12(d), the ACHP is hereby extending the
25   applicability of Section 106 emergency provisions to run for the duration of the Presidential
26   declaration." *Id.* at 2.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                     43          ATTORNEY GENERAL OF WASHINGTON
                                                               Ecology Division
                                                          1125 Washington St. SE
                                                               P.O. Box 40100
                                                          Olympia, WA 98504
                                                             (360) 753-6200

180.    To Plaintiff States knowledge, no federal agency has requested that ACHP extend the applicability of emergency provisions for Section 106 consultation in response to the Executive Order.

181.    Federal agencies are now following ACHP's decision that Section 106 consultations can be done on an emergency basis pursuant to the Executive Order.

**F.    Use of Emergency Procedures Harms the States**

182.    The Corps's unlawful use of emergency procedures in non-emergency situations to comply with the President's illegal Executive Order will result in irreparable injury to Plaintiff States' proprietary, sovereign, and quasi-sovereign interests.

**Direct harms to proprietary interests**

183.    The States have proprietary interests in their natural resources, such as the health and useability of their waters for drinking, agriculture, recreation, and habitat, and the wildlife and biota that rely on aquatic and riparian habitats, as well as historic and cultural resources. Harm to these resources directly injures the States' proprietary interests.

184.    Harms to these interests are inherent when emergency procedures are invoked to fast-track review, short-circuit coordination, and jam through permit approvals on an expedited basis. These procedures are not just bureaucratic red tape. They serve important purposes by ensuring the action agency makes permit decisions based on a full understanding of the environmental, social, historic, and geological factors at the project site.

185.    For just one example, during the winter of 2020 in Washington State, the Corps issued a Section 404 permit using emergency procedures to Skagit County Drainage District 21, bypassing the Section 401 Certification process with the Washington State Department of Ecology (Washington).

186.    The Corps's decision to use emergency procedures in that instance was based on issues observed from prior flooding, which *may* have qualified for treatment as an emergency. But, because the Corps and project proponent failed to work with Ecology through typical

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

44

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

permitting procedures, the project did not reflect Washington's expertise and unique knowledge and understanding of the area's flooding conditions. Specifically, if the Corps had followed typical permitting procedures, it would have learned from Washington that flooding in that area would occur no matter how much dredging was completed and harms from a futile dredging project would have been avoided.

187.    Instead, the project resulted in an inadequately stabilized, oversized channel that was not constructed to prevent erosion and the deposition of large amounts of sediment into Nookachamps Creek and did nothing to address flooding. Sedimentation is a well-known problem for riparian habitat as it can bury stream beds, smother spawning grounds, interfere with aquatic life, and alter the chemical and physical makeup of a waterway. As a result, this event was particularly concerning for Nookachamps Creek as it is a critical tributary of the Skagit River and provides habitat for coho, chum, chinook, pink, and sockeye salmon as well as steelhead trout. Chinook from the Skagit Watershed are a critical source of food for endangered Southern Resident Orcas in Puget Sound.

188.    This example, and resulting harms to natural resources, are likely to be repeated around the country (including Plaintiff States) under the Executive Order and its command that the Corps, Interior, and other agencies invoke emergency procedures, bypassing critical environmental review for hundreds—if not thousands—of energy-related projects now and in the future.

189.    And, although use of emergency procedures may still require "after-the-fact" review and permitting under multiple federal statutes, which *might* address some negative effects of projects rushed through permitting, "after-the-fact" review does not replace the evaluations required as part of the normal permitting process.

190.    For example, the ESA implementing regulations include an emergency provision explaining that "[f]ormal consultation shall be initiated as soon as practicable after [an] emergency is under control." 50 C.F.R. § 402.05(b).

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

191.    But retroactively attempting to rectify environmental harms to various species, habitat, and other natural resources will almost certainly result in a worse outcome for the resources in question than proactively identifying and determining how to avoid, minimize, and/or appropriately mitigate those impacts before issuing a permit.

192.    For example, the "take" of an endangered species or damage to cultural or historic resources cannot be undone after-the-fact.

193.    This is why informal consultation under the ESA is required even in an actual emergency to which 50 C.F.R. § 402.05 applies, namely "situations involving acts of God, disasters, casualties, national defense or security emergencies." 50 C.F.R. § 402.05(a) ("Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)–(d) of the Act").

194.    But informal emergency consultation is no substitute for the more rigorous process set out in the ESA for non-emergencies—i.e., situations that do not involve the limited set of actual emergencies set out in 50 C.F.R. § 402.05(a)—and is designed to yield to the permitting authority. In fact, the ESA Section 7 Consultation Handbook issued by the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, advises the Services that, when it comes to emergency procedures, "DO NOT stand in the way of response efforts" (emphasis original).[37]

195.    The Clean Water Act preserves the States' existing powers to adopt conditions and restrictions necessary to protect state waters. Any use of emergency procedures to preclude or inhibit the States from exercising their authority to protect state waters, through evading or unlawfully restricting time to issue Section 401 certifications, is contrary to the language in the Clean Water Act. Contrary to the Clean Water Act's system of "cooperative federalism," it also

---

[37] Available at: https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    impairs the States' abilities to fully participate in permitting decisions, as well as their sovereign

2    interests—carefully preserved by Congress—in protecting water quality within their borders.

3        196.    For example, many Plaintiff States own or hold in trust the fish and other wildlife

4    populations within their borders and have certain statutory obligations to protect these resources.

5    Because the Corps's improper—and unlawful—use of emergency procedures will undermine

6    the States' ability to fully protect the aquatic habitat and resources those species rely upon for

7    survival, this practice causes or substantially risks direct harms to the States' wildlife and wildlife

8    populations.

9        197.    That use of emergency procedures curtails environmental review of projects

10    needing a Section 404 permit will undoubtedly result in negative impacts to the environment

11    further exemplifies why this practice is—and must be—limited to actual emergencies.

12    **Direct harms to sovereign interests**

13        198.    In addition to impacts to state natural resources themselves, the improper use of

14    emergency procedures directly harms state sovereign interests, including costs associated with

15    "filling the regulatory gap" and other administrative and compliance costs. *See New Jersey v.*

16    *Env't Prot. Agency*, 989 F.3d 1038, 1045–49 (D.C. Cir. 2021) (finding New Jersey had standing

17    to challenge EPA reporting rule under the Claim Air Act because inadequate requirements

18    imposed "administrative costs and burdens" on the state).

19        199.    For example, in addition to contravening the Clean Water Act's objective of

20    restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters,

21    33 U.S.C. § 1251(a), and directly harming Plaintiff States' proprietary interests in their natural

22    resources, the Corps's illegal use of emergency procedures to implement the unlawful Executive

23    Order undermines the Plaintiff States' recognized authority under Clean Water Section 401, and

24    imposes increased regulatory burdens on Plaintiff States, causing direct financial harms.

25        200.    To the extent the Corps demands that a State issue a Section 401 certification

26    decision in an expedited manner (e.g., within days or weeks or risk waiver), this would require

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

47

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

a significant diversion of state resources to adequately review and issue a decision on the Section 401 certification request that, if issued, would ensure state water quality standards will be met. Such a diversion of state resources is unjustified where no emergency exists.

201.    While the Corps has in some of its Energy Emergency Guidance stated that it will follow the Section 401 rule time period established by regulation, the Corps's Energy Emergency Guidance makes clear that Districts "will not delay a timely response [on the issuance of a Section 404 permit] because of any standard procedures." *See, e.g.,* Exhibit I at 4 (Seattle Guidance).

202.    But even if the Corps allows States adequate time to conduct Section 401 certifications, the Plaintiff States will need to pour additional resources into supplementing the rushed or truncated environmental review by the Corps to ensure that appropriate conditions are applied to avoid or mitigate harm to aquatic resources from projects approved under emergency procedures pursuant to the Executive Order. In some cases, where Corps environmental review is completely absent, Plaintiff States will have to expend their own limited resources conducting environmental reviews the Corps is legally required to do but, under the command of the Executive Order, fail to undertake.

203.    Moreover, requiring States to engage in other agency consultations or prepare comments on an expedited timeline will also require additional state resources. This has already occurred in Washington, where the Corps has set seven-day comment periods for complex projects involving in-water work in critical aquatic habitat. Indeed, in communications with Washington regulators, the Corps has already acknowledged that the sudden rush to permit energy-related projects has negative impacts on Washington regulators' workloads.

204.    Indeed, Washington strives to work cooperatively with the federal government to ensure the integrity of Washington's waters, and Washington and the Corps have a longstanding practice of cooperatively reviewing project information to meet these objectives when permitting projects. But the Corps's decision to use emergency procedures and expedite any permit

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

48

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

applications that they view as fitting the definition and intent of the Executive Order puts Washington's ability to review and condition projects to maintain water quality and protect the environment at risk. This disruption will impact Washington regulators' workload and workflow, require shifts in priorities, timeline adjustments, and significantly strain capacities which could lead to delays in fulfilling key responsibilities, reduced quality of output, and inefficiencies in established processes.

**Harms to quasi-sovereign interests**

205.    These same harms also impede States' quasi-sovereign interests "independent of and behind the titles of its citizens, in all the earth and air within its domain." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907).

206.    Direct harms to state natural resources, including water quality, water resources, habitat, and wildlife, directly impact the health and well-being of Plaintiff States' residents. For example, in Washington, significant populations (including tribal populations) rely on Washington's freshwater and saltwater water bodies for both recreation and sustenance. Impacts to fish populations from improper use of emergency procedures harms these interests.

207.    The Army Corps's use of emergency procedures to authorize projects within Plaintiff States' jurisdictions undermines the ability of Plaintiff States to protect the quality of waters within our borders, and correspondingly, the health and well-being of our residents.

## CAUSES OF ACTION

### COUNT 1
**Common Law *Ultra Vires* – Conduct Outside the Scope of Statutory Authority Conferred on the Executive (Against All Defendants)**

208.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

209.    Executive agencies and officers, including the President, may not act in excess of their legal authority.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

49

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

210.    A court reviewing executive action has an independent duty to determine what the law is and whether executive officers invoking statutory authority exceed their statutory power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

211.    Courts may review a presidential Executive Order and are empowered to enjoin officers of the Executive Branch from obeying illegal Presidential commands, and may enjoin *ultra vires* acts, that is, acts exceeding the officers' purported statutory authority. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 909–11 (N.D. Cal. 2019), *vacated on other grounds*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021).

212.    The NEA only allows the President to unlock emergency powers that Congress authorized in other statutes. It does not create new emergency powers or enlarge existing ones. *See* 50 U.S.C. § 1621(a).

213.    The NEA requires the President to specify the statutory provisions of law under which he proposes that he or his officers will act before any emergency authority may be exercised. 50 U.S.C. § 1631.

214.    While the President purported to specify the statutory provisions of law under which he proposes that he or his officers will act, none of those provisions provide the President or any agency with emergency powers or authorities upon a declaration of a national energy emergency under the NEA as set out in the Executive Order.

215.    The President has acted *ultra vires* by directing agencies to invoke emergency procedures to evade or shorten technical and/or environmental review under circumstances that—as a matter of law—do not qualify as an emergency under applicable statutory and regulatory provisions.

216.    The Corps has acted contrary to law and *ultra vires* by, among other things, implementing the Executive Order's directive to issue Clean Water Act Section 404 permits on an expedited or emergency.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

50

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

217.    The ACHP has acted contrary to law and *ultra vires* by, among other things, implementing the Executive Order's directive to conduct consultations with regard to historic preservation, pursuant to Section 106 of the NHPA, 54 U.S.C. § 306108, with regard to historic preservation on an emergency basis, and extending such emergency treatment to last for the indeterminate duration of the Executive Order's declared emergency.

218.    For these reasons, Plaintiff States are entitled to a declaration that Defendants' use of emergency procedures is unlawful, and that the Court should enjoin Defendants' implementation of the Executive Order.

## COUNT 2
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Contrary to Law
### (Against Corps Defendants)

219.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

220.    The Corps is an "agency" as defined in 5 U.S.C. § 551(1).

221.    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

222.    Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose.

223.    Agency action is also not in accordance with the law if agency action is inconsistent with applicable federal regulations.

224.    The Corps's actions in utilizing emergency procedures to fulfill the President's directive in the Executive Order directly contravenes the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and other applicable statutes because those statutes do not authorize emergency action under the circumstances described in the Executive Order.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

51

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    225.    The Corps's actions in utilizing emergency procedures to fulfill the President's

2    directive in the Executive Order directly contravenes the Corps's emergency procedures

3    regulation set out at 33 C.F.R. § 325.2(e).

4    226.    The Corps's decision to implement "emergency procedures" represents the

5    consummation of their decision-making process on how to effectuate the President's directive

6    in the Executive Order and is therefore a final agency action justiciable under the APA.

7    227.    As a result, the Corps's actions must be set aside as not in accordance with law.

8                                        **COUNT 3**
    **Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Arbitrary and Capricious**
9                          **(Against Corps Defendants)**

10   228.    Plaintiff States reallege and incorporate by reference the allegations set forth in

11   each of the preceding paragraphs.

12   229.    The Corps is an "agency" as defined in 5 U.S.C. § 551(1).

13   230.    The APA provides that this Court "shall" "hold unlawful and set aside" agency

14   action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with

15   law." 5 U.S.C. § 706(2)(A).

16   231.    Agency action is arbitrary and capricious if the agency fails to consider important

17   factors, considers issues that Congress did not intend for it to consider, or fails to articulate a

18   reasoned explanation for the action.

19   232.    When the Corps invoked emergency procedures to permit projects under Clean

20   Water Act Section 404, 33 U.S.C. § 1344, it was required to consider the objective of the Clean

21   Water Act.

22   233.    The Clean Water Act's objective is to "restore and maintain the chemical,

23   physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

24   234.    The protection of water quality is the paramount interest the Corps must consider

25   when executing its permitting authority under Clean Water Act Section 404.

26

COMPLAINT FOR DECLARATORY          52          ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                    Ecology Division
                                                   1125 Washington St. SE
                                                      P.O. Box 40100
                                                    Olympia, WA 98504
                                                      (360) 753-6200

1    235.    The Corps failed to consider how impacts to water quality resulting from

2  permitting without proper environmental review undermine, rather than further, the Clean Water

3  Act's objective of restoring and maintaining the chemical, physical, and biological integrity of

4  the Nation's waters.

5    236.    When the Corps invoked emergency procedures to permit projects under Clean

6  Water Act Section 404, 33 U.S.C. § 1344, it was required to consider, for each permit

7  application, whether there was an emergency within the meaning of 33 C.F.R. § 325.2(e)(4).

8    237.    The Corps failed to consider whether an emergency within the meaning of

9  33 C.F.R. § 325.2(e)(4) existed to justify use of emergency procedures for hundreds of projects.

10    238.    The Corps failed to articulate a reasoned explanation of how the Executive Order

11  constitutes an emergency within the meaning of 33 C.F.R. § 325.2(e)(4).

12    239.    The Corps failed to articulate a reasoned explanation of how it can invoke

13  emergency procedures when the regulatory conditions for invoking those procedures are not met.

14    240.    In reliance on an Executive Order directing the bypass of critical environmental

15  protections under a false energy "emergency," the Corps also relied on factors Congress did not

16  intend for it to consider.

17    241.    The Corps's decision to implement "emergency procedures" represents the

18  consummation of its decision-making process on how to effectuate the President's directive in

19  the Executive Order and is therefore a final agency action justiciable under the APA.

20    242.    The Corps's actions as set out herein conflict with the Clean Water Act's

21  objective to protect water quality, are arbitrary and capricious, and must be set aside.

22                                    **COUNT 4**
        **Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Contrary to Law**
23                          **(Against ACHP Defendants)**

24    243.    Plaintiff States reallege and incorporate by reference the allegations set forth in

25  each of the preceding paragraphs.

26    244.    The ACHP is an "agency" as defined in 5 U.S.C. § 551(1).

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

245.    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

246.    Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose.

247.    Agency action is also not in accordance with the law if agency action is inconsistent with applicable federal regulations.

248.    The ACHP's actions in utilizing emergency procedures to fulfill the President's directive in the Executive Order directly contravenes the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq*., and other applicable statutes because those statutes do not authorize emergency action under the circumstances described in the Executive Order.

249.    The ACHP's actions in utilizing emergency procedures to fulfill the President's directive in the Executive Order directly contravenes the ACHP's emergency procedures regulation set out 36 C.F.R. § 800.12.

250.    The ACHP's decision to implement emergency procedures represents the consummation of their decision-making process on how to effectuate the President's directive in the Executive Order and is therefore a final agency action justiciable under the APA.

251.    As a result, the ACHP's actions must be set aside as not in accordance with law.

**COUNT 5**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Arbitrary and Capricious**
**(Against ACHP Defendants)**

252.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

253.    The ACHP is an "agency" as defined in 5 U.S.C. § 551(1).

254.    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    54                    ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

255.     Agency action is arbitrary and capricious if the agency fails to consider important factors, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

256.     When the ACHP invoked emergency procedures for compliance with Section 106 of the NHPA for projects permitted pursuant to the Executive Order, 54 U.S.C. § 306108, it was required to consider the objective of the NHPA.

257.     The NHPA exists to preserve and protect historic and archaeological sites for present and future generations. 54 U.S.C. § 300101.

258.     The ACHP failed to consider how impacts to historic and archaeological sites resulting from permitting pursuant to emergency procedures would undermine, rather than further, the NHPA's objective of preserving and protecting historic and archaeological sites.

259.     When the ACHP approved use of emergency procedures to comply with Section 106 of the NHPA to permit projects pursuant to the Executive Order, it was required to consider whether there was an emergency within the meaning of 36 C.F.R. § 800.12.

260.     The ACHP failed to consider whether an emergency within the meaning of 36 C.F.R. § 800.12(a) existed to justify use of emergency procedures for hundreds of projects.

261.     The ACHP failed to articulate a reasoned explanation of how the Executive Order constitutes an emergency within the meaning of 36 C.F.R. § 800.12(a).

262.     The ACHP failed to articulate a reasoned explanation of how it can invoke emergency procedures when the regulatory conditions for invoking those procedures are not met.

263.      In reliance on an Executive Order directing the bypass of critical environmental protections under a false energy "emergency," the ACHP also relied on factors Congress did not intend for it to consider.

264.     The ACHP's decision to implement "emergency procedures" represents the consummation of its decision-making process on how to effectuate the President's directive in the Executive Order and is therefore a final agency action justiciable under the APA.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    55                    ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

265.    The ACHP's actions as set out herein conflict with the NHPA's objective to protect and preserve historic and archaeological sites, are arbitrary and capricious, and must be set aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare Executive Order 14156 unlawful under the common law *ultra vires* doctrine.

b.    Declare that the Corps's and ACHP's actions implementing Executive Order 14156 are arbitrary and capricious, not in accordance with law, and exceed statutory authority.

c.    Temporarily and then permanently enjoin the Corps and ACHP from issuing permits or other authorizations and/or actions on an emergency basis in implementation of Executive Order 14156.

d.    Award such additional relief as the interests of justice may require.

DATED this 9th day of May, 2025.

NICHOLAS W. BROWN
Attorney General of Washington


*/s/ Kelly T. Wood*
*/s/ Janell Middleton*
*/s/ Dylan Stonecipher*
*/s/ Caitlin Soden*
KELLY T. WOOD, WSBA #40067
Senior Counsel
JANELL MIDDLETON, WSBA # 52666
DYLAN STONECIPHER, WSBA # 58245
Assistant Attorneys General
Ecology Division
1125 Washington St. SE
Olympia, Washington 98504
360-586-6770
kelly.wood@atg.wa.gov
Janell.middleton@atg.wa.gov
Dylan.stonecipher@atg.wa.gov

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

56

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1   CAITLIN SODEN, WSBA # 55457
    Assistant Attorney General
2   Environmental Protection Division
    800 Fifth Avenue, Suite 2000
3   Seattle, Washington 98104
    206-464-7744
4   caitlin.soden@atg.wa.gov

5   *Attorneys for the State of Washington*

6

7   ROB BONTA
    Attorney General of California
8   SARAH E. MORRISON
    Supervising Deputy Attorney General
9

10   *s/ Tatiana K. Gaur*
     *s/ Catherine M. Wieman*
11   *s/ Keari A. Platt*
     TATIANA K. GAUR*
12   CATHERINE M. WIEMAN*
     KEARI A. PLATT*
13   Deputy Attorneys General
     California Office of the Attorney General
14   300 South Spring Street, Suite 1702
15   Los Angeles, CA 90013
     213-269-6329
16   Tatiana.Gaur@doj.ca.gov

17   * *Pro hac vice motion forthcoming*
18   *Attorneys for the State of California*

19   KRISTIN K. MAYES
     Attorney General of Arizona
20

21   */s/ Joseph Branco*
22   JOSEPH BRANCO*
     Office of the Attorney General
23   2005 North Central Avenue
     Phoenix, AZ 85004
24   Telephone: (602) 542-3725
     Joseph.Branco@azag.gov
25

26   * *Pro hac vice motion forthcoming*
     *Attorneys for the State of Arizona*

COMPLAINT FOR DECLARATORY          57          ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                                      Ecology Division
                                                      1125 Washington St. SE
                                                         P.O. Box 40100
                                                       Olympia, WA 98504
                                                         (360) 753-6200

1

2
WILLIAM TONG
Attorney General of Connecticut

3
*/s/ Jill Lacedonia*

4
JILL LACEDONIA*
Assistant Attorney General

5
165 Capitol Avenue
Hartford, CT 06106

6
(860) 808-5250
Jill.Lacedonia@ct.gov

7
*\* Pro hac vice motion forthcoming*

8
*Attorneys for the State of Connecticut*

9
KWAME RAOUL
Attorney General of Illinois

10

11
*/s/ Jason E. James*

12
JASON E. JAMES*
Assistant Attorney General
Office of the Attorney General

13
Environmental Bureau
201 W. Pointe Drive, Suite 7

14
Belleville, IL 62226
Phone: (217) 843-0322

15
jason.james@ilag.gov

16
*\* Pro hac vice motion forthcoming*
*Attorneys for the State of Illinois*

17

18
AARON M. FREY
Attorney General of Maine

19

20
*/s/ Jack Dafoe*

21
JACK DAFOE*
Assistant Attorney General

22
Natural Resources Division
Office of the Maine Attorney General

23
6 State House Station
Augusta, ME 04333

24
(207) 626-8868
jack.dafoe@maine.gov

25

26
*\* Pro hac vice motion forthcoming*
*Attorneys for the State of Maine*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                          58                  ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1      ANTHONY G. BROWN
     Attorney General of Maryland

2

3      */s/ Steven J. Goldstein*
     STEVEN J. GOLDSTEIN*

4      Assistant Attorney General
     Office of the Attorney General of Maryland

5      200 Saint Paul Place, 20th Floor
     Baltimore, MD 21202

6      (410) 576-6414
     sgoldstein@oag.state.md.us

7
     *\* Pro hac vice motion forthcoming*

8      *Attorneys for the State of Minnesota*

9      ANDREA JOY CAMPBELL
     Attorney General of Massachusetts

10

11      */s/ Zeus H. Smith*
     ZEUS H. SMITH*

12      Assistant Attorney General
     Environmental Protection Division

13      Office of the Attorney General
     One Ashburn Place

14      Boston, MA 02108
     (617) 963-2294

15      Zeus.smith@mass.gov

16      *\* Pro hac vice motion forthcoming.*
     *Attorneys for the Commonwealth of*

17      *Massachusetts*

18      FOR THE PEOPLE OF THE STATE OF
     MICHIGAN

19      DANA NESSEL
     Attorney General of Michigan

20      */s/ Benjamin C. Houston*

21      BENJAMIN C. HOUSTON*
     Assistant Attorney General

22      Environment, Natural Resources, and Agriculture
     Division

23      6th Floor G. Menne Williams Building
     525 W. Ottawa Street, PO Box 30755

24      Lansing, Michigan 48909
     (517) 335-7664

25      HoustonB1@michigan.gov

26      *\* Pro hac vice motion forthcoming*
     *Attorneys for the People of the State of Michigan*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF          59         ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    KEITH ELLISON
     Attorney General of Minnesota

2

3    */s/ Alyssa Bixby-Lawson*
     ALYSSA BIXBY-LAWSON

4    Assistant Attorney General
     445 Minnesota Street, Suite 600

5    St. Paul, Minnesota 55101-2131
     (651) 300-0904 (Voice)

6    (651) 297-4139 (Fax)
     Alyssa.bixby-lawson@ag.state.mn.us

7

8    *\* Pro hac vice motion forthcoming*
     *Attorneys for the State of Minnesota*

9

10   FOR THE STATE OF NEW JERSEY
     MATTHEW J. PLATKIN

11   Attorney General of New Jersey

12   */s/ Nell Hryshko*
     Nell Hryshko

13   Deputy Attorney General
     Division of Law

14   25 Market St., P.O. Box 093
     Trenton, NJ 08625

15   Telephone: (609) 376-2735
     Email: nell.hryshko@law.njoag.gov

16

17   *\* Pro hac vice motion forthcoming*
     *Attorneys for the State of New Jersey*

18

19   DAN RAYFIELD
     Attorney General of Oregon

20

21   */s/ Diane Lloyd*
     DIANE LLOYD*

22   Assistant Attorney-in-Charge
     Natural Resources Section

23   Oregon Department of Justice
     1162 Court Street NE

24   Salem, Oregon 97301-4096
     (503) 947-4540

25   Diane.Lloyd@doj.oregon.gov

26   *\* Pro hac vice motion forthcoming*
     *Attorneys for the State of Oregon*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

60

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Alison H. Carney*
*s/ Nicholas M. Vaz*
ALISON H. CARNEY *
NICHOLAS M. VAZ*
Special Assistant Attorneys General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 exts. 2116/2297
acarney@riag.ri.gov
nvaz@riag.ri.gov

*\* Pro hac vice motions forthcoming*
*Attorneys for the State of Rhode Island*

CHARITY R. CLARK
Attorney General of Vermont

*/s/Laura B. Murphy*
Laura B. Murphy*
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-1059
laura.murphy@vermont.gov

*\* Pro hac vice motion forthcoming*
*Attorneys for the State of Vermont*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Gabe Johnson-Karp*
Gabe Johnson-Karp*
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
gabe.johnson-karp@wisdoj.gov

*\* Pro hac vice motion forthcoming*
*Attorneys for the State of Wisconsin*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    61         ATTORNEY GENERAL OF WASHINGTON
                                                    Ecology Division
                                                    1125 Washington St. SE
                                                    P.O. Box 40100
                                                    Olympia, WA 98504
                                                    (360) 753-6200