1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

STATE OF WASHINGTON, STATE
OF CALIFORNIA, STATE OF
ARIZONA, STATE OF
COLORADO, STATE OF
CONNECTICUT, STATE OF
ILLINOIS, STATE OF MAINE,
STATE OF MARYLAND,
COMMONWEALTH OF
MASSACHUSETTS, PEOPLE OF
THE STATE OF MICHIGAN,
STATE OF MINNESOTA, STATE
OF NEW JERSEY, STATE OF NEW
MEXICO, STATE OF OREGON,
STATE OF RHODE ISLAND,
STATE OF VERMONT, STATE OF
WISCONSIN,

                        Plaintiffs,

        v.

DONALD TRUMP, in his official
capacity as President of the United
States; DANIEL DRISCOLL, in his
official capacity as Secretary of the
Army; LIEUTENANT GENERAL
WILLIAM H. GRAHAM, JR., in his
official capacity as Chief of Engineers
and Commanding General of the U.S.
Army Corps of Engineers; U.S.
ARMY CORPS OF ENGINEERS;

NO. 2:25-cv-00869

FIRST AMENDED AND
SUPPLEMENTAL
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  TRAVIS VOYLES, in his official
   capacity as Vice Chair of the
2  Advisory Council on Historic
   Preservation; ADVISORY COUNCIL
3  ON HISTORIC PRESERVATION;
   DOUG BURGUM, in his official
4  capacity as Secretary of the Interior;
   and UNITED STATES
5  DEPARTMENT OF THE
   INTERIOR.
6
                        Defendants.
7

8          The States of Washington, California, Arizona, Colorado, Connecticut,

9   Illinois, Maine, Maryland, the People of the State of Michigan[1], the States of

10  Minnesota, New Jersey, New Mexico, Oregon, Rhode Island, Vermont,

11  Wisconsin, and the Commonwealth of Massachusetts (Plaintiff States), bring

12  this action to protect the States—including their citizens and their natural

13  resources—from the federal government's unlawful use of emergency

14  procedures that bypass critical ecological, historical, and cultural resource

15  review.

16                          **INTRODUCTION**

17          1.      This case concerns an Executive Order issued on January 20,

18  2025, EO 14156, 90 Fed. Reg. 8433 (January 29, 2025), entitled "Declaring a

19  National Energy Emergency" (Executive Order).[2] Despite the fact that U.S.

20  energy production is at an all-time high and growing, President Trump

21  invoked authority under the National Emergencies Act, 50 U.S.C. §§ 1601 *et*

22  *seq.*, to declare an "energy emergency." The Executive Order commands the

23

24          [1] Plaintiff People of the State of Michigan is represented by Attorney General Dana Nessel. The
25  Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf
    of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.
            [2] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/declaring-
26  a-national-energy-emergency/. Attached as Exhibit A.

FIRST AMENDED AND                          2         ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                      Ecology Division
DECLARATORY                                                1125 Washington St. SE
                                                               P.O. Box 40100
AND INJUNCTIVE RELIEF                                        Olympia, WA 98504
                                                               (360) 753-6200

heads of executive departments and federal agencies, including the United
States Army Corps of Engineers (the Corps), the Department of Interior
(Interior), and the Advisory Council on Historic Preservation (ACHP), to
issue permits and other approvals necessary for fossil fuel, hydropower,
nuclear, or geothermal energy or critical minerals projects (hereinafter
referred to as "favored energy projects") on an expedited, emergency basis.

2.      The Executive Order is unlawful, and its commands that federal
agencies disregard the law and their regulations to fast-track favored energy
projects will result in damage to waters, wetlands, critical habitat, historic and
cultural resources, endangered species, and the people and wildlife that rely
on these precious resources.

3.      The Plaintiff States agree that energy production, the
infrastructure needed to support it, and a reliable and affordable supply of
electricity are of critical importance to both the States and the Nation. The
invocation of the Nation's emergency authorities, however, is reserved for
actual emergencies—not changes in Presidential policy.

4.      And for good reason. The Clean Water Act, 33 U.S.C. §§ 1251
*et seq.* and other environmental laws at issue here enshrine states' rights to
protect the environment within their borders. Abusing emergency procedures
undermines those rights and risks irreparably harming states, their residents,
and their environments. As a result, and for just one example, the Corps'
regulations authorize "emergency procedures" *only* when normal procedures
would result in unacceptable hazard to human life, significant loss of property,
or immediate, unforeseen, and significant economic hardship.

5.      Indeed, to date, the Corps and other agencies have limited use of
emergency procedures to projects necessary during or in the aftermath of

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

3

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  natural or human-made disasters like hurricanes, flooding, or the 2010

2  Deepwater Horizon explosion and oil spill in the Gulf of Mexico. But now,

3  prodded onto the shakiest of limbs by the President's unsupported and

4  unlawful Executive Order, multiple federal agencies seek to broadly employ

5  these emergency procedures in non-emergency situations to, among other

6  actions, permit discharges of dredged or fill material into waters of the United

7  States. Other agencies, like the ACHP, facilitate that unlawful process by

8  overextending their emergency procedures to short-change or completely skip

9  critical environmental review under the Executive Order's directive.

10      6.      Unlawfully bypassing proper permitting procedures for hundreds

11  of projects currently proposed in and around the Nation—and presumably

12  many more in the future—will result in significant and irreparable harm to the

13  States' natural and historic resources and the people and biota that rely on

14  those resources for drinking, farming, recreating, and habitat.

15      7.      To prevent these harms to Plaintiff States from rushed review

16  untethered to any actual emergency, the Court should declare that the

17  Executive Order is unlawful, that the agency Defendants' efforts to carry it

18  out are arbitrary, capricious, and not in accordance with law, and enjoin any

19  actions by the agency Defendants to pursue emergency procedures for non-

20  emergency projects.

21                      **JURISDICTION AND VENUE**

22      8.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and

23  1346(a)(2). The Court has further remedial authority under the Declaratory

24  Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. The Court also has jurisdiction

25

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  under the judicial-review provisions of the Administrative Procedure Act

2  (APA). 5 U.S.C. § 702.[3]

3       9.     Venue is proper in this district pursuant to 28 U.S.C. §

4  1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued

5  in their official capacities. The State of Washington is a resident of this

6  judicial district and a substantial part of the events or omissions giving rise to

7  this Complaint occurred within the Seattle Division of the Western District of

8  Washington. The Corps' Seattle District, which is currently fast-tracking

9  permits pursuant to the Executive Order, is also located within the Seattle

10  Division.

11  **PARTIES**

12       10.     Plaintiff States are sovereign states of the United States of

13  America. Plaintiffs bring this action in their sovereign and proprietary

14  capacities. As set out below, Defendants' actions directly harm the States'

15  interests, including, but not limited to, environmental and financial harms that

16  flow from the President's unlawful declaration of an energy "emergency," the

17  Corps' unlawful implementation of the Executive Order under its Clean Water

18  Act Section 404 authority, and the ACHP's unlawful implementation of the

19  Executive Order under its authority under Section 106 of the National Historic

20  Preservation Act of 1966 (NHPA), 54 U.S.C. § 306108. The States also bring

21  this action to protect their quasi-sovereign interests in the public health,

22  safety, and welfare of their residents, as well as in their waters, natural

23  resources, environment, and their economies.

24

25       [3] Pursuant to 16 U.S.C. § 1540(g), Plaintiffs provided Defendants notice of their
intent to sue on July 18, 2025 for violations of the ESA and its implementing regulations. A

26  copy of that notice is attached as Exhibit B.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

11.     Defendant Donald Trump is President of the United States. He is sued in his official capacity.

12.     Defendant Daniel Driscoll is United States Secretary of the Army. He may, acting through the Army Corps' Chief of Engineers, issue permits to discharge dredged or fill material into waters of the United States pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344. He is sued in his official capacity.

13.     Defendant Lieutenant General William H. "Butch" Graham, Jr., is Commanding General of the United States Army Corps of Engineers. He is delegated authority to issue permits to discharge dredged or fill materials into waters of the United States pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344. He is sued in his official capacity.

14.     Defendant United States Army Corps of Engineers is a branch of the United States Army. The Corps is responsible for issuing permits to discharge dredge or fill materials into waters of the United States pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

15.     Defendants Daniel Driscoll, Defendant Lieutenant General William H. Graham, Jr., and Defendant United States Army Corps of Engineers are collectively referred to herein as the Corps.

16.     Defendant Travis Voyles is Vice Chairman of the Advisory Council on Historic Preservation. He, or his designee, is responsible for assuring federal agency compliance with Section 106 of the NHPA, 54 U.S.C. § 306108. The position of Chair of the Advisory Council on Historic Preservation is currently vacant. He is sued in his official capacity.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

6

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

17.     Defendant Advisory Council on Historic Preservation is responsible for assuring federal agency compliance with Section 106 of the NHPA.

18.     Defendants Travis Voyles and Defendant Advisory Council on Historic Preservation are collectively referred to herein as ACHP.

19.     Defendant Douglas Burgum is Secretary of Interior. He, or his designee, is responsible for issuing numerous permits, leases, or other approvals for favored energy projects and complying with various federal statutes governing such permits, leases, or other approvals, including the National Environmental Policy Act (NEPA). He is sued in his official capacity.

20.     Defendant Department of Interior is responsible for issuing numerous permits, leases, or other approvals for favored energy projects and complying with various federal statutes governing such permits, leases, or other approvals, including the NEPA.

## ALLEGATIONS

A.    **Legal Background**

**The National Emergencies Act**

21.     Congress enacted the National Emergencies Act (NEA), 50 U.S.C. §§ 1601 *et seq.*, in 1976 to create a transparent and accountable procedure for presidential emergency declarations.

22.     In enacting the NEA, Congress recognized that presidents had overused authorities granted by Congress for quick action in situations where Congress lacked adequate time to act. The primary purpose of the NEA was to prevent the President from exercising unbounded authority to declare states of emergency and continue them in perpetuity. Accordingly, the NEA terminated

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  then-existing declared emergencies (some having persisted for decades) and

2  created a new legal framework to cabin the President's emergency authority.

3  Congress intended the NEA to ensure that presidential emergency powers

4  would "be utilized only when emergencies actually exist." S. Rep. No. 94-

5  1168, at 2 (1976). Senator Frank Church, who was instrumental in developing

6  the NEA, explained that "the President should not be allowed to invoke

7  emergency authorities or in any way utilize the provisions of this Act for

8  frivolous or partisan matters, nor for that matter in cases where important but

9  not 'essential' problems are at stake." *Hearing on H.R. 3884 Before the S.*

10 *Comm. of Governmental Operations*, 94th Cong. 7 (1976). Senator Church

11 further explained that "[t]he Committee intentionally chose language which

12 would make clear that the authority of the Act was to be reserved for matters

13 that are 'essential' to the protection of the Constitution and the people." *Id.*

14      23.     The NEA requires the President to specify the statutory

15 emergency authorities he or she intends to invoke, publish the emergency

16 declaration in the Federal Register, and transmit it to Congress. *Id.* "When the

17 President declares a national emergency, no powers or authorities made

18 available by statute for use in the event of an emergency shall be exercised

19 unless and until the President specifies the provisions of law under which he

20 proposes that he, or other offices will act. Such specification may be made

21 either in the declaration of a national emergency, or by one or more

22 contemporaneous or subsequent Executive orders published in the Federal

23 Register and transmitted to Congress." 50 U.S.C. §§ 1621, 1631. Emergency

24 declarations automatically terminate after one year, unless the President

25 formally extends them within 90 days of the anniversary date of the

26 declaration. *Id.* § 1622(d).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

8

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

24.     The NEA does not create emergency powers but provides a framework for the President to invoke emergency powers that Congress has authorized in other federal statutes. *See* 50 U.S.C. § 1621(a) ("With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such a national emergency"). As the Ninth Circuit recognized, the NEA does not enlarge the powers of the Executive Branch beyond authorities in existing statutes and regulations. *Sierra Club v. Trump*, 977 F.3d 853, 864–65 (9th Cir. 2020), *vacated on other grounds*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021).

25.     Numerous statutes authorize the President to use emergency powers upon declaration of a national emergency pursuant to the National Emergencies Act. For example, 10 U.S.C. § 2808(a) provides, "[i]n the event of a declaration . . . by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. §§ 1601 *et seq*.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects." Similarly, 50 U.S.C. § 1515 provides, "[a]fter [the effective date], the operation of this section . . . or any portion thereof, may be suspended by the President during the period of . . . any national emergency declared by Congress or by the President."

26.     As described further below, Defendants claim emergency powers pursuant to the Clean Water Act, NHPA, NEPA, and Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq*. These statutes do not authorize the use of emergency procedures for the "energy emergency" alleged here.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

9

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

**The Clean Water Act**

27.    The Clean Water Act's objective is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

28.    In doing so, Congress specifically recognized, preserved, and protected "the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . and to consult with the [EPA] Administrator in the exercise of his authority under this chapter." 33 U.S.C. § 1251(b).

29.    To achieve that goal, Clean Water Act Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person into waters of the United States unless that discharge is authorized by a permit issued under, *inter alia*, Clean Water Act Section 404, 33 U.S.C. § 1344.

30.    Clean Water Act Section 404(a) authorizes the Secretary of the Army, acting through the Chief of Engineers of the Corps, to issue permits to discharge dredged or fill material into navigable waters at specified disposal sites. 33 U.S.C. § 1344(a).

31.    Each disposal site must be specified for each permit through application of and compliance with the United States Environmental Protection Agency's (EPA) Section 404(b)(1) Guidelines, 40 C.F.R. Part 230. *See* 33 U.S.C. § 1344(b)(1).

32.    The Corps has promulgated regulations governing its process to review applications for and issue Clean Water Act Section 404 permits. *See generally* 33 C.F.R. §§ 320, 323, 325.

33.    The Corps' standard procedures for processing a Section 404 permit application are set out in 33 C.F.R § 325.2(a). For discharges requiring a standard permit (i.e., an individual permit), the Corps receives a permit

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

10

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1   application,[4] and if/when the application is complete, issues a public notice of

2   the application soliciting comments from the public, adjacent property

3   owners, interested groups and individuals, local agencies, state agencies, and

4   federal agencies. The Corps considers all comments and the applicant's

5   responses to those comments, if any, and determines whether the proposed

6   project will require either an Environmental Assessment or, if there are

7   significant environmental impacts, an Environmental Impact Statement under

8   the NEPA. *See* 33 C.F.R § 325.2(a)(1)– (5). These processes ensure that the

9   Corps fully considers the project's environmental impacts and reasonable

10  alternatives before making a decision.

11      34.    The Corps is required to conduct a public interest review, which

12  involves an extensive evaluation of the "probable impacts, including

13  cumulative impacts, of the proposed activity . . . on the public interest," and

14  careful weighing of the "reasonably foreseeable detriments" against benefits

15  from the project that "reasonably may be expected to accrue." 33 C.F.R

16  § 320.4(a)(1).

17      35.    The Corps' decision on an application for a Section 404 permit

18  "should reflect the national concern for both protection and utilization of

19  important resources" and must consider many factors including "conservation,

20  economics, aesthetics, general environmental concerns, [impacts to] wetlands,

21  historic properties, fish and wildlife values, flood hazards, floodplain values,

22  land use, navigation, shore erosion and accretion, recreation, water supply and

23  conservation, water quality, energy needs, safety, food and fiber production,

---

24          [4] The Corps generally recommends a pre-application consultation and makes itself

25  available to advise potential applicants of studies or other information foreseeably required
    for later federal action. *See* 33 C.F.R. § 325.1(b) (pre-application consultation for major

26  applications).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  mineral needs, considerations of property ownership and, in general, the needs
2  and welfare of the people." *Id.*

3      36.    The Clean Water Act preserves a significant role for states in
4  protecting water quality within their borders. Where an applicant for a federal
5  license or permit seeks to conduct an activity "which may result in any
6  discharge into the navigable waters" of a state, the applicant *must* receive a
7  water quality certification decision from the state in which the discharge will
8  occur under Section 401 of the Clean Water Act unless the state waives
9  certification. 33 U.S.C. § 1341; *see also* 33 C.F.R. §§ 320.4(d), 325.2(b)(1).

10      37.    Under the Clean Water Act Section 401 certification process,
11  states evaluate the applicant's proposed project for compliance with
12  applicable state effluent limitations, water quality standards, and any other
13  appropriate requirements of state law. Having conducted this review, states
14  can deny, condition, or approve the application for water quality certification
15  depending on the water quality impacts of the proposed activity. 33
16  U.S.C.§ 1341(a), (d); 33 C.F.R. § 325.2(b)(1)(ii).

17      38.    In enacting Section 401, Congress sought to ensure that all
18  activities authorized by the federal government that may result in a discharge
19  would comply with "State law" and that "[f]ederal licensing or permitting
20  agencies [could not] override State water quality requirements." S. Rep. 92-
21  313, at 69, *reproduced in* 2 Legislative History of the Water Pollution Control
22  Act Amendments of 1972 ("Legislative History Vol. 2"), at 1487 (1973).
23  "Congress intended that [through Section 401] the states would retain the
24  power to block, for environmental reasons, local water projects that might
25  otherwise win federal approval." *Keating v. FERC*, 927 F.2d 616, 622

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

12

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    (D.C. Cir. 1991); *see also PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of*

2    *Ecology*, 511 U.S. 700, 721–23 (1994).

3        39.    This authority is foundational to the Clean Water Act's system of

4    "cooperative federalism" and Congress's preservation of State authority over

5    the waters within their borders. *U.S. v. Cooper*, 482 F.3d 658, 667 (4th Cir.

6    2007).

7        40.    Under the Section 401 regulations, the Corps and a certifying

8    state may agree on a reasonable period of time, not to exceed one year, for the

9    certifying authority to act on the request for certification. 40 C.F.R. § 121.6. If

10   no agreement is made, the reasonable period defaults to six months. State

11   analysis under Section 401 can be a highly complex process that can take

12   months to accomplish after a state agency with delegated Clean Water Act

13   permitting authority receives a complete application.

14       41.    Clean Water Act Section 404(e) authorizes the Corps to issue

15   Section 404 permits on a state, regional, or nationwide basis for certain

16   categories of activities involving discharges of dredged or fill material

17   (collectively, general permits). 33 U.S.C. § 1344(e); *see also* 33 C.F.R. §§

18   325.5, 330. The Corps must also obtain a Section 401 certification, or waiver,

19   before issuing or reissuing any general permit. Although programmatic water

20   quality certifications are often provided, states retain the right to deny a water

21   quality certification for an activity otherwise meeting the terms and conditions

22   of a particular general permit. In such instances, the authorization for all such

23   activities within a state will be denied without prejudice until the state issues

24   an individual Section 401 certification applicable to such activities or waives

25   the right to do so. *See* 33 C.F.R. § 330.4(c)(3).

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

13

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

42.     Corps regulations also reflect the numerous statutory obligations it must fulfill before issuing a Section 404 permit to ensure the authorized discharge of dredge and/or fill materials do not undermine the overall goals of the Clean Water Act and comply with other statutory requirements regarding the protection of environmental and cultural resources. For example, the Corps must comply with, among other things, NEPA, 42 U.S.C. §§ 4321 *et seq.*, the ESA, 16 U.S.C. §§ 1531 *et seq.*, the Coastal Zone Management Act (CZMA) 16 U.S.C. §§ 1451 *et seq.*, and the NHPA, 54 U.S.C. §§ 300101 *et seq.* As described more fully below, these statutes require the Corps to fully consider the impacts of the permitted action on the environment, endangered species, historic properties, and coastal zones before issuing the permit. In many cases, the Corps must also consult with relevant agencies and states on those impacts. Like the Clean Water Act, these statutes preserve important roles for the states in the Corps' permitting decisions in order to protect the state's cultural and environmental resources.

43.     When the Corps proposes issuing any general permit, the Corps evaluates the categories of activity proposed for coverage under those permits to determine environmental effects and uses procedures similar to those used during the standard permitting process. *See* 33 U.S.C. § 1344(e)(1) (requiring compliance with Section 404(b)(1) guidelines); 33 C.F.R. § 325.5(c); 33 C.F.R. Part 330. Entities proposing to discharge subject to general permits need not submit individual permit applications to obtain permit coverage. *See* 33 C.F.R. §§ 325.2(e), 330.6. As a result, discharges authorized under general permits are subject to less individual scrutiny, but substantial limitations remain to prevent the Corps from authorizing discharges under general

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  permits that risk impacts to water quality, coastal zones, endangered species,

2  and historic properties. *See* 33 C.F.R. §§ 325.2, 330.4, 330.5.

3  **Coastal Zone Management Act**

4      44.    Section 404 permits must comply with the CZMA. 16 U.S.C.

5  §§ 1451 *et seq.* The CZMA was enacted "to preserve, protect, develop, and

6  where possible, to restore or enhance, the resources of the Nation's coastal

7  zone for this and succeeding generations[,]" and to "encourage the

8  participation and cooperation of the public, state and local governments, and

9  interstate and other regional agencies, as well as of the Federal agencies

10  having programs affecting the coastal zone, in carrying out the purposes of

11  this chapter[.]" 16 U.S.C. § 1452(1), (4).

12      45.    Like the Clean Water Act, the CZMA preserves an important role

13  for the states. If the permitted activities will "affect[] any land or water use or

14  natural resource of [a state's] coastal zone," the applicant must provide "a

15  certification that the proposed activity complies with the enforceable policies

16  of the state's approved [Coastal Zone Management Program] and that such

17  activity will be conducted in a manner consistent with the program." 16

18  U.S.C. § 1456(c)(1)(A), (c)(3)(A). The state may then concur with the

19  applicant's certification, or object. 16 U.S.C. § 1456(c)(3)(A). Federal

20  agencies may not issue a permit without the state's concurrence "or until, by

21  the state's failure to act, the concurrence is conclusively presumed, unless the

22  Secretary [of Commerce] . . . finds, after providing a reasonable opportunity

23  for detailed comments from the Federal agency involved and from the state,

24  that the activity is consistent with the objectives of [the CZMA] or is

25  otherwise necessary in the interest of national security." *Id.*

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

15

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

46.     Under Corps regulations, if the applicant is a federal agency and the state objects to the proposed federal activity on the basis that it is inconsistent with its approved Coastal Zone Management Program, the Corps cannot make a final decision on the application until the parties have had an opportunity to utilize the procedures specified by the CZMA for resolving such disagreements. 33 C.F.R. § 325.2(b)(2)(i). If the applicant is not a federal agency and the state objects to the certification or issues a decision indicating that the proposed activity requires further review, the Corps shall not issue the permit until the state concurs with the certification statement or the Secretary of Commerce determines that the proposed activity is consistent with the purposes of the CZMA or necessary in the interest of national security. 33 C.F.R. § 325.2(b)(2)(ii).

**The National Historic Preservation Act**

47.     Before issuing a Section 404 permit, the Corps also must consult with state, local, or tribal governments and/or the ACHP to determine whether the permitted activity will impact any historic or archeological sites. *See* 33 C.F.R. § 325.2(b)(3), 36 C.F.R. § 800.2(c)(1); *see also* 54 U.S.C. § 306108 (Section 106)*.* "The fundamental purpose of the NHPA is to ensure the preservation of historical resources." *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (citations omitted). Section 106 of the NHPA "is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs" and is an important step in ensuring compliance with the fundamental purpose of the NHPA. *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 805 (9th Cir. 1999) (quoting *Apache Survival Coalition v. United States*, 21 F.3d 895, 906 (9th Cir. 1994)).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1      48.     For its part, the ACHP is required to provide federal agencies

2   with advice and guidance on proper compliance with Section 106 of the

3   NHPA.

4   **The Endangered Species Act**

5      49.     The Corps also must review the Section 404 permit application

6   for "potential impact on threatened or endangered species pursuant to section

7   7 of the Endangered Species Act." 33 C.F.R. § 325.2(b)(5). Where the Corps

8   determines that a proposed activity "may affect an endangered or threatened

9   species or their critical habitat," it must consult with the U.S. Fish and

10  Wildlife Service and/or the National Marine Fisheries Service (the Services).

11  *Id.* § 325.2(b)(5); *see also id.* § 320.4(c). The ESA requires this consultation.

12  16 U.S.C. § 1536.

13     50.     The ESA is "the most comprehensive legislation for the

14  preservation of endangered species ever enacted by any nation." *Tenn. Valley*

15  *Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress's "plain intent … in

16  enacting [the ESA] was to halt and reverse the trend towards species

17  extinction, whatever the cost." *Id.* at 184. The ESA's "language, history, and

18  structure" make plain that "Congress intended endangered species to be

19  afforded the highest of priorities." *Id.* at 174; *see also* 16 U.S.C. § 1536(a);

20  § 1531(c)(1) ("[A]ll Federal departments and agencies shall seek to conserve

21  endangered species and threatened species and shall utilize their authority in

22  furtherance of the purposes of this [Act].").

23     51.     The ESA prohibits the "take" of any endangered species of fish

24  or wildlife listed under the ESA. 16 U.S.C. § 1538(a)(1)(B). Take is defined to

25  mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

26  collect, or to attempt to engage in any such conduct." § 1532(19). It is also

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

17

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  "unlawful for any person . . . to attempt to commit, solicit another to commit,

2  or cause to be committed" such offenses. § 1538(g). These prohibitions apply

3  to private parties as well as federal agencies. § 1532(13).

4      52.     To fulfill the purposes of the ESA, Section 7, 16 U.S.C. § 1536,

5  requires that each federal agency "in consultation with and with the assistance

6  of the [the Services], insure that any action authorized, funded, or carried out

7  by such agency . . . is not likely to jeopardize the continued existence of any

8  endangered species or threatened species or result in the destruction or

9  adverse modification of habitat of such species." § 1536(a)(2); *see also*

10 50 C.F.R. § 402.14(a). Agencies must review their actions "at the earliest

11 possible time." 50 C.F.R. § 402.14(a).

12     53.     The scope of agency actions subject to Section 7 consultation

13 broadly includes "all activities or programs of any kind authorized, funded, or

14 carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02

15 (definition of "action"). Permits issued by the Corps, including Section 404

16 permits, fall under the scope of agency actions requiring Section 7

17 consultation, as acknowledged in the Corps' Clean Water Act implementing

18 regulations, 33 C.F.R. § 325.2(b)(5).

19     54.     The ESA prohibits federal agencies from making "any

20 irreversible or irretrievable commitment of resources" that would

21 "foreclose[e] the formulation or implementation of any reasonable and

22 prudent alternative measures" through the consultation process. 16 U.S.C.

23 § 1536(d).

24     55.     The ESA establishes an interagency consultation process to assist

25 federal agencies in complying with their substantive duty to guard against

26 jeopardy to listed species or destruction or adverse modification of critical

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  habitat. Federal agencies must initiate consultation with the Services

2  whenever an action may affect ESA-listed species or designated critical

3  habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). This "may affect"

4  threshold is low. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006,

5  1027 (9th Cir. 2012) (en banc).

6      56.    For each federal action, the action agency must ask the Services

7  whether any listed or proposed species may be present in the area of the

8  agency action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If listed or

9  proposed species may be present, the action agency must prepare a "biological

10  assessment" to determine whether the listed species may be affected by the

11  proposed action. *Id.* An action agency is only relieved of its obligation to

12  consult on its actions under the ESA where the action will have "no effect" on

13  listed species or critical habitat.

14      57.    If the action agency (here, the Corps or Interior) determines that

15  an action "may affect" but is "not likely to adversely affect" a listed species or

16  its critical habitat, they may conduct an "informal consultation," during which

17  the Services must concur in writing with the action agency's determination. 50

18  C.F.R. § 402.13; 402.14(a)-(b). If the action agency determines that the action

19  is "likely to adversely affect" a listed species or its designated critical habitat,

20  or if the Services do not concur with a "not likely to adversely affect"

21  determination, the action agency must engage in "formal consultation," as

22  detailed in 50 C.F.R. § 402.14.

23      58.    Formal consultation results in a biological opinion in which the

24  Services determine whether the agency action will jeopardize the survival and

25  recovery of listed species or will destroy or adversely modify the species'

26  designated critical habitat. 16 U.S.C. § 1536(b). To make this determination,

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  the Services must review all relevant information and provide a detailed

2  evaluation of the action's effects on listed species. *Id*. § 1536(b)(3)(A). If

3  either of the Services finds the action will cause jeopardy or adverse

4  modification, it must suggest "reasonable and prudent alternatives" in the

5  biological opinion which it believes would avoid jeopardy or adverse

6  modification of critical habitat. *Id*.

7       59.    In formal consultation, the Services determine whether to

8  authorize an incidental take statement, which may only be issued if the

9  Services have determined that the action will not jeopardize listed species or

10  adversely modify their critical habitat. 16 U.S.C. § 1536(b)(4). An incidental

11  take statement must: (1) specify the impact of the incidental take on the listed

12  species, (2) specify "reasonable and prudent measures" the agency considers

13  necessary to minimize that impact, and (3) set forth mandatory terms and

14  conditions. *Id*. An incidental take statement insulates an action agency from

15  liability for take of an endangered or threatened species, provided the agency

16  complies with the statement's terms and conditions. 16 U.S.C. § 1536(o)(2).

17  This insulation from liability extends to any entity receiving a federal permit,

18  license, authorization, or funding that is subject to, and in compliance with,

19  the incidental take statement. *Id*.

20  **The National Environmental Policy Act**

21       60.    The Corps and Interior permit decisions "will require either an

22  environmental assessment or an environmental impact statement" pursuant to

23  NEPA, unless the activity is categorically excluded from NEPA. 33 C.F.R.

24  § 325.2(a)(4). NEPA sets forth a national policy "to use all practicable means

25  and measures, including financial and technical assistance, in a manner

26  calculated to foster and promote the general welfare, to create and maintain

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  conditions under which man and nature can exist in productive harmony, and

2  fulfill the social, economic, and other requirements of present and future

3  generations of Americans." 42 U.S.C. § 4331(a).

4      61.    These "sweeping policy goals" are "realized through a set of

5  'action-forcing' procedures that require that agencies take a 'hard look at

6  environmental consequences,' and that provide for broad dissemination of

7  relevant environmental information." *Robertson v. Methow Valley Citizens*

8  *Council*, 490 U.S. 332, 350 (1989) (internal citations omitted). Specifically,

9  NEPA requires agencies to prepare a "detailed statement" of environmental

10  impacts for all proposed major federal actions significantly affecting the

11  quality of the human environment. The statement must include the

12  "reasonably foreseeable environmental effects" of such actions, "any

13  reasonably foreseeable adverse environmental effects which cannot be

14  avoided should the proposal be implemented," and a "reasonable range of

15  alternatives . . . that are technically and economically feasible, and meet the

16  purpose and need of the proposal." 42 U.S.C. § 4332(C).

17      62.    If a proposal for a major federal action "does not have a

18  reasonably foreseeable significant effect on the quality of the human

19  environment, or if the significance of such effect is unknown," the agency

20  shall prepare an environmental assessment "set[ting] forth the basis of such

21  agency's finding of no significant impact or determination that an

22  environmental impact statement is necessary." 42 U.S.C. § 4336 (b)(2).

23      63.    NEPA's procedural requirements are not a box-checking exercise

24  to support a pre-determined approval. "The comprehensive 'hard look'

25  mandated by Congress and required by the statute . . . must be taken

26  objectively and in good faith, not as an exercise in form over substance, and

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

21

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  not as a subterfuge designed to rationalize a decision already made." *Metcalf*

2  *v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

3      64.    These statutory mandates serve a vital role in protecting the

4  Nation's waters, coastlines, endangered species, and historic sites, among

5  other resources, while preserving our federalist system and the important role

6  of states in environmental protection.

7  **B.    Federal Laws and Applicable Regulations Limit the Use of Emergency Procedures**

8

9  <u>**Corps Regulations and Practice for Emergencies**</u>

10     65.    Neither Section 404, nor any other provision of the Clean Water

11  Act, authorizes the Corps or any other agency to issue Section 404 permits on

12  an emergency basis. *See* 33 U.S.C. § 1344. The single reference to

13  "emergency" in Section 404 merely exempts certain discharges of dredged or

14  fill material "for the purpose of maintenance, including emergency

15  reconstruction of recently damaged parts, of currently serviceable structures"

16  from the requirement to obtain a Section 404 permit.[5] 33 U.S.C. §

17  1344(f)(1)(B).

18     66.    The Clean Water Act's only "Emergency Powers" provision

19  authorizes the EPA Administrator to sue "to immediately restrain any person

20  causing or contributing" to pollution "presenting an imminent and substantial

21  endangerment to the health . . . or to the welfare of persons . . . to stop the

22  discharge of pollutants causing or contributing to such pollution or to take

23  such other action as may be necessary." *See* 33 U.S.C. § 1364. This statutory

24  language demonstrates that Congress contemplated the potential need for

---

25      [5] Clean Water Act Section 404(f) exempted discharges of dredged or fill material
    may still be subject to regulation under Section 307, 33 U.S.C. § 1317. *See* 33 U.S.C.
26  § 1344(f)(1)(F).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

emergency action under the Clean Water Act and expressly authorized only those powers it thought necessary. Importantly, the emergency powers Congress granted are for the purpose of protecting waters of the United States and furthering the Clean Water Act's goals.

67.    Notwithstanding the absence of relevant emergency powers in the Clean Water Act, the Corps has promulgated a regulation allowing for and governing the use of "emergency procedures" in the processing of Section 404 permit applications. 33 C.F.R. § 325.2(e)(4).

68.    The Corps "emergency procedures" provision is not without limitation. It clearly conscribes the "emergencies" to which it applies. The provision defines an "emergency" as "a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures." *Id.*

69.    In an emergency, "the district engineer will explain the circumstances and recommend special procedures to the division engineer who will instruct the district engineer as to further processing of the application." *Id.*

70.    Even in an emergency, the Corps will make "reasonable efforts . . . to receive comments from interested Federal, state, and local agencies and the affected public." *Id.*

71.    The Corps will also publish "notice of any special procedures authorized" under 33 C.F.R. § 325.2(e)(4), along with their rationale for utilizing "emergency procedures" as soon as practicable. *Id.*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

72.     Several Corps Districts and Divisions have developed guidance, or adopted guidance from other Districts, on implementing the "emergency procedures" provision. These guidance documents confirm that "emergency procedures" should be used only when a failure to take immediate "corrective action" would result in an "unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship.[6]

73.     For example, guidance from the South Pacific Division states "it is not appropriate to use . . . emergency procedures" for "exigencies that do not meet the strict definition of [an] emergency," i.e., situations posing an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship. Several districts have adopted the South Pacific Division guidance. A true and correct copy of the South Pacific Division guidance is attached as Exhibit C.

74.     The Fort Worth District guidance states that "emergency situations" warranting the use of "emergency procedures" are "very serious situations," such as "emergencies due to a natural disaster (e.g., flood, hurricane, earthquake, etc.) or a catastrophic (sudden and complete) failure of a facility due to an external cause (e.g., a bridge collapse after being struck by a barge)." A true and correct copy of the Fort Worth District guidance is attached as Exhibit D.

75.     The Seattle District website states, as an example, that the Corps "may not view an action as an emergency if the applicant has known of the deficient condition of the failing structure and has not made reasonable

---

[6] Corps regulations provide for use of other "Alternative Procedures," none of which would be appropriate to issue "emergency permits" directed by Executive Order. *See* 33 C.F.R. § 325.2(e)(1)-(3).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

attempts to secure appropriate permits and conduct timely repairs. Emergency authorization decisions are made on a case-by-case basis."[7]

76.    Historic permitting data confirms that the Corps utilizes emergency procedures sparingly to authorize corrective action in emergency situations where processing applications under standard procedures would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship. Online permitting records dating back to 2010 demonstrate that the Corps uses emergency procedures to respond to catastrophic events such as oil spills and natural disasters (e.g., the Deepwater Horizon disaster in the Gulf of Mexico and the devastating 2013 flooding in Colorado).[8]

77.    "Emergency procedures" may also be used to avoid dangerous situations where work stoppage required under a Cease & Desist Order issued by the Corps or EPA could result in a safety issue. 33 C.F.R. § 326.3(c)(4). Even then, the Corps must make a determination, and publish its rationale for doing so, that the situation was an "emergency" as defined by 33 C.F.R. § 325.2(e)(4).

78.    On July 3, 2025, the Corps updated its NEPA implementing regulations. *See Procedures for Implementing NEPA; Processing of Department of the* Army *Permits*, 90 Fed. Reg. 29,465, *codified at* 33 CFR Parts 320, 325, and 333. The regulations do "not provide an exception from compliance with the NEPA statute [in emergency situations]." 90 Fed. Reg. at 29,470. Instead, when "responding to emergency situations to prevent or

---

[7] Available at: https://www.nws.usace.army.mil/Missions/Civil-Works/Regulatory/Emergencies/.

[8] The list of Corps' projects previously approved under emergency procedures is available at https://permits.ops.usace.army.mil/orm-public

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

25

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

reduce imminent risk of life, health, property, or severe economic losses," the Corps "may proceed without the specific documentation and other procedural [NEPA regulatory] requirements." 33 C.F.R. § 333.39. The Corps must consider "probable environmental consequences in determining appropriate emergency actions" and "NEPA documentation should be accomplished prior to initiation of emergency work if time constraints render this practicable." *Id.*

79.    Nothing in the Clean Water Act, the Corps' regulations and guidance, or its permitting history suggests that the Corps can use its emergency regulations to routinely issue permits for preferred energy projects that do not qualify as emergencies under the Clean Water Act or Corps regulations.

**Interior's Regulations and Practice for Emergencies**

80.    Interior has adopted regulations governing the use of emergency authority in the preparation of NEPA documentation. 43 C.F.R. § 46.150. This provision applies only if the designated Interior Responsible Official "determines that an emergency exists that makes it necessary to take urgently needed actions before preparing an environmental document or documenting its use of a categorical exclusion." 43 C.F.R. § 46.150.

81.    This authority is highly circumscribed, applying only to "those actions necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources." 43 C.F.R. § 46.150(a). In these limited circumstances, the Responsible Official must "consider the probable environmental consequences of these actions [taken in response to an emergency] and mitigate reasonably foreseeable adverse environmental effects to the extent practicable." *Id.*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

26

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

82.     The regulations further require the Responsible Official to "document in writing the determination that an emergency exists and describe the responsive actions taken at the time the emergency [i.e., urgently needed actions to mitigate harm to life, property, or important natural, cultural, or historic resources] exists." 43 C.F.R. § 46.150(a)-(b).

83.     If further emergency actions are required and preclude preparation of an environmental document, the Responsible Official must "consult with [Interior's] Office of Environmental Policy and Compliance about alternative arrangements for NEPA compliance." 43 C.F.R. § 46.150(c).

84.     Where such follow-on actions are likely to have significant environmental impacts, Interior must "consult with the Council on Environmental Quality prior to authorizing the use of alternative arrangements." 43 C.F.R. § 46.150(d).

85.     The "alternative arrangements shall apply only to the proposed actions necessary to control the immediate actions in response and related to the emergency . . . and must be documented." 43 C.F.R. § 46.150(c); *id.* § 46.150(a).

**Endangered Species Act Emergency Regulations and Practice**

86.     The ESA and its implementing regulations do not allow agencies to routinely or categorically postpone consultation or take protected species. Under the ESA, the President may exempt agencies from Section 7 consultation only in a very narrow type of emergency situation, for "any project for the repair or replacement of a public facility substantially as it existed prior to the disaster" in an area "declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act." 16 U.S.C. § 1536(p). An ESA consultation exemption of this type of action is

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

only allowed if the President finds the action "(1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of [Section 7] to be followed." *Id*. But this authority may only be exercised to the extent that either the governor of the state in which an agency action will occur or a permit or license applicant has already applied for an exemption pursuant to 16 U.S.C. § 1536(e). 16 U.S.C. 1536(p).

87.    The Services jointly adopted a regulation allowing for an alternative ESA consultation process in emergency situations, when such situations "mandate the need to consult in an expedited manner," 50 C.F.R. § 402.05(a). These ESA emergency consultation procedures are limited to "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." *Id*. Formal consultation "shall be initiated as soon as practicable after the emergency is under control." *Id.* § 402.05(b).

88.    The Services' Endangered Species Consultation Handbook describes emergencies as exigent situations, such as those "involving an act of God, disasters, casualties, national defense or security emergencies, etc., and includes response activities that must be taken to prevent imminent loss of human life or property. Predictable events . . . usually do not qualify as emergencies under the section 7 regulations unless there is a significant unexpected human health risk."[9]

_____

[9] Endangered Species Consultation Handbook, available at: https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

28

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    **ACHP's Emergency Procedures**

2        89.    The NHPA directs the Secretary to promulgate regulations that

3    waive certain NHPA requirements "in the event of a major natural disaster or

4    an imminent threat to national security." *See* 54 U.S.C § 306112. However,

5    the regulations cannot waive Section 106 obligations. *See id.*

6        90.    ACHP regulations instead allow alternative procedures for

7    emergency situations. *See* 36 C.F.R. § 800.12. ACHP's alternative procedures

8    may be used "during operations which respond to a disaster or emergency

9    declared by the President, a tribal government, or the Governor of a State or

10   which respond to other immediate threats to life or property." *Id.* § 800.12(a).

11   Emergency procedures may be used only for "undertakings that will be

12   implemented within 30 days after the disaster or emergency has been formally

13   declared by the appropriate authority," unless ACHP extends them. *Id.*

14   § 800.12(d).

15   **C.    The President Declares a National "Energy Emergency" Despite the**
         **Absence of Any Emergency**

16

17       91.    The President issued Executive Order 14156 on January 20,

18   2025—day one of his new Administration. The Executive Order declares a

19   national energy emergency pursuant to the NEA, 50 U.S.C. §§ 1601 *et seq*.

20   But the circumstances demonstrate that there is no national energy emergency

21   and the Executive Order fails to comply with the NEA.

22       92.    The Executive Order claims a need to remediate an alleged

23   shortage of energy supplies and shore up an "unreliable" grid to meet the

24   Nation's needs. It provides no support for these assertions.

25

26

FIRST AMENDED AND                                                    29               ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                                                    Ecology Division
DECLARATORY                                                                              1125 Washington St. SE
                                                                                              P.O. Box 40100
AND INJUNCTIVE RELIEF                                                                      Olympia, WA 98504
                                                                                              (360) 753-6200

93.     In reality, domestic energy production is at an all-time high, thriving due to a diverse mix of fossil and non-fossil fuel resources, and the Nation's bulk power system is resilient.

94.     The United States is producing record quantities of crude oil and natural gas, and experts predict additional production growth through at least 2026. Given this ample production, oil prices fell for the fourth consecutive year in 2025 and are forecast to continue declining in 2026.[10]

95.     The United States produces so much oil and natural gas that oil and gas producers said they will not increase output in response to the President's declaration of a national energy emergency because it is not economical to do so.[11]

96.     The United States also already produces more oil and gas than it uses. It is the world's largest exporter of liquified natural gas and exports millions of barrels a day of crude oil. It has been a net energy exporter since 2019, when President Trump declared the nation energy independent.[12]

97.     The Executive Order claims the Nation has insufficient energy supplies to meet its needs and address an affordability crisis, but also proposes

---

[10] World Bank Group, Commodity Prices to Hit Six-Year Low in 2026 as Oil Glut Expands (Oct. 29,2025). Available at https://www.worldbank.org/en/news/press-release/2025/10/28/commodity-markets-outlook-october-2025-press-release

[11] Wall Street Journal, U.S. Frackers and Saudi Officials Tell Trump They Won't Drill More (Feb. 3, 2025). Available at https://www.wsj.com/business/energy-oil/trump-oil-drilling-saudi-arabia-71c095ff?reflink=desktopwebshare_permalink.

[12] U.S. Energy Information Admin., In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023 (Apr. 1, 2024). Available at https://www.eia.gov/todayinenergy/detail.php?id=61683.
U.S. Energy Information Admin., U.S. Exports of Crude Oil (Jan. 31, 2025), Available at https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a.
U.S. Energy Information Admin., U.S. Energy Facts Explained (July 15, 2024), Available at https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php; U.S. Energy Independence Set New Record In 2023

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  to increase the export of those allegedly limited supplies. As the U.S.

2  Department of Energy recently found, increasing exports will drive up

3  domestic prices for Americans.

4      98.    The Executive Order also excludes solar and wind power from its

5  definition of "energy," despite the importance of wind and solar power to grid

6  reliability, energy security, and affordability.

7      99.    Wind and solar power are consistently among the cheapest

8  sources of electricity.[13] They also improve the reliability and affordability of

9  our Nation's energy supply by tempering the impact of international

10 commodity price swings of crude oil and natural gas and reducing electric grid

11 operators' reliance on interruptible natural gas deliveries.[14]

12     100.   Indeed, the U.S. Department of Energy has acknowledged that

13 "[t]he rise of renewable power, which comes from unlimited energy resources,

14 like wind, sunlight, water, and the Earth's natural heat, has the potential to

15 vastly improve the reliability of the American energy system." Exhibit E at 3.

16 The Department estimates that the United States has enough renewable energy

17 potential to meet 100 times the annual nationwide energy demand.[15]

18 _____

19     [13] *See* https://www.lazard.com/media/xemfey0k/lazards-lcoeplus-june-2024-_vf.pdf

        [14] U.S. Dep't of Energy, Energy Reliability and Resilience (last accessed March 11,

20 2025). Available at https://www.energy.gov/eere/energy-reliability-and-resilience.

   U.S. Fed. Energy Reg. Comm'n et al., The February 2021 Cold Weather Outages in Texas

21 and the South Central United States (Nov. 2021), at 172

   https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-

22 united-states-ferc-nerc-and  ("Natural gas fuel supply issues alone caused 27.3 percent of

   the generating unit outages" during Winter Storm Uri).

23
       [15] U.S. Dep't of Energy, Renewable Energy Resource Assessment Information for

24 the United States (Mar. 2022), at 57. Available at

   https://www.energy.gov/sites/default/files/2022-

25 03/Renewable%20Energy%20Resource%20Assessment%20Information%20for%20the%2

   0United%20States.pdf

26

FIRST AMENDED AND                           31          ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                         Ecology Division
DECLARATORY                                                    1125 Washington St. SE
AND INJUNCTIVE RELIEF                                               P.O. Box 40100
                                                                 Olympia, WA 98504
                                                                   (360) 753-6200

101.   The Executive Order emphasizes the need for more "domestic energy resources," ignoring that wind and solar resources are produced domestically, too.

102.   The Executive Order's myopic focus on fossil fuels thus undermines the public interest in promoting reliable, diverse, and affordable energy. It also ignores the reality of climate change. Burning fossil fuels increases the instances of severe and extreme weather events that damage our country's infrastructure and threaten human life. Experts agree that extreme weather fueled by climate change, not the underproduction of fossil fuels, poses the most urgent challenge to our electric grid.[16]

103.   A diverse portfolio of generation sources that includes local, renewable energy sources such as wind and solar enhances grid reliability. Wind and solar are also essential to bolstering local energy generation in regions of the country that do not have abundant fossil fuel resources. Because fossil fuels must be transported to these regions from other parts of the country, they are often exposed to the price volatility and reliability risks inherent in purchasing fuel on the open market. Renewables moderate this risk by generating electricity using locally available resources.

104.   Notwithstanding the Administration's emergency claim, the Administration has taken other actions that undermine their findings of inadequate supplies of energy or an affordability or reliability crisis. These actions also show there is no national emergency that justifies the emergency declaration and use of emergency powers.

---

[16] Congressional Res. Serv., Natural Gas Reliability: Issues for Congress (July 15, 2024), at 16-17. Available at https://sgp.fas.org/crs/misc/R48127.pdf.
National Aeronautics and Space Administration, The Causes of Climate Change (last accessed Mar. 11, 2025), https://science.nasa.gov/climate- change/causes/.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

105.   Since January 2025, President Trump has approved five additional terminals to export natural gas from the United States, with no explanation for increasing exports during an alleged national shortage or how ramping up exports will impact Americans struggling with energy costs.[17]

106.   Defendants have paused or canceled permitting, approvals, and financing for numerous energy infrastructure projects that would increase energy supply, affordability, and reliability. These actions include: issuing a stop-work order for Revolution Wind, an 80% complete offshore wind project sufficient to power 350,000 homes; cancelling a conditional loan for the Grain Belt Express, an 800-mile transmission line across the Midwest; and canceling the environmental review process for the Esmeralda Seven, which would have been the largest solar project by capacity in the U.S. While the Executive Order seeks to remove mandatory environmental review for favored energy projects, Defendants have announced numerous policies adding extra-statutory layers of review to shovel-ready wind and solar energy projects.[18]

---

[17] *See*, Timothy Gardner, *Trump administration approves Venture Global LNG exports from Louisiana project* (Mar. 19, 2025). Reuters, Available at https://www.reuters.com/business/energy/trump-doe-approves-venture-global-lng-exports-louisiana-project-2025-03-19/

[18] *See* Diana DiGangi, *Interior denies canceling largest solar project in U.S. after axing review*, UtilityDive (Oct. 14, 2025), https://www.utilitydive.com/news/department-interior-cancels-review-nevada-solar-project-trump/802704/; Robert Walton, *DOE cancels $4.9B conditional loan commitment for Grain Belt Express*, Utility Dive (July 23, 2025) https://www.utilitydive.com/news/doe-cancels-conditional-loan-commitment-grain-belt-express/753828/; Diana Digangi, *Revolution Wind to resume construction after judge grants injunction*, UtilityDive (Sept. 23, 2025), https://www.utilitydive.com/news/revolution-wind-stop-work-trump-construction/760803/; Benjamin Storrow, *Trump is escalating his attacks on wind, solar*, E&E News by POLITICO (July 22, 2025) https://www.eenews.net/articles/trump-is-escalating-his-attacks-on-wind-solar.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

33

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

107.   Since January 2025, companies have cancelled over $32 billion of private investment in clean energy projects across the country.[19]

108.   In addition, although the Executive Order is purportedly based on a need to assist Americans living on low- and fixed-incomes, that rationale is undermined by other actions of the Administration that make it harder for those individuals to pay their electricity and heating bills by freezing federal funding for and otherwise impeding programs designed to help low-income households do just that.

109.   For example, the Administration unlawfully froze funds to administer: (i) the Low Income Home Energy Assistance program, 42 U.S.C. § 8621(a), which is designed to help States ensure that low-income residents have heat and power in the winter, (ii) the Solar for All program, 42 U.S.C. § 7434(a)(1), which funds rooftop solar panels and storage systems for installation in low-income and disadvantaged communities, and (iii) the High-Efficiency Electric Home Rebate Act, 42 U.S.C. § 18795a, which provides rebates for low- and moderate-income households for heat pumping and cooling and electrification projects. Funding under those programs was ordered to be restored pursuant to court order.[20]

110.   And, on or around April 1, 2025, the Department of Health and Human Services laid off the entire staff of the Low-Income Home Energy Assistance Program.

---

[19] Michael Timberlake, E2, *Clean Economy Works: November 2025 Analysis*, E2 (Dec. 12, 2025), E2-Clean-Economy-Works-November-Analysis-Memo-v1.pdf

[20] *See* Memorandum and Order on Motion for a Preliminary Injunction in *State of New York, et al. v. Donald Trump* (D.R.I. No. 1:25-cv-00039), ECF Doc. No. 161 (filed Mar. 6, 2025)

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

34

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

111.   The Executive Order's emergency declaration is not based on any real emergency, nor does the Executive Order attempt to address one. Rather, it is based on the assertion of an unfounded, false "emergency" declared largely in response to disagreement with "the policies of the previous administration" and of states in the Northeast and West Coast. 90 Fed. Reg. 8433 (2025).

112.   According to the Executive Order, the Nation's energy problems are "most pronounced" in the Northeast and West Coast due to "State and local policies" that the President disagrees with. 90 Fed. Reg. 8434.

113.   Moreover, the assertion that state and local energy policies in the Northeast and on the West Coast "jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population" is unsupported. *Id*. Washington State has some of the lowest energy prices in the Nation (and also some of the cleanest energy).[21] For years, Massachusetts has consistently ranked as the most or one of the most energy efficient States in the Nation, recognized for its "efforts to transition its utility energy efficiency programs to reduce harmful pollution in the state and ensure the benefits of energy efficiency are distributed more equitably among residences and businesses, . .

---

[21] U.S. Bureau of Labor Statistics, Western Information Office, Average Energy Prices, Seattle-Tacoma-Bellevue–December 2024 (December 2024), ("The 13.9 cents per kWh Seattle households paid for electricity in December 2024 was 21.0 percent less than the nationwide average of 0.176 cents per kWh. Last December, electricity costs were 24.9 percent lower in Seattle compared to the nation. In the past five years, prices paid by Seattle area consumers for electricity were less than the U.S. average by 16.2 percent or more in the month of December."), https://www.bls.gov/regions/west/news-release/averageenergyprices_seattle.htm#:~:text=The%2013.9%20cents%20per%20kWh,( See%20chart%202.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

35

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    . [as well as] for its pioneering work to align its energy efficiency targets with

2    efforts to transition off fossil fuels."[22]

3        114.    These Northeastern and West Coast states have cut harmful

4    emissions from the power sector while growing their economies at a greater

5    rate than the national average.[23]

6        115.    The Executive Order does not explain how reduced emissions

7    from the power sector impact national security, nor how growing state

8    economies devastate prosperity.

9    **D.    Under the Guise of a National "Energy Emergency," Executive**

10   **Order 14156 Commands Unlawful Action**

11       116.    In response to the alleged energy emergency, the Executive

12   Order directs federal agencies to "identify *and exercise* any lawful emergency

13   authorities available to them, as well as all other lawful authorities they may

14   possess, to facilitate the identification, leasing, siting, production,

15   transportation, refining, and generation of domestic energy resources,

16

17

---

18       [22] *See* Massachusetts Recognized as National Leader in Energy Efficiency: Takes

19   One of Top Spots for Programs that Reduce Energy Costs, Improve Living Conditions and
     Create Jobs, Massachusetts Department of Energy Resources press release (March 20,

20   2025), available at https://www.mass.gov/news/massachusetts-recognized-as-national-
     leader-in-energy-efficiency, citing The American Council for an Energy-Efficient

21   Economy (ACEEE) annual State Energy Efficiency Scorecard, available at
     https://www.aceee.org/state-policy/scorecard.

22       [23] *See e.g.*, Analysis Group, The Economic Impacts of the Regional Greenhouse

23   Gas Initiative on Ten Northeast and Mid-Atlantic States (May 2023), (over 12-year period,
     program resulted in 46% reduction in greenhouse gas emissions, raised $3.8 billion in

24   allowance revenues, generated net economic benefits of $5.7 billion, and added about
     48,000 jobs), https://www.analysisgroup.com/Insights/publishing/the-economic-impacts-

25   of-the-regional-greenhouse-gas-initiative-on-ten-northeast-and-mid-atlantic-
     states2/#:~:text=The%20study%20also%20found%20that,and%20added%2048%2C000%2

26   0job%2Dyears.

FIRST AMENDED AND                              36        ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                        Ecology Division
DECLARATORY                                                   1125 Washington St. SE
                                                                   P.O. Box 40100
AND INJUNCTIVE RELIEF                                           Olympia, WA 98504
                                                                   (360) 753-6200

1  including, but not limited to, on Federal lands." 90 Fed. Reg. at 8434.

2  (emphasis added).

3  117.  The Executive Order requires agencies to "identify *and use* all

4  relevant lawful emergency and other authorities . . . to expedite the

5  completion of all authorized and appropriated infrastructure, energy,

6  environmental, and natural resources projects that are within" their respective

7  authorities. *Id*. (emphasis added).

8  118.  Of particular note, the Executive Order states that "agencies shall

9  identify *and use* all lawful emergency or other authorities available to them to

10  facilitate the supply, refining, and transportation of energy in and through the

11  West Coast of the United States, Northeast of the United States, and Alaska."

12  *Id.* (emphasis added).

13  119.  The Executive Order further commands the Corps to "identify

14  planned or potential actions to facilitate the Nation's energy supply that may

15  be subject to emergency treatment pursuant to the regulations and nationwide

16  permits promulgated by the Army Corps . . . pursuant to section 404 of the

17  Clean Water Act, 33 U.S.C. 1344," and other Army Corps permitting

18  authorities.[24] *Id*.

19  120.  The Executive Order further directs agencies to "use, to the

20  fullest extent possible and consistent with applicable law, the emergency

21  Army Corps permitting provisions to facilitate the Nation's energy supply."

22  *Id.*

23

24

---

25  [24] The Corps also has, and the Executive Order purports to apply to, permitting

26  authority under section 10 of the Rivers and Harbors Act, 33 U.S.C. 403, and section 103 of the Marine Protection Research and Sanctuaries Act, 33 U.S.C. 1413.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

37

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

121.    The Executive Order directs agencies "to use, to the maximum extent permissible under applicable law, the ESA regulation on [ESA] consultations in emergencies [50 C.F.R. § 402.05], to facilitate the Nation's energy supply." *Id*. at 8435.

122.    In short, based on nothing but the unsupported and arbitrary emergency declaration, the Executive Order illegally commands Defendants to disregard laws critical to protecting the environment, historic and cultural resources, and State sovereignty.

**E.    Agency Defendants' Unlawfully Implement the Executive Order**
**Corps' Implementation of the Executive Order**

123.    Following the Executive Order, the Corps has promulgated and systematically applied emergency permitting procedures for favored energy projects without considering whether or how the projects will affect the nation's energy supply or whether an "unacceptable hazard to life, significant loss of property, or an immediate, unforeseen, and significant economic hardship" would result if standard permitting procedures were followed. 33 C.F.R. § 325.2(e)(4).

124.    The Corps' public permitting database contains Clean Water Act Section 404 projects and proposals, including final and pending individual permits and permits pending or issued using the Corps' emergency procedures. Historically, the emergency permit data "events" field identified emergencies caused by hurricane, storm, and flood events, as well as the Deepwater Horizon oil spill in the Gulf of Mexico.

125.    Within weeks of the Executive Order, on or about February 17, 2025, the Corps added a new category of emergency projects, "EO 14156 Declaring a National Energy Emergency," to its public permitting database.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

The Corps identified 688 projects across the country in this emergency category. A true and correct copy of permit data available on February 19, 2025, is attached hereto as Exhibit F (Project List).

126. About three days later, after the media circulated reports about the new emergency projects, the Corps deleted the "EO 14156" category and removed the vast majority of projects on the Project List from the Permitting Database altogether.

127. Since taking down this information, the Corps has refused to publicly disclose the extent of its "energy emergency" permitting actions.

128. In February and March 2025, the Corps began emailing state officials to inform them that the Corps will be establishing emergency procedures for favored energy projects. In those emails, the Corps identified favored energy projects it planned to subject to emergency permitting and to expedite their review under the Executive Order. For example, Corps officials asked Massachusetts officials to "significantly shorten" the time for state agencies to issue water quality certifications "in terms of days," rather than the "reasonable period of time . . . not to exceed one year" authorized under Section 401. Alternatively, Massachusetts could provide "some sort of blanket water quality certification for energy projects." True and correct copies of emails sent to Connecticut and Massachusetts officials are attached hereto as Exhibit G.

129. In March 2025, Corps headquarters directed districts to establish special emergency procedures pursuant to 33 C.F.R. § 325.2(e)(4) for all "energy-related activities covered by E.O. 14156." Corps leadership provided districts with template emergency procedures and guidance "to ensure emergency procedures are executed consistently and effectively across the

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

39

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

enterprise. [The template] establishes the slowest the permit process may move, under this emergency." A true and correct copy of the guidance is attached as Exhibit H ("Corps Emergency Procedure Guidance").

130. The Corps Emergency Procedure Guidance states that the emergency procedure "does not obviate the need to comply with all applicable laws and regulations." Exhibit H at 6. Nonetheless, districts should "not delay timely responses because of any standard procedures." *Id.* at 4, 7 and 10. Districts are instead directed to employ emergency procedures for CZMA, the ESA, and the NHPA to abbreviate or postpone the required review under those statutes. For the Endangered Species Act, districts are directed to refer to the Services' emergency consultation regulation at 50 C.F.R. § 402.05, which allows the Corps to delay consultation until the "emergency is under control." *Id.* At 6 and 34. For the National Historic Preservation Act, districts are directed to refer to the ACHP guidance on energy emergency actions, which limits the time for States and tribes to comment to just seven days or less. *See* Ex. H at 14, 15, and 35.

131. In April 2025, Corps Districts across the country posted Public Notices of the Special Emergency Processing Procedures that would be used for favored energy projects pursuant to the Executive Order. Each Districts' emergency procedures (collectively, "Corps Emergency Procedures") followed headquarters' template and the Corps Emergency Procedure Guidance, with minor differences. A true and correct copy of the Seattle District's Special Emergency Processing Procedures for activities covered by the Energy Emergency is attached as Exhibit I.

132. Neither the notice of emergency procedures, nor the Corps Emergency Procedures themselves, set out any facts establishing a situation

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

40

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  qualifying as an emergency under the Corps' regulations and instead rely

2  solely on the Executive Order.

3      133.   The Corps Emergency Procedures merely reference the

4  Executive Order. They do not require officials to find that an emergency

5  situation exists that "would result in an unacceptable hazard to life, a

6  significant loss of property, or an immediate, unforeseen, and significant

7  economic hardship if corrective action requiring a permit is not undertaken

8  within a time period less than the normal time needed to process the

9  application under standard procedures" before treating an energy project as an

10  emergency situation. 33 C.F.R. § 325.2(e)(4). The Corps needs only to

11  "[c]onfirm whether the activity meets the criteria for an energy-related

12  emergency per the E.O."

13      134.   The Corps Emergency Procedures do not explain why the

14  procedures only apply to favored energy projects and not all types of energy

15  projects.

16      135.   If the project is subject to the Corps Emergency Procedures,

17  public comment is no longer guaranteed. Instead, public notice and an

18  opportunity to comment may be provided for 7 to 15 days.

19      136.   For water quality certifications under Section 401 of the Clean

20  Water Act, the Corps Emergency Procedures defer to EPA's Section 401 Rule

21  establishing a reasonable time period for certification of six months. 40 C.F.R.

22  § 121.6(c). Nonetheless, the Corps Emergency Procedures still require

23  districts to seek a 25-day turn-around from the applicable state or tribal

24  authority.

25      137.   Immediately after publishing the Corps Emergency Procedures,

26  the Corps began processing favored energy projects as emergencies.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

41

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    138.   As of this filing, the Corps has processed dozens of permit

2    applications for favored energy projects within the Plaintiff States using the

3    Corps Emergency Procedures. The projects range in complexity and severity

4    of their environmental impacts: some involve routine maintenance, others

5    have been in development for years and involve significant expansions or

6    development of new infrastructure.

7    139.   Under the Corps Emergency Procedures, the Corps shortened

8    public comment periods, if offered at all. State, local, and tribal historic

9    preservation officers have substantially less time to review impacts to historic

10   and cultural resources and object to proposals. For projects with potential

11   impacts to endangered species, the Corps indefinitely delays required ESA

12   consultations with the Services. The Corps is also utilizing emergency NEPA

13   procedures to approve permits with incomplete documentation of

14   environmental impacts.

15   140.   In sum, after the President signed the Executive Order, the Corps

16   acted rapidly to implement the Executive Order, taking the "Corps

17   Implementing Actions." Specifically, the Corps set a national policy from

18   headquarters to process emergency permit applications without following

19   applicable statutory and regulatory safeguards, as manifest in its designation

20   of a new emergency permitting category in its database, requests to states to

21   expedite review, Corps Emergency Procedure Guidance and template, and

22   other related actions. In addition, Corps Districts promulgated the Corps

23   Emergency Procedures, following the Corps Emergency Procedure Guidance

24   and template.

25

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

42

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

**Interior's implementation of the Executive Order**

141.    On April 23, 2025, Interior issued a press release entitled "Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply," announcing its intent to "accelerate the development of domestic energy resources and critical minerals" pursuant to the Executive Order. Press Release, U.S. Dep't of the Interior, *Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025).[25]  The press release touted that "[t]he new permitting procedures will take a multi-year process down to just 28 days at most." The press release stated that the procedures would apply only to favored energy projects.

142.    The same day, April 23, 2025, Interior simultaneously announced the adoption of alternative arrangements for compliance with NEPA, the ESA, and the NHPA, referred to here as Interior Alternative Arrangements and attached as Exhibit J. In doing so, Interior cited the Executive Order as the basis for the Interior Alternative Arrangements. Purporting to act pursuant to Interior's emergency NEPA provisions in 43 C.F.R. § 46.150 the Interior Alternative Arrangements for NEPA compliance note that they were adopted in coordination with and the authorization of the Council on Environmental Quality.

143.    The Interior Alternative Arrangements do not follow Interior's regulations governing when alternative arrangements can be adopted.

144.    The Interior Alternative Arrangements also represent a radical departure from normal NEPA procedures and show little ability to satisfy

---

[25] Available at: https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

43

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    NEPA's statutory requirements, including NEPA's basic command that

2    Interior assess the environmental effects of its actions prior to undertaking

3    them.

4         145.   First, the Interior Alternative Arrangements include an

5    application form requiring project applicants wishing to invoke Alternative

6    Arrangements for qualifying projects to provide project information, including

7    the proposed plan of operation or underlying permit application. *See* Ex. L at

8    4. Regardless of the level of detail provided, the Responsible Official has little

9    time to consider the project prior to making a decision. For projects that the

10   Responsible Official determines not likely to have significant environmental

11   impacts, the Responsible Official must prepare an environmental assessment

12   within "approximately 14 days" of receipt of the application. *Id*. at 2. The

13   Responsible Official will "concurrently within the same period" prepare

14   documentation supporting a "finding of no significant impact." *Id*. at 2. No

15   public comment is required at any stage of this process up to and including the

16   final decision. *Id*.

17        146.   Even for projects likely to have significant environmental

18   impacts, the process is hardly more robust. The Responsible Official will

19   "publish a notice of intent to prepare an environmental impact statement …

20   soliciting written comments and announcing a public meeting." *Id.* at 2. The

21   Responsible official exercises complete discretion over the length of the

22   public comment period but, in any event, Interior "anticipates that most

23   comment periods will be approximately 10 days." *Id*. After publishing the

24   notice of intent, the Responsible Official has 28 days to prepare an

25   environmental impact statement. *Id*. The environmental impact statement must

26   be "concise," containing only "a brief description of environmental effects."

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

44

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1   *Id.* There is no obligation to "publish a draft environmental impact statement"

2   for public review prior to finalizing and recording the agency's final decision.

3   *Id.*

4       147.  Interior is currently implementing these procedures for several

5   projects, including projects with environmental impacts in Plaintiff States,

6   such as the Wildcat Loadout Facility (Wildcat Facility), which would load oil

7   onto rail cars for transport directly along sensitive and critical waterways and

8   ecosystems in the State of Colorado.

9   **ACHP's Implementation of the Executive Order**

10      148.  On or around March 27, 2025, the ACHP published on its

11  website a document titled "Section 106 Emergency Provisions and the

12  Executive order Declaring a National Emergency." *See* Exhibit K ("ACHP

13  Emergency Provisions"). The ACHP Emergency Provisions purport to

14  provide information "to assist agencies in implementing the terms of the

15  Executive Order in regard to historic preservation reviews." *Id.* at 1.

16      149.  The ACHP Emergency Provisions state that "for any proposed

17  undertaking that falls within the scope of the Executive Order, agencies

18  should follow the terms of any applicable Section 106 agreement that contains

19  emergency provisions." *Id.* Where such agreements do not exist, the ACHP

20  Emergency Provisions state that "agencies can avail themselves of the

21  expedited emergency provisions in Section 800.12(b)(2) of the Section 106

22  regulations." *Id.*

23      150.  In terms of the length of time applicable to use of emergency

24  Section 106 provisions, the ACHP Emergency Provisions provide that

25  "[w]hile Section 800.12 only applies for 30 days following an emergency

26  declaration, pursuant to Section 800.12(d), the ACHP is hereby extending the

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

45

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

applicability of Section 106 emergency provisions to run for the duration of the Presidential declaration." *Id*. at 2.

151.   To Plaintiff States knowledge, no federal agency has requested that ACHP extend the applicability of emergency provisions for Section 106 consultation in response to the Executive Order.

152.   Federal agencies are now following ACHP's decision that Section 106 consultations can be done on an emergency basis pursuant to the Executive Order.

## F.   Defendants' Actions to Illegally Implement Emergency Procedures Harm the Plaintiff States

153.   Defendants' actions to illegally implement widescale use of emergency procedures in non-emergency situations under the Executive Order will irreparably injure Plaintiff States' proprietary and sovereign interests.

**<u>Harms to proprietary interests</u>**

154.   Plaintiff States have proprietary interests in their natural resources, such as the quality of their waters for drinking, agriculture, recreation, and habitat, the wildlife and biota that rely on aquatic and riparian habitats, or historic and cultural resources. Harm to these resources injures the States' proprietary interests.

155.   The standard permit procedures are meant to ensure the agency makes permit decisions based on a full understanding of the environmental, social, historic, and geological factors at the project site. Inappropriate use of emergency procedures impedes mitigation or avoidance of project impacts to state resources, such that harm to state proprietary interests will occur.

156.   For example, the Clean Water Act preserves the States' existing powers to adopt conditions and restrictions necessary to protect state waters.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

46

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    Any use of emergency procedures to preclude or inhibit the States from

2    exercising their authority to protect state waters, through unlawfully

3    restricting the time to review and issue Section 401 certifications, is contrary

4    to the language in the Clean Water Act. Contrary to the Clean Water Act's

5    system of "cooperative federalism," Defendants' emergency procedures also

6    impair the States' abilities to fully participate in permitting decisions, as well

7    as their sovereign interests—carefully preserved by Congress—in protecting

8    water quality within their borders.

9        157.    Discharging dredged and/or fill material into waters can

10   significantly and adversely affect water supplies; aquatic life and habitat,

11   aquatic ecosystem diversity, productivity, and stability; wildlife dependent on

12   aquatic ecosystems; and recreational, aesthetic, and economic values, among

13   other things. Dredged and/or "fill material should not be discharged into the

14   aquatic ecosystem unless it can be demonstrated that such a discharge will not

15   have an unacceptable adverse impact either individually or in combination

16   with known and/or probable impacts of other activities affecting the

17   ecosystems of concern." 40 C.F.R. § 230.1(c).[26] Unlawfully shortcutting every

18   means of evaluating the potential effects of proposed discharges undermines

19   this fundamental principle.

20       158.    In addition, Plaintiff States own or hold in trust the fish and other

21   wildlife populations within their borders and most have statutory obligations

22   to protect and manage these resources for the fish and wildlife to thrive and

23   the public to enjoy. These include federally-listed endangered and threatened

24

25       [26] The Corps is required to determine that the discharge of dredged and/or fill
     material authorized through a Section 404 permit complies with 40 C.F.R. Part 230

26   (404(b)(1) Guidelines).

FIRST AMENDED AND                              47                    ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                                    Ecology Division
DECLARATORY                                                             1125 Washington St. SE
                                                                              P.O. Box 40100
AND INJUNCTIVE RELIEF                                                      Olympia, WA 98504
                                                                            (360) 753-6200

species and their critical habitat. Because Defendants' improper—and unlawful—use of emergency procedures will undermine the States' ability to fully protect the habitat and resources those species rely upon for their survival, Defendants' implementation of the Executive Order causes or risks substantial harms to the States' wildlife.

159.    Defendants' actions weaken the procedural safeguards in NEPA, the ESA, the NHPA, and the Clean Water Act. This will result in the loss of biological diversity and diminish fish, wildlife, and other natural resources that could otherwise be used for present and future commercial purposes.

160.    Additionally, the responsibility for, and burden of, protecting imperiled species, historic and cultural properties, clean water, and environmental quality now falls more heavily on Plaintiff States. The States must undertake additional costs and expenses to mitigate the impacts of Defendants' conduct. Plaintiff States incur costs to hire staff to participate in emergency review procedures, study the impacts of projects permitted on an emergency basis, and remediate or mitigate the impacts of projects permitted without full reviews and consultations.

161.    Recent precedent demonstrates how Plaintiff States will suffer harm from use of emergency procedures.  For example, during the winter of 2020 in Washington State, the Corps issued a Section 404 permit using emergency procedures to Skagit County Drainage District 21, bypassing the Section 401 Certification process with the Washington State Department of Ecology.

162.    The Corps' decision to use emergency procedures in that instance was based on issues observed from prior flooding, which *may* have qualified for treatment as an emergency. But, because the Corps and project proponent

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

48

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

failed to work with Ecology through typical permitting procedures, the project did not reflect Washington's expertise and unique knowledge and understanding of the area's flooding conditions. Specifically, if the Corps had followed typical permitting procedures, it would have learned from Washington that flooding in that area would occur no matter how much dredging was completed and harms from a futile dredging project would have been avoided.

163.    Instead, the project resulted in an inadequately stabilized, oversized channel that was not constructed to prevent erosion and the deposition of large amounts of sediment into Nookachamps Creek. It also did nothing to address flooding. Sedimentation is a well-known problem for riparian habitat as it can bury stream beds, smother spawning grounds for salmonids, interfere with aquatic life, and alter the chemical and physical makeup of a waterway. As a result, this event was particularly concerning for Nookachamps Creek, as it is a critical tributary of the Skagit River and provides habitat for coho, chum, chinook, pink, and sockeye salmon as well as steelhead trout. Chinook from the Skagit Watershed are a critical source of food for endangered Southern Resident Orcas in Puget Sound.

164.    This example, and resulting harms to natural resources, are likely to be repeated around the country (including Plaintiff States) under the Executive Order and its command that Defendants invoke emergency procedures to bypass critical environmental review for hundreds of favored energy projects.

165.    Since the President signed the Executive Order, Defendants have actively sought to move projects forward under emergency procedures that are in and/or impact Plaintiff States.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

49

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

166.    The initial Corps list of 688 emergency projects published in February 2025 included minor or routine projects as well as large infrastructure projects in Plaintiff States, such as the Cascade Renewable Transmission LLC Columbia River Project.[27] The project aims to build an underwater transmission line traversing 100 miles of the Columbia River and will require extensive review of the environmental impacts and multiple federal, state, and local permits before moving forward. The project proponents have withdrawn their application for a Section 404 permit, although they may resubmit their application at any time. Permitting this project without the rigorous environmental review previously identified as necessary and required would represent a radical—and unlawful—departure from the anticipated plan and the Corps permitting procedures for projects of this scale. It would also undermine Washington's and Oregon's rights and abilities to protect water quality, state resources, and residents.

167.    The Corps is also employing emergency procedures for Electron Hydro, LLC's bladder diversion and infrastructure project in the Puyallup River in Pierce County, Washington. The proposed project requires the discharge of up to 3,400 cubic yards of dredged streambed material/rock into the Puyallup River that will temporarily impact 8,120-square feet (sq. ft.) of river, and the additional discharge of up to 1,300 CY of dredged stream bed material/rock, up to 1,100 CY of rock/concrete grout fill, and up to 3,800 CY of concrete fill for the installation of a 70-foot long by 12-foot wide inflatable rubber bladder spillway and foundation/aprons and 395-linear foot intake/bank stabilization wall, permanently impacting 0.36 acre of the

---

[27] The list included projects unrelated to energy development, such as the West Coyote Hills housing development in California.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

50

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

Puyallup River. A true and correct copy of the Corps' notice announcing

emergency procedures for this project is attached as Exhibit L (Army Corps

Public Notice, 12/17/25).

168.   The rubber bladder contains 6PPD—the same chemical found in

tires that forms 6PPD-quinone, a highly toxic fish killing chemical, when

exposed to air. The Puyallup River provides vital habitat to chinook salmon,

bull trout, and steelhead trout, all of which are protected under the Endangered

Species Act. The river also provides habitat to coho, chum, and pink salmon,

as well as cutthroat trout.

169.   The purported purpose of this project is to divert water to

generate hydropower, but Electron Hydro, LLC is prohibited by court order

from doing so. A true and correct copy of the court order is attached as

Exhibit M (Parties' Stipulation and Order Re Settlement and Dismissal,

*American Whitewater v. Electron Hydro, LLC*, No. 2:16-cv-00047 (W.D. Wa.

Mar. 25, 2022)). The project will require an individual 401 water quality

certification from Washington, and Washington will need to concur with the

project proponent's certification that the proposed project complies with and

will be conducted in a manner consistent with Washington's CZM program.

170.   The Corps also employed emergency procedures to authorize the

Nemadji Trail Energy Center (NTEC) in Wisconsin before a permit was

issued. The NTEC project involves a natural gas power plant, electric

transmission line, and natural gas pipeline. If it were to proceed, the project

would involve filling multiple acres of wetlands, building a transmission line

over the Nemadji River, and drilling a natural gas pipeline and fiberoptic line

underneath the waterway. If the project were to proceed solely on the federal

approvals, Wisconsin's ability to evaluate and protect against the potential

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

51

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

risk of adverse impacts to Wisconsin wetlands and waterways would be compromised.

171.    And the Corps issued a notice to proceed under emergency procedures for the Ashland to Ironwood Transmission Line in Wisconsin. The project involves rebuilding and moving two 35-mile transmission lines. The lines traverse multiple wetlands, bogs, and rivers and will involve temporarily filling 335 acres of wetlands. Although the Corps continues to consult with state, local, and tribal officials on environmental impacts, including concerns about impacts to the federally endangered long-eared bat, the notice allowed the company to begin construction in the absence of a permit and before completing any necessary federal environmental reviews.

172.    Interior has also moved projects affecting one or more Plaintiff States forward under the Interior Alternative Arrangements. For example, the Wildcat Facility, on Bureau of Land Management (BLM) land located in Price, Utah, serves as a transfer station for oil extracted from the Uinta Basin. At this facility, oil is loaded from tanker trucks to rail cars for export to refining facilities along the Gulf Coast. During this journey, rail cars traveling from the Wildcat Facility traverse over 100 miles along the Colorado River through the State of Colorado.

173.    These trains run directly along sensitive and critical waterways and ecosystems, including the Colorado River and its headwaters, the Fraser River, and the Arkansas River. Together, these water bodies are the water source for millions of people, businesses, and farms in Colorado and throughout the Western United States. As such, derailments, spills, or other accidents from oil trains traversing rail lines adjacent to these rivers pose a serious risk to the people, businesses, and wildlife dependent on this water.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

52

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

174.   The operator of the Wildcat Facility proposed an expansion of the facility in 2023 but ultimately failed to provide BLM with information needed to conduct a proper environmental analysis. As a result, BLM terminated its review of the proposal.

175.   On or around May 1, 2025—mere days after Interior published its procedures for compliance with the Energy Emergency, including Interior's Alternative Arrangements—the Wildcat Facility requested that BLM process its right-of-way expansion proposal under the Alternative Arrangements. That request was approved by the Acting Assistant Secretary, Land and Minerals Management, on or around June 19, 2025. No public comment period was announced.

176.   Approximately 14 days later, on or around July 3, 2025, BLM issued its Decision Record approving the expansion, along with its environmental assessment and Finding of No Significant Impact.

177.   The environmental analysis noted that it was prepared under "alternative arrangements" for compliance with the National Environmental Policy Act "because of the national energy emergency described in Executive Order 14156."[28] While the State of Colorado and other parties submitted public comments on the proposed expansion, the Public Involvement section of the environmental analysis stated that "the Responsible Official [was] not required to seek public comment prior to finalizing the EA."[29]

178.   As noted in the environmental assessment, expansion of the Wildcat Facility will result in a substantial increase in oil train traffic. As stated by BLM, daily oil train exports from the Wildcat Facility will increase

---

[28] https://eplanning.blm.gov/public_projects/2039088/200657441/20137832/251037812/Final%20Final%20Wildcat%20EA%207.3.25.pdf.

[29] Id.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

53

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

from 20,000 barrels of crude per day to approximately 100,000 barrels. The lifespan of the expanded project is estimated to be 20 years.

179.   Any review of projects granted emergency approvals that occurs after the fact cannot replace the evaluations required as part of the normal permitting process or fully prevent the harms to Plaintiff States.

180.   For example, the ESA implementing regulations include an emergency provision explaining that "[f]ormal consultation shall be initiated as soon as practicable after [an] emergency is under control." 50 C.F.R. § 402.05(b).

181.   Retroactively attempting to rectify environmental harms to various species, habitat, and other natural resources will almost certainly result in a worse outcome for the resources in question than proactively identifying and determining how to avoid, minimize, and/or appropriately mitigate those impacts before issuing a permit.

182.   For example, the "take" of an endangered species or damage to cultural or historic resources cannot be undone after the fact.

183.   State harms also flow from other illegal actions not jurisdictionally appropriate here, but that are directed by—and cite as justification—the President's illegal Executive Order and result in direct harms to Plaintiff State interests. Specifically, the Department of Energy last year issued Federal Power Act section 202(c) "emergency" orders requiring numerous aging and failing fossil-fuel power plants to continue operations, including three coal plants in Plaintiff States: the J.H. Campbell Generating Station in Michigan, the TransAlta Centralia plant in Washington, and Craig Station in Colorado. In each order, the Secretary of Energy relied in part on

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

54

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    the Executive Order as a basis for his finding that an "emergency" under

2    Federal Power Act Section 202(c) exists.

3        184.   Continuing to operate these plants will ultimately result in

4    significant costs to the States in the form of increased utility rates, increased

5    pollution, and future instability and difficulty in shoring up power needs.

6    **Harms to sovereign interests**

7        185.   The improper use of emergency procedures harms state sovereign

8    interests, including costs associated with "filling the regulatory gap" and other

9    administrative and compliance costs. *See New Jersey v. Env't Prot. Agency*,

10   989 F.3d 1038, 1045–49 (D.C. Cir. 2021) (finding New Jersey had standing to

11   challenge EPA reporting rule under the Clean Air Act because inadequate

12   requirements imposed "administrative costs and burdens" on the state).

13       186.   For example, in addition to contravening the Clean Water Act's

14   objective of restoring and maintaining the chemical, physical, and biological

15   integrity of the Nation's waters, 33 U.S.C. § 1251(a), and directly harming

16   Plaintiff States' proprietary interests in their natural resources, the Corps' use

17   of emergency procedures to implement the Executive Order undermines the

18   Plaintiff States' recognized authority under Clean Water Section 401, and

19   imposes increased regulatory burdens on Plaintiff States when used in their

20   states, causing direct financial harms.

21       187.   To the extent the Corps demands that a state issue a Section 401

22   certification decision in an expedited manner (e.g., within days or weeks or

23   risk waiver), this would require a significant diversion of state resources to

24   adequately review and issue a decision on the Section 401 certification request

25   that, if issued, would ensure state water quality standards will be met. Such a

26   diversion of state resources is unjustified where no emergency exists.

FIRST AMENDED AND                                    55                  ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                                Ecology Division
DECLARATORY                                                              1125 Washington St. SE
AND INJUNCTIVE RELIEF                                                      P.O. Box 40100
                                                                         Olympia, WA 98504
                                                                          (360) 753-6200

188.   While the Corps has in some of its Emergency Procedures stated that it will follow the Section 401 rule time period established by regulation, the Corps' procedures also state that Districts "will not delay a timely response [on the issuance of a Section 404 permit] because of any standard procedures." *See, e.g.,* Exhibit I at 4 (Seattle Guidance).

189.   But even if the Corps allows states adequate time to conduct Section 401 certifications, the Plaintiff States now must pour additional resources into supplementing the rushed or truncated environmental review by the Corps to ensure that appropriate conditions are applied to avoid or mitigate harm to aquatic resources from projects approved under emergency procedures pursuant to the Executive Order. In some cases, where Corps environmental review is completely absent, Plaintiff States must expend their own limited resources conducting environmental reviews the Corps is legally required to do but, under the command of the Executive Order, fails to undertake.

190.   Moreover, requiring states to engage in other agency consultations or prepare comments on an expedited timeline requires additional state resources. This has already occurred in Washington, where the Corps has set seven-day comment periods for complex projects involving in-water work in critical aquatic habitat. Indeed, in communications with Washington regulators, the Corps has already acknowledged that the sudden rush to permit energy-related projects has negative impacts on Washington regulators' workloads.

191.   This disruption will impact state regulators' workload and workflow, require shifts in priorities, timeline adjustments, and strain

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

56

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    capacities which could lead to delays in fulfilling key responsibilities, reduced

2    quality of output, and inefficiencies in established processes.

### CAUSES OF ACTION
### COUNT 1
### Common Law *Ultra Vires* – Conduct Outside the Scope of Statutory Authority Conferred on the Executive (Against All Defendants)

7    192.   Plaintiff States reallege and incorporate by reference the

8    allegations set forth in each of the preceding paragraphs.

9    193.   Executive agencies and officers, including the President, may not

10   act in excess of their legal authority.

11   194.   A court reviewing executive action has an independent duty to

12   determine what the law is and whether executive officers invoking statutory

13   authority exceed their statutory power. *See* <u>Loper Bright Enters. v. Raimondo</u>,

14   603 U.S. 369, 392–94 (2024); *Armstrong v. Exceptional Child Ctr., Inc.*, 575

15   U.S. 320, 326 (2015).

16   195.   Courts may review a presidential Executive Order and are

17   empowered to enjoin officers of the Executive Branch from obeying illegal

18   Presidential commands, and may enjoin *ultra vires* acts, that is, acts exceeding

19   the officers' purported statutory authority. *Chamber of Com. v. Reich*, 74 F.3d

20   1322, 1328 (D.C. Cir. 1996); *Sierra Club v. Trump*, 379 F. Supp. 3d 883,

21   909–11 (N.D. Cal. 2019), *vacated on other grounds*, *Biden v. Sierra Club*, 142

22   S. Ct. 56 (2021).

23   196.   The NEA requires the President to specify the statutory

24   provisions of law under which he proposes that he or his officers will act

25   before any emergency authority may be exercised. 50 U.S.C. § 1631.

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

57

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

197.   While the President purported to specify statutory and regulatory provisions under which he proposes that he or his officers will act, none of those provisions give the President or any agency emergency powers or authorities upon a declaration of a national energy emergency under the NEA as set out in the Executive Order.

198.   The President has acted *ultra vires* by directing agencies to invoke emergency procedures to evade or shorten technical and/or environmental review under circumstances that do not qualify as an emergency under applicable statutory and regulatory provisions.

199.   The Corps has acted contrary to law and *ultra vires* by, among other things, taking the Corps Implementing Actions and otherwise acting under the Executive Order to expedite permit application processing without following applicable statutory and regulatory directives for emergency procedures.  The Corps' *ultra vires* actions include implementing the Executive Order's directive to issue Clean Water Act Section 404 permits for favored energy projects on an expedited or emergency basis and by creating new emergency procedures for favored energy projects that redefine what procedures the ESA, NEPA, or the NHPA require.

200.   The ACHP has acted contrary to law and *ultra vires* by, among other things, issuing the ACHP Emergency Provisions. ACHP's *ultra vires* actions include implementing the Executive Order's directive to conduct consultations with regard to historic preservation, pursuant to Section 106 of the NHPA, 54 U.S.C. § 306108, on an emergency basis, and extending such emergency treatment to last for the indeterminate duration of the Executive Order's declared emergency.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

58

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

201.   Interior has acted contrary to law and *ultra vires* by, among other things, issuing the Interior Alternative Arrangements. Interior's *ultra vires* actions include implementing the Executive Order's directive to issue leases or other approvals for favored energy projects under new emergency procedures in ways that do not comply with NEPA or Interior's regulations implementing NEPA.

202.   For these reasons, Plaintiff States are entitled to a declaration that Defendants' use of emergency procedures is unlawful, and that the Court should enjoin Defendants' implementation of the Executive Order.

## COUNT 2
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Contrary to Law**
**(Against Corps Defendants)**

203.   Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

204.   The Corps is an "agency" as defined in 5 U.S.C. § 551(1).

205.   The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

206.   Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose.

207.   Agency action is also not in accordance with the law if agency action is inconsistent with applicable federal regulations.

208.   The Corps Implementing Actions constitute final agency actions subject to judicial review under the APA.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

59

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

209.   The Corps Implementing Actions directly contravene the Clean Water Act, the ESA, and other applicable statutes because those statutes do not authorize emergency action under the circumstances described in the Executive Order.

210.   The Corps Implementing Actions directly contravene the Corps' emergency procedures regulation set out at 33 C.F.R. § 325.2(e), the established regulatory process for Section 7 consultation under the ESA, and other applicable regulations.

211.   To the extent the Corps Implementing Actions purport to modify existing emergency procedure regulations, such modification is contrary to the APA, 5 U.S.C. § 553.

212.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Corps Implementing Actions are unlawful under the APA. Plaintiff States are further entitled to vacatur of these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing the Corps from issuing permits, conducting consultations, providing other authorizations, or revising agency procedures on an emergency basis pursuant to Executive Order 14156 or the Corps Implementing Actions.

**COUNT 3**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Arbitrary and Capricious**
**(Against Corps Defendants)**

213.   Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

214.   The Corps is an "agency" as defined in 5 U.S.C. § 551(1).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

60

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

215.   The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

216.   Agency action is arbitrary and capricious if the agency fails to consider important factors, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

217.   The Corps Implementing Actions constitute final agency actions subject to judicial review under the APA.

218.   Through the Corps Implementing Actions, the Corps acted arbitrarily and capriciously. The Corps failed to engage in reasoned decisionmaking, failed to provide reasoned justification for their actions, failed to consider reasonable alternatives, failed to consider reliance interests, relied on factors which Congress has not intended them to consider, and entirely failed to consider important aspects of the problem.

219.   For example, the Corps failed to consider the objective of the Clean Water Act when it took the Corps Implementing Actions.

220.   The Clean Water Act's objectives are to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and "preserve, and protect the primary responsibilities and rights of States." 33 U.S.C. § 1251(a), (b).

221.   The protection of water quality is the paramount interest the Corps must consider when executing its permitting authority under Clean Water Act Section 404.

222.   The Corps failed to consider how deviating from the standard permitting process was likely to undermine, rather than further, the Clean

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

61

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1   Water Act's objectives of restoring and maintaining the chemical, physical,

2   and biological integrity of the Nation's waters and protecting the role of

3   states.

4        223.   When the Corps took the Corps Implementing Actions, it was

5   required to consider, for each permit application, whether there was an

6   emergency within the meaning of 33 C.F.R. § 325.2(e)(4).

7        224.   The Corps failed to consider whether an emergency within the

8   meaning of 33 C.F.R. § 325.2(e)(4) existed to justify use of emergency

9   procedures for hundreds of projects.

10       225.   The Corps failed to articulate a reasoned explanation of how the

11  circumstances described in the Executive Order constitute an emergency

12  within the meaning of 33 C.F.R. § 325.2(e)(4).

13       226.   In reliance on an Executive Order directing the bypass of critical

14  environmental protections under a false energy "emergency," the Corps also

15  relied on factors Congress did not intend for it to consider.

16       227.   For projects that may affect endangered or threatened species, the

17  Corps Implementing Actions arbitrarily and unlawfully invoke 50 C.F.R.

18  § 402.05 to indefinitely delay the required process for consultation under the

19  ESA.

20       228.   The Corps failed to articulate a reasoned explanation of how it

21  can invoke emergency processing procedures for favored energy projects

22  when the regulatory conditions for invoking those procedures are not met.

23       229.   In the alternative, even if the Corps could use emergency

24  procedures to address an energy emergency, the Corps has not provided any

25  explanation, let alone a rational one, for prioritizing favored energy projects

26

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

62

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    over other energy projects, or for excluding wind, solar, or battery storage

2    projects from emergency treatment.

3        230.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States

4    are entitled to a declaration that the Corps Implementing Actions are arbitrary

5    and capricious under the APA. Plaintiff States are further entitled to vacatur of

6    these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief

7    under 5 U.S.C. § 705; and a permanent injunction preventing the Corps from

8    issuing permits, conducting consultations, or providing other authorizations or

9    agency procedures or guidance on an emergency basis pursuant to Executive

10   Order 14156 or the Corps Implementing Actions.

**COUNT 4**

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Contrary to Law**

**(Against Interior Defendants)**

14       231.   Plaintiff States reallege and incorporate by reference the

15   allegations set forth in each of the preceding paragraphs.

16       232.   Interior is an "agency" as defined in 5 U.S.C. § 551(1).

17       233.   The APA provides that this Court "shall" "hold unlawful and set

18   aside" agency action that is "arbitrary, capricious, an abuse of discretion, or

19   not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

20       234.   Agency action is not in accordance with the law if the agency

21   fails to interpret and implement the statutory language consistent with the

22   statute's text, structure, and purpose.

23       235.   Agency action is also not in accordance with the law if agency

24   action is inconsistent with applicable federal regulations.

25       236.   Interior's decision to issue the Alternative Arrangements

26   constitutes a final agency action subject to judicial review under the APA.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

63

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

237.   The Alternative Arrangements directly contravene NEPA, the ESA, and other applicable statutes, which do not authorize emergency action under the circumstances described in the Executive Order.

238.   The Alternative Arrangements directly contravene the Interior's emergency procedures regulation set out at 43 C.F.R. § 46.150, the established regulatory process for Section 7 consultation under the ESA, and other applicable regulations

239.   To the extent the Alternative Arrangements purport to modify Interior's existing emergency procedures regulation, such modification is contrary to the APA, 5 U.S.C. § 553.

240.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Alternative Arrangements are unlawful under the APA. Plaintiff States are further entitled to vacatur of these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing Interior from issuing permits, conducting consultations, or providing other authorizations or agency procedures or guidance on an emergency basis pursuant to Executive Order 14156 or the Alternative Arrangements.

**COUNT 5**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Arbitrary and Capricious**
**(Against Interior Defendants)**

241.   Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

242.   Interior is an "agency" as defined in 5 U.S.C. § 551(1).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

64

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

243.    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

244.    Agency action is arbitrary and capricious if the agency fails to consider important factors, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

245.    Interior's decision to issue the Alternative Arrangements constitutes a final agency action subject to judicial review under the APA.

246.    Through the Alternative Arrangements, Interior acted arbitrarily and capriciously. Interior failed to engage in reasoned decisionmaking, failed to provide reasoned justification for their actions, failed to consider reasonable alternatives, failed to consider reliance interests, relied on factors which Congress has not intended them to consider, and entirely failed to consider important aspects of the problem.

247.    When Interior issued the Alternative Arrangements, it was required to consider the objectives of NEPA.

248.    NEPA's objectives are: "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

249.    To those ends, Congress directed that all federal agencies, including Interior, "identify and develop methods . . . which will ensure that presently unquantified environmental amenities and values may be given

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

65

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1    appropriate consideration in decisionmaking along with economic and

2    technical considerations." 42 U.S.C. § 4332(B).

3        250.   Interior failed to consider how deviating from its standard NEPA

4    process was likely to undermine, rather than further, NEPA's objectives of

5    ensuring that agencies fully consider the potential environmental impacts of

6    their decisions.

7        251.   In adopting the Alternative Arrangements, Interior was limited to

8    "urgently needed actions . . . necessary to control the immediate impacts of

9    the emergency that are urgently needed to mitigate harm to life, property, or

10   important natural, cultural, or historic resources." 43 C.F.R. § 46.150.

11       252.   Interior failed to articulate a reasoned explanation of how the

12   circumstances described in the Executive Order constitute an emergency

13   within the meaning of 43 C.F.R. § 46.150.

14       253.   In reliance on an Executive Order directing the bypass of critical

15   environmental protections under a false energy "emergency," Interior also

16   relied on factors Congress did not intend for it to consider.

17       254.   Interior failed to articulate a reasoned explanation of how it can

18   invoke emergency procedures for favored energy projects when the regulatory

19   conditions for invoking those procedures are not met. Interior also failed to

20   articulate a reasoned explanation for allowing applicants to opt into the

21   alternative arrangements when the desires of a project applicant are not a

22   factor that is appropriate to consider under NEPA.

23       255.   For projects that may affect endangered or threatened species, the

24   Alternative Arrangements arbitrarily and unlawfully invoke 50 C.F.R.

25   § 402.05 to indefinitely delay the required process for consultation under the

26   ESA.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

66

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

256.   In the alternative, even if Interior could use emergency procedures to address an energy emergency, Interior has not provided any explanation, let alone a rational one, for prioritizing favored energy projects over other energy projects, or for excluding other energy projects from its Alternative Arrangements.

257.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Alternative Arrangements are arbitrary and capricious under the APA. Plaintiff States are further entitled to vacatur of these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing Interior from issuing permits, conducting consultations, or providing other authorizations or agency procedures or guidance on an emergency basis pursuant to Executive Order 14156 or the Alternative Arrangements.

**COUNT 6**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Contrary to Law**
**(Against ACHP Defendants)**

258.   Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

259.   The ACHP is an "agency" as defined in 5 U.S.C. § 551(1).

260.   The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

261.   Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

67

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

262.   Agency action is also not in accordance with law if agency action is inconsistent with applicable federal regulations.

263.   ACHP's decision to issue the ACHP Emergency Provisions constitutes a final agency action subject to judicial review under the APA.

264.   The ACHP Emergency Provisions directly contravene the NHPA, and other applicable statutes because those statutes do not authorize emergency action under the circumstances described in the Executive Order.

265.   The ACHP Emergency Provisions directly contravene the ACHP's emergency procedures regulation set out 36 C.F.R. § 800.12.

266.   To the extent the ACHP Emergency Provisions purport to modify existing emergency procedure regulations, such modification is contrary to the APA, 5 U.S.C. § 553.

267.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ACHP Emergency Provisions are unlawful under the APA. Plaintiff States are further entitled to vacatur of these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing ACHP from directing federal agencies to consult State Historic Preservation Officers, Tribal Historic Preservation Officers, Indian Tribes, or Native Hawaiian organizations, issuing findings of no adverse effect, entering into memoranda of agreement or programmatic agreements, or providing other authorizations or agency procedures or guidance on an emergency basis pursuant to Executive Order 14156 or the ACHP Emergency Provisions.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

68

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

## COUNT 7
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706 – Arbitrary and Capricious
### (Against ACHP Defendants)

268.   Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

269.   The ACHP is an "agency" as defined in 5 U.S.C. § 551(1).

270.   The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

271.   Agency action is arbitrary and capricious if the agency fails to consider important factors, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

272.   ACHP's decision to issue the ACHP Emergency Provisions constitutes a final agency action subject to judicial review under the APA.

273.   Through the ACHP Emergency Provisions, ACHP acted arbitrarily and capriciously. ACHP failed to engage in reasoned decisionmaking, failed to provide reasoned justification for their actions, failed to consider reasonable alternatives, failed to consider reliance interests, relied on factors which Congress has not intended them to consider, and entirely failed to consider important aspects of the problem.

274.   When the ACHP issued the ACHP Emergency Provisions, it was required to consider the objective of the NHPA.

275.   The NHPA exists to preserve and protect historic and archaeological sites for present and future generations. 54 U.S.C. § 300101.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

69

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

276.   The ACHP failed to consider how impacts to historic and archaeological sites resulting from permitting pursuant to the ACHP Emergency Provisions would undermine, rather than further, the NHPA's objective of preserving and protecting historic and archaeological sites.

277.   When the ACHP issued the ACHP Emergency Provisions, it was required to consider whether there was an emergency within the meaning of 36 C.F.R. § 800.12, and whether all the included energy projects were an essential and immediate response to the alleged emergency.

278.   The ACHP failed to consider whether an emergency within the meaning of 36 C.F.R. § 800.12 existed to justify use of emergency procedures for hundreds of projects, irrespective of the individual circumstances and purpose of each individual project.

279.   The ACHP failed to articulate a reasoned explanation of how the Executive Order constitutes an emergency within the meaning of 36 C.F.R. § 800.12(a).

280.   The ACHP failed to articulate a reasoned explanation of how it can invoke emergency procedures when the regulatory conditions for invoking those procedures are not met.

281.   In reliance on an Executive Order directing the bypass of critical environmental protections under a false energy "emergency," the ACHP also relied on factors Congress did not intend for it to consider.

282.   The ACHP failed to rationally explain why its emergency guidance applies only to favored energy projects and not others.

283.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ACHP Emergency Provisions are arbitrary and capricious under the APA. Plaintiff States are further entitled to vacatur of

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

70

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing ACHP from directing federal agencies to consult State Historic Preservation Officers, Tribal Historic Preservation Officers, Indian Tribes, or Native Hawaiian organizations, issuing findings of no adverse effect, entering into memoranda of agreement or programmatic agreements, or providing other authorizations or agency procedures or guidance on an emergency basis pursuant to Executive Order 14156 or the ACHP Emergency Provisions.

## COUNT 8
### Violation of the Endangered Species Act and Implementing Regulations, 16 U.S.C. §§ 1536, 1538(g) 1540(g), 50 C.F.R. Part 402– Against Corps and Interior Defendants

284.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

285.    The Endangered Species Act requires federal agencies to consult with the Services before undertaking actions that are likely to affect listed species or habitat. Congress required agencies to follow that consultation process except in certain rare situations inapplicable here.

286.    The Corps Implementing Actions and Interior Alternative Arrangements, which invoke 50 C.F.R. § 402.05 routinely and categorically for favored energy projects, contradicts and ignores the ESA's overarching purpose.

287.    They also violates the ESA's mandate that agencies "insure" their actions are not likely to jeopardize threatened or endangered species or adversely modify their critical habitat before taking action. 16 U.S.C. § 1536(a)(2).

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

71

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

288. They also violate the ESA's mandate that agencies avoid irreversible or irretrievable commitments of resources until consultation has been completed. *Id.* § 1536(d).

289. The Services' joint regulation for emergency consultation, 50 C.F.R. § 402.05, is inapplicable. Section 402.05 allows for emergency responses to sudden, unanticipated events, when necessary to prevent the loss of life, protect public safety, or avoid other imminent harm. This regulation cannot reasonably be construed to allow for routine, categorical application to advance Presidential policy goals.

290. The Corps' and Interior's use of the emergency consultation process described in 50 C.F.R. § 402.05 for favored energy projects violates the ESA and its implementing regulations.

291. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Corps Implementing Actions and Interior Alternative Arrangements violate the ESA and its implementing regulations and violate the APA. Plaintiff States are further entitled to vacatur of these actions pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing the Corps or Interior from issuing permits, conducting consultations, or providing other authorizations or agency procedures or guidance on an emergency basis pursuant to Executive Order 14156, the Corps Implementing Actions, or the Interior Alternative Arrangements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare Executive Order 14156 unlawful under the common law *ultra vires* doctrine.

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

72

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

b.  Declare that the Agency Defendants' actions implementing Executive Order 14156 are arbitrary and capricious, not in accordance with law, and exceed statutory authority, and vacate and set aside these actions.

c.  Temporarily and then permanently enjoin the Agency Defendants from issuing permits, conducting consultations, or providing other authorizations or agency procedures or guidance on an emergency basis pursuant to Executive Order 14156, the Corps Implementing Actions, Interior Alternative Arrangements, or the ACHP Emergency Provisions.

d.  Award Plaintiffs their attorneys' fees and costs pursuant to 54 U.S.C. § 307105, 16 U.S.C. § 1540(g)(4), and any other applicable statute.

e.  Award such additional relief as the interests of justice may require.

DATED this 30th day of January, 2026.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Kelly T. Wood*
*/s/ Janell Middleton*
*/s/ Dylan Stonecipher*
*/s/ Caitlin Soden*
KELLY T. WOOD, WSBA #40067
Senior Counsel
JANELL MIDDLETON, WSBA # 52666
DYLAN STONECIPHER, WSBA # 58245
Assistant Attorneys General
Ecology Division
1125 Washington St. SE
Olympia, Washington 98504
360-586-6770
kelly.wood@atg.wa.gov
Janell.middleton@atg.wa.gov
Dylan.stonecipher@atg.wa.gov

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

73

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CAITLIN SODEN, WSBA # 55457
Assistant Attorney General
Environmental Protection Division
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
206-464-7744
caitlin.soden@atg.wa.gov

*Attorneys for the State of Washington*

ROB BONTA
Attorney General of California
ROBERT D. SWANSON
Supervising Deputy Attorney General


*s/ Tatiana K. Gaur*
*s/ Catherine M. Wieman*
*s/ Keari A. Platt*
TATIANA K. GAUR*
CATHERINE M. WIEMAN*
KEARI A. PLATT*
Deputy Attorneys General
California Office of the Attorney
General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
213-269-6329
Tatiana.Gaur@doj.ca.gov

*Attorneys for the State of California*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

74

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1  KRISTIN K. MAYES
2  Attorney General of Arizona

3  */s/ Kirsten Engel*
4  KIRSTEN ENGEL*
5  Office of the Attorney General
   2005 North Central Avenue
6  Phoenix, AZ 85004
7  Telephone: 520-209-4020
   Kirsten.Engel@azag.gov
8
9  *Attorneys for the State of Arizona*

10 PHILIP J. WEISER
11 Attorney General of Colorado

12 /s/ Carrie Noteboom
13 CARRIE NOTEBOOM**
   Assistant Deputy Attorney General
14 Ralph L. Carr Judicial Center
15 1300 Broadway, 10th Floor
   Denver, CO 80203
16 720-508-6000
17 carrie.noteboom@coag.gov

18 *Attorneys for the State of Colorado*
19
20 WILLIAM TONG
   Attorney General of Connecticut
21
   */s/ Jill Lacedonia*
22 JILL LACEDONIA*
   Assistant Attorney General
23 165 Capitol Avenue
   Hartford, CT 06106
24 860-808-5250
25 Jill.Lacedonia@ct.gov
26 *Attorneys for the State of Connecticut*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

75

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

KWAME RAOUL
Attorney General of Illinois

/s/ Jason E. James
JASON E. JAMES*
Assistant Attorney General
Office of the Attorney General
Environmental Bureau
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
Phone: 217-843-0322
jason.james@ilag.gov

*Attorneys for the State of Illinois*

AARON M. FREY
Attorney General of Maine

/s/ Jack Dafoe
JACK DAFOE*
Assistant Attorney General
Natural Resources Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
207-626-8868
jack.dafoe@maine.gov

*Attorneys for the State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN*
Assistant Attorney General
Office of the Attorney General of
Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6414
sgoldstein@oag.state.md.us

*Attorneys for the State of Maryland*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

76

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1 | ANDREA JOY CAMPBELL
Attorney General of Massachusetts

2

3 | */s/ Zeus H. Smith*
ZEUS H. SMITH*

4 | Assistant Attorney General
Environmental Protection Division

5 | Office of the Attorney General
One Ashburn Place

6 | Boston, MA 02108
(617) 963-2294

7 | Zeus.smith@mass.gov

8 | *Attorneys for the Commonwealth of
Massachusetts*

9

10 | DANA NESSEL
Attorney General of Michigan

11 | */s/ Benjamin C. Houston*

12 | *s/ Hadley Tuthill*
BENJAMIN C. HOUSTON*

13 | HADLEY TUTHILL*
Assistant Attorney General

14 | Environment, Natural Resources, and
Agriculture Division

15 | 6th Floor G. Menne Williams Building
525 W. Ottawa Street, PO Box 30755

16 | Lansing, Michigan 48909
(517) 335-7664

17 | HoustonB1@michigan.gov

18 | *Attorneys for the People of the
State of Michigan*

19

20 | KEITH ELLISON
Attorney General of Minnesota

21 | */s/ Alyssa Bixby-Lawson*

22 | ALYSSA BIXBY-LAWSON*
Assistant Attorney General

23 | 445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131

24 | (651) 300-0904 (Voice)
(651) 297-4139 (Fax)

25 | Alyssa.bixby-lawson@ag.state.mn.us

26 | *Attorneys for the State of Minnesota*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

77

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FOR THE STATE OF NEW JERSEY
MATTHEW J. PLATKIN
Attorney General of New Jersey


*/s/ Nell Hryshko*
Nell Hryshko*
Deputy Attorney General
Division of Law
25 Market St., P.O. Box 093
Trenton, NJ 08625
Telephone: (609) 376-2735
Email: nell.hryshko@law.njoag.gov

*Attorneys for the State of New Jersey*


FOR THE STATE OF NEW MEXICO
RAUL TORREZ
Attorney General


*/s/ Esther Jamison*
Esther Jamison**
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
Tel. (505) 627-3474
EJamison@nmdoj.gov

*Attorneys for the State of New Mexico*

DAN RAYFIELD
Attorney General of Oregon


*/s/ Diane Lloyd*
DIANE LLOYD*
Assistant Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Diane.Lloyd@doj.oregon.gov

*Attorneys for the State of Oregon*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

78

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

PETER F. NERONHA
Attorney General of Rhode Island


*/s/ Alison H. Carney*
*s/ Nicholas M. Vaz*
ALISON H. CARNEY*
NICHOLAS M. VAZ*
Special Assistant Attorneys General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 exts. 2116/2297
acarney@riag.ri.gov
nvaz@riag.ri.gov

*Attorneys for the State of Rhode Island*


CHARITY R. CLARK
Attorney General of Vermont

*/s/Laura B. Murphy*
LAURA B. MURPHY*
Assistant Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-1059
laura.murphy@vermont.gov

*Attorneys for the State of Vermont*

FIRST AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

79

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(360) 753-6200

1

2      JOSHUA L. KAUL
       Attorney General of Wisconsin
3

4      */s/ Gabe Johnson-Karp*
       GABE JOHNSON-KARP*
5      *Assistant Attorney General*
6      Wisconsin Department of Justice
       17 West Main Street
7      Post Office Box 7857
8      Madison, Wisconsin 53707-7857
       (608) 267-8904
9      gabe.johnson-karp@wisdoj.gov
10     *Attorneys for the State of Wisconsin*

11

12     * Admitted *pro hac vice*
       ** *Pro hac vice* application
13     forthcoming

14

15

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED AND                        80            ATTORNEY GENERAL OF WASHINGTON
SUPPLEMENTAL COMPLAINT FOR                                      Ecology Division
DECLARATORY                                                 1125 Washington St. SE
AND INJUNCTIVE RELIEF                                            P.O. Box 40100
                                                             Olympia, WA 98504
                                                               (360) 753-6200