1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Honorable Jamal N. Whitehead

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | Case No. 2:25-cv-869-JW |
| DONALD TRUMP, in his official capacity as President of the United States, et al., | **DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)** |
| Defendants. | NOTE ON MOTION CALENDAR: June 4, 2026 |
| | ORAL ARGUMENT REQUESTED |

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.      The Clean Water Act and Emergency Permitting Procedures ........................... 2

    II.     The National Historic Preservation Act and Emergency Procedures ................. 3

    III.    NEPA and Interior's Regulations for Emergencies ............................................. 4

    IV.    The Endangered Species Act and Emergency Consultation Regulations ........... 5

    V.     Executive Order 14156—Declaring a National Energy Emergency .................. 6

    VI.    The Complaint ..................................................................................................... 8

ARGUMENT ....................................................................................................................... 8

    I.      The States Lack Article III Standing to Bring Any of Their Claims .................. 8

          A.     The Corps and Interior Have Not Caused the States Any Injury .............. 9

          B.     The Complaint Does Not Allege That the Council Has Caused Any
                Concrete Injury Either to a Historic Property or to the States ............... 13

    II.     The States Do Not Allege "Final Agency Action." ........................................... 14

          A.     The States' Attempt to Mount a Programmatic Attack on the Agencies
                Fails ...................................................................................................... 15

          B.     The States Are Not Challenging a Final Agency Action ....................... 16

                1.   The Agencies Have Not Consummated Their Decisionmaking
                    Processes .......................................................................................... 16

                2.   The Agencies Have Not Established Legally Binding Obligations .. 18

    III.    The States' Challenge Is Not Ripe for Review ................................................. 20

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

i

A.    Delayed Review Would Not Cause the States Any Hardship ................20

B.    The Court's Intervention Would Interfere with Administrative Action,
      While Judicial Review Would Benefit from Further Factual
      Development ...........................................................................................21

IV.    The Court Should Reject the States' Ultra Vires Claim .....................................22

A.    The President Must Be Dismissed from this Case .................................22

B.    The States Fail to State an Ultra Vires Claim .......................................23

CONCLUSION...........................................................................................................24

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

ii

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

1

## TABLE OF AUTHORITIES

2 **Cases**

3 *Abbott Labs. v. Gardner*,

4     387 U.S. 136 (1967).................................................................................................. 20

5 *Armstrong v. Exceptional Child Ctr., Inc.*,

6     135 S. Ct. 1378 (2015)............................................................................................. 22

7 *Bennett v. Spear*,

8     520 U.S. 154 (1997).......................................................................................... 17, 18

9 *Butte Env't Council v. U.S. Army Corps of Eng'rs*,

10     620 F.3d 936 (9th Cir. 2010) ..................................................................................... 6

11 *Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*,

12     1:15–cv–00912-LJO-BAM, 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) ............................ 24

13 *California v. Trump*,

14     407 F. Supp. 3d 869 (N.D. Cal. 2019) .................................................................... 22

15 *Clapper v. Amnesty Int'l*,

16     568 U.S. 398 (2013).................................................................................................. 11

17 *Food & Drug Admin. v. All. for Hippocratic Med.*,

18     602 U.S. 367 (2024).................................................................................................. 11

19 *Franklin v. Massachusetts*,

20     505 U.S. 788 (1992).......................................................................................... 15, 23

21 *Friends of Animals v. Burgum*,

22     164 F.4th 738 (9th Cir. 2026) ..................................................................................... 5

23 *Friends of the Earth v. Hintz*,

24     800 F.2d 822 (9th Cir. 1986) ..................................................................................... 2

25 *Grupo Mexicano De Desarrollo v. All. Bond Fund*,

26     527 U.S. 308 (1999).................................................................................................. 22

27

28

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

iii

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

*Idaho Rivers United v. U.S. Army Corps of Eng'rs,*

    No. C14-1800JLR, 2016 WL 498911 (W.D. Wash. Feb. 9, 2016) .......................................... 20

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*

    681 F.3d 1006 (9th Cir. 2012) ................................................................................ 13

*Lane v. Pena,*

    518 U.S. 187 (1996) .............................................................................................. 23

*Leite v. Crane Co.,*

    749 F.3d 1117 (9th Cir. 2014) ................................................................................ 10

*Lujan v. Defs. of Wildlife,*

    504 U.S. 555 (1992) ................................................................................................ 9

*Lujan v. Nat'l Wildlife Fed'n,*

    497 U.S. 871 (1990) .................................................................................... 1, 15, 16

*Mississippi v. Johnson,*

    71 U.S. (4 Wall) 475 (1867) ............................................................................ 22–23

*Nat'l Mining Ass'n v. Fowler,*

    324 F.3d 752 (D.C. Cir. 2003) ................................................................................. 3

*Navajo Nation v. Off. of Navajo & Hopi Indian Relocation,*

    631 F. Supp. 3d 776 (D. Ariz. 2022) ..................................................................... 16

*Nixon v. Fitzgerald,*

    457 U.S. 731 (1982) .............................................................................................. 23

*Norton v. S. Utah Wilderness All.,*

    542 U.S. 55 (2004) ................................................................................................ 15

*Nuclear Regul. Comm'n v. Texas,*

    605 U.S. 665 (2025)........................................................................................ 22, 23

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*

    523 U.S. 726 (1998) ........................................................................................ 20, 21

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

iv

*Pennsylvania v. New Jersey*,

    426 U.S. 660 (1976)................................................................................................. 11

*Rattlesnake Coal. v. EPA*,

    509 F.3d 1095 (9th Cir. 2007) ............................................................................. 15

*Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332 (1989)................................................................................................... 4

*S. Cal. All. Of Publicly Owned Treatment Works v. EPA*,

    8 F.4th 831 (9th Cir. 2021) ................................................................................... 19

*Seven Cnty. Infrastructure Coal. v. Eagle County*,

    605 U.S. 168 (2025)................................................................................................... 4

*Spokeo, Inc. v. Robins*,

    578 U.S. 330 (2016)................................................................................................... 8

*Stockton v. Brown*,

    152 F. 4th 1124 (9th Cir. 2025) ........................................................................... 20

*Summers v. Earth Island Inst.*,

    555 U.S. 489 (2009)................................................................................................... 8

*Toilet Goods Ass'n v. Gardner*,

    387 U.S. 158 (1967)............................................................................................ 20, 21

*Town of Chester v. Laroe Ests., Inc.*,

    581 U.S. 433 (2017)................................................................................................. 10

*TransUnion LLC v. Ramirez*,

    594 U.S. 413 (2021).............................................................................................. 9, 12

*Trump v. Am. Fed'n of Gov't Emps.*,

    145 S. Ct. 2635 (2025)............................................................................................ 23

*United States v. Amirnazmi*,

    645 F.3d 564 (3d Cir. 2011) ................................................................................. 22

Defendants' Motion to Dismiss

Case No. 2:25-cv-00869-JNW

U.S. Department of Justice

Environment and Natural Resources Division

P.O. Box 7611

Washington, D.C. 20044

(202) 532-3080

v

*W. Radio Servs. Co. v. Glickman*,

  123 F.3d 1189 (9th Cir. 1997) ............................................................ 16

*Washington v. HHS*,

  482 F. Supp. 3d 1104 (W.D. Wash. 2020) ......................................... 11

*Waterford Citizens' Ass'n v. Reilly*,

  970 F.2d 1287 (4th Cir. 1992) ...................................................... 3, 13

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,

  5 F.4th 997 (9th Cir. 2021) ......................................... 14, 16, 17, 18, 19

*Wild Fish Conservancy v. Jewell*,

  730 F.3d 791 (9th Cir. 2013) ............................................................ 15

**Statutes**

5 U.S.C. § 704 ..................................................................................... 14

16 U.S.C. § 1532(15) ............................................................................. 5

16 U.S.C. § 1536(a)(2) ...................................................................... 5, 13

16 U.S.C. § 1536(b)(3)(A) ..................................................................... 6

16 U.S.C. § 1536(d) ......................................................................... 6, 13

16 U.S.C. § 1540(g)(2) ........................................................................ 14

33 U.S.C. § 1341(a)(1) ........................................................................... 2

33 U.S.C. § 1344(a) ............................................................................... 2

42 U.S.C. § 4321 ................................................................................... 4

42 U.S.C. § 4332(2)(C) .......................................................................... 5

42 U.S.C. § 4336(b)(2) ........................................................................... 5

54 U.S.C. § 304108(a) ........................................................................... 3

54 U.S.C. § 306108 .......................................................................... 3, 13

**Regulations**

33 C.F.R. § 320.1(a)(2) .......................................................................... 3

33 C.F.R. § 325.2 ................................................................................... 2

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

vi

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

33 C.F.R. § 325.2(e)(4) ........................................................................................... 3, 21

33 C.F.R. § 325.8(b)–(c) ................................................................................................ 3

36 C.F.R. § 800.12 ................................................................................. 4, 14, 16, 18

36 C.F.R. § 800.12(a) ................................................................................................... 4

36 C.F.R. § 800.12(b)(1) .............................................................................................. 4

36 C.F.R. § 800.12(b)(2) ....................................................................................... 4, 14

36 C.F.R. § 800.12(d) ................................................................................................... 4

40 C.F.R. § 121.6(c) ..................................................................................................... 2

40 C.F.R. § 121.7(a) ..................................................................................................... 2

43 C.F.R. § 46.150 ........................................................................................................ 5

43 C.F.R. pt. 46 ............................................................................................................. 5

43 C.F.R. § 46.150(a) ................................................................................................... 5

43 C.F.R. § 46.150(b) ................................................................................................... 5

43 C.F.R. § 46.150(c) ................................................................................................... 5

43 C.F.R. § 46.150(d) ................................................................................................... 5

50 C.F.R. § 402.01(b) ................................................................................................... 5

50 C.F.R. § 402.05(a) ............................................................................................... 6, 7

50 C.F.R. § 402.05(b) ............................................................................................. 6, 18

50 C.F.R. § 402.13(c) ................................................................................................... 6

50 C.F.R. § 402.14(a) ................................................................................................... 6

50 C.F.R. § 402.14(h)(1)(iv) ........................................................................................ 6

50 C.F.R. § 402.14(h)(2) .............................................................................................. 6

50 C.F.R. § 402.14(m)(1) ............................................................................................. 6

**Federal Register Notices**

90 Fed. Reg. 8433 (Jan. 20, 2025) ...................................................................... 6, 7, 23

Defendants' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

vii

# INTRODUCTION

In January 2025, the President declared a national energy emergency and instructed agencies to use all lawful authorities to speed up permitting for traditional energy infrastructure. In response, the U.S. Army Corps of Engineers (the "Corps"), the U.S. Department of the Interior ("Interior"), and the Advisory Council on Historic Preservation ("ACHP" or "Council") developed emergency processing frameworks. The agencies apply and tailor their emergency procedures when evaluating discrete (a) permit applications or (b) proposed actions by an agency that may affect endangered and threatened species.

Here, the Plaintiff States do not challenge any discrete permitting decision or proposed action. Instead, they allege that, when applied, these procedures will deprive them of procedural rights. Yet more than a year has passed since the President declared the emergency, and the States struggle to identify any deprivation. And to the extent the States believe they have been denied a right to participate in the permitting process, they can bring individual lawsuits to challenge the particular permit issued and the processes the agencies used in that case. This is the "traditional" and "normal . . . mode of operation of the courts." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

For these reasons, the amended complaint founders on multiple independent jurisdictional shoals. First, the States lack standing. The States have not shown that they have been deprived of rights owed to them. And their back-up theory—that they are working more to supplement (unspecified) work the agencies are forgoing—is self-inflicted harm not traceable to the agencies. Second, the States do not identify any reviewable final agency action. Instead, they mount impermissible programmatic challenges to the general administration of the agencies' programs. To the extent they challenge specific procedures adopted by the agencies, these mark the beginning—not the consummation—of the agencies' decisionmaking processes and lack legal effect until applied in a particular circumstance. Finally, the States' claims are not ripe: without any injury, withholding review will cause the States no hardship, and additional facts—how the agencies will apply the processes in particular circumstances—are required for judicial review.

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

1

1    The ultra vires claim should additionally be dismissed for failure to state a claim. As

2 the Supreme Court has recognized for over 150 years, there is no cause of action to enjoin the

3 President in the performance of his official duties. And the ultra vires claim against the

4 agencies fails because it is duplicative of their Administrative Procedure Act ("APA") claims

5 and they have identified no specific prohibitions the agencies have transgressed.

6    This Court should dismiss the amended complaint in full.

**BACKGROUND**

**I.    The Clean Water Act and Emergency Permitting Procedures**

9    Section 404 of the Clean Water Act authorizes the Corps to regulate discharges of

10 dredged and fill material into waters of the United States through the issuance of permits. 33

11 U.S.C. § 1344(a). When seeking an individual permit, the project proponent must submit an

12 application to discharge material in a particular area in connection with a specific project. The

13 applicant must also provide a certification from the relevant state that the discharge complies

14 with water quality requirements, including state water quality standards. 33 U.S.C. §

15 1341(a)(1). This requirement, known as the "Section 401 certification," allows a state to grant

16 a certification, grant with conditions, waive the certification, or deny it. 40 C.F.R. § 121.7(a).

17 The state must issue its certification decision "within a reasonable period of time (which shall

18 not exceed one year)," or it waives its right to do so. 33 U.S.C. § 1341(a)(1). The federal

19 permitting agency and the state may agree to what constitutes a reasonable period, but if they

20 fail to do so, the state must issue its decision within six months. 40 C.F.R. § 121.6(c).

21    The Corps considers a Section 404 application in accordance with its permit

22 processing regulations in 33 C.F.R. § 325.2, culminating in a final decision to grant or deny

23 that permit application. *See, e.g.*, *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir.

24 1986). Judicial review of Corps permitting decisions generally is available under the APA.

25 *See, e.g.*, *id.*

26

27

28

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

The Corps' regulations also allow for processing applications via emergency procedures. Specifically, division[1] engineers are authorized to approve special processing procedures in emergency situations. 33 C.F.R. § 325.2(e)(4). The regulations define an "emergency" as "a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures." *Id.*

## II.    The National Historic Preservation Act and Emergency Procedures

The National Historic Preservation Act ("NHPA") provides, in relevant part, that an agency considering an action (an "undertaking") that might impact historic properties must give the Council "a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. Section 106 is procedural; it imposes no substantive standards on agencies as to whether a historic property should or should not be protected, but only requires them to solicit the Council's comments and to "take into account the effect of [their] undertaking[s]" on historic properties. *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003) (citation omitted).

NHPA Section 211 provides that the Council may promulgate such rules and regulations as it deems "necessary to govern the implementation of [Section 106] in its entirety." 54 U.S.C. § 304108(a). The Council has broad discretion in devising regulations to "fill[] the interstices of the statute by defining how federal agencies may discharge their section 106 obligation." *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1290 (4th Cir. 1992) (citing 36 C.F.R. Part 800.1 *et seq.*).[2]

The ACHP has promulgated regulations implementing Section 106, "Protection of Historic Properties" at 36 C.F.R. Part 800, setting forth the steps that federal agencies must

---

[1] The Corps is a decentralized organization, and most of the authority for administering its regulatory programs is delegated to divisions and districts at the regional and local level, respectively. 33 C.F.R. § 320.1(a)(2); *see also id.* § 325.8(b)–(c).

[2] This holding was in no way altered by the 1992 amendments to the NHPA.

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

1  follow to comply with Section 106. The regulations of interest here are those relating to a

2  disaster or an emergency declared by the President. *See* 36 C.F.R. § 800.12.

3       Among other things, the regulations allow the Council to review and approve federal

4  agencies' proposed procedures for Section 106 compliance under "a disaster or emergency

5  declared by the President." 36 C.F.R. § 800.12(a). Where an agency has not adopted

6  emergency procedures under Section 800.12(a), and where the agency "proposes an

7  emergency undertaking as an essential and immediate response to a disaster or emergency

8  declared by the President," the regulations give the agency two options. The agency may

9  comply with Section 106 by either: (1) following a programmatic agreement developed in

10  accordance with 36 C.F.R. § 800.14(b) that contains specific provisions for dealing with

11  historic properties in emergency situations, 36 C.F.R. § 800.12(b)(1); or (2) notifying the

12  Council (or other specified parties), and "affording them an opportunity to comment" within

13  seven days (or the time available). 36 C.F.R. § 800.12(b)(2). Thus, where the agency has

14  adopted neither emergency-specific procedures, nor an emergency-specific programmatic

15  agreement, the regulation simply requires the agency to complete a brief comment process

16  that allows the agency to fulfill its Section 106 duties on an expedited basis.

17       ACHP regulations provide that while emergency procedures apply for 30 days

18  following an emergency declaration by the President, "[a]n agency may request an extension."

19  36 C.F.R. § 800.12(d). On occasion, the Council has preemptively extended this 30-day limit.

20  For example, it did so in relation to the President's national emergency declaration relating to

21  the COVID-19 pandemic.

22  **III.    NEPA and Interior's Regulations for Emergencies**

23       The National Environmental Policy Act ("NEPA") requires that federal agencies

24  consider the environmental consequences of major federal actions significantly affecting the

25  environment. 42 U.S.C. § 4321; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

26  349 (1989). The statute achieves its objectives by imposing procedural, rather than substantive

27  requirements. *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 177

28  (2025). NEPA requires that an agency prepare a comprehensive environmental impact

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

4

1  statement ("EIS") for "major Federal actions significantly affecting the quality of the human

2  environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an environmental assessment

3  ("EA") to determine whether the impacts of an action will be significant, and if not, the

4  agency may prepare a finding of no significant impact and forgo preparation of an EIS. 42

5  U.S.C. § 4336(b)(2); *see also Friends of Animals v. Burgum*, 164 F.4th 738, 750 (9th Cir.

6  2026).

7        Interior has regulations governing the implementation of NEPA. *See* 43 C.F.R. Part

8  46. Those regulations contain provisions governing emergencies—when there is insufficient

9  time for the agency to prepare an environmental analysis prior to taking urgent action. 43

10 C.F.R. § 46.150. In an emergency, an agency official may take "actions necessary to control

11 the immediate impacts of the emergency that are urgently needed to address imminent threats

12 to life, property, or important natural, cultural, or historic resources." *Id.* § 46.150(a). The

13 official must document the emergency in writing and describe the actions taken to respond to

14 the emergency. *Id.* § 46.150(b). If the official determines that additional actions are necessary

15 to respond to the emergency, the official may consult with Interior's Office of Environmental

16 Policy and Compliance regarding alternative arrangements. *Id.* § 46.150(c). For actions that

17 may have significant environmental impacts, Interior must consult with the Council on

18 Environmental Quality. *Id.* § 46.150(d).

19 **IV.    The Endangered Species Act and Emergency Consultation Regulations**

20        The Endangered Species Act ("ESA") protects threatened and endangered species in

21 several ways. Section 7 of the ESA directs each federal agency to ensure, in consultation with

22 Interior's U.S. Fish and Wildlife Service (the "Service"), the U.S. Department of Commerce's

23 National Marine Fisheries Service, or both, that "any action authorized, funded, or carried out

24 by such agency . . . is not likely to jeopardize the continued existence of" any listed species or

25 destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).[3] Consultation

26

27 [3] The Secretary of the Interior, acting through the U.S. Fish and Wildlife Service, is generally
28 responsible for all terrestrial and freshwater species. 16 U.S.C. § 1532(15); 50 C.F.R.
   § 402.01(b).

Defs.' Motion to Dismiss                        U.S. Department of Justice
Case No. 2:25-cv-00869-JNW            Environment and Natural Resources Division
                                                    P.O. Box 7611
                            5                    Washington, D.C. 20044
                                                  (202) 532-3080

1    may be either informal or formal. *See* 50 C.F.R. § 402.14(a). Informal consultation ends with

2    the Service's written concurrence that the action is not likely to adversely affect listed species

3    or designated critical habitat. *Id.* § 402.13(c). Formal consultation, by contrast, concludes with

4    the Service's issuance of a biological opinion, which addresses how the agency action affects

5    listed species and designated critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R.

6    § 402.14(h)(1)(iv), (m)(1). Judicial review of a letter of concurrence or biological opinion

7    generally is available under the APA. *See, e.g.*, *Butte Env't Council v. U.S. Army Corps of

8    Eng'rs*, 620 F.3d 936, 947 (9th Cir. 2010).

9         Consultation "may be conducted informally through alternative procedures" when

10   "emergency circumstances mandate the need to consult in an expedited manner . . . that the

11   Director [of one of the Services] determines to be consistent with the requirements of sections

12   7(a)-(d) of the Act." 50 C.F.R. § 402.05(a). Formal consultation must be initiated "as soon as

13   practicable after the emergency is under control." *Id.* § 402.05(b). These emergency

14   procedures apply to "situations involving acts of God, disasters, casualties, national defense or

15   security emergencies, etc." *Id.* § 402.05(a).

16        After initiating consultation, the action agency may not make "any irreversible or

17   irretrievable commitment of resources" with respect to the action that "has the effect of

18   foreclosing the formulation or implementation of any reasonable and prudent alternative

19   measures" that can be taken if the Service's biological opinion finds jeopardy or adverse

20   modification. 16 U.S.C. § 1536(d), (b)(3)(A); 50 C.F.R. § 402.14(h)(2).

21   **V.   Executive Order 14156—Declaring a National Energy Emergency**

22        The President signed Executive Order 14156 declaring a National Energy Emergency

23   on January 20, 2025. 90 Fed. Reg. 8433 (Jan. 20, 2025). The EO states that "[t]he integrity

24   and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate

25   and pressing priority for the protection of the United States' national and economic security."

26   *Id.* In addition, "[t]he United States' insufficient energy production, transportation, refining,

27   and generation constitutes an unusual and extraordinary threat to our Nation's economy,

28   national security, and foreign policy." *Id.* at 8434. To that end, the EO directs the heads of

Defs.' Motion to Dismiss                                    U.S. Department of Justice
Case No. 2:25-cv-00869-JNW                    Environment and Natural Resources Division
                                                              P.O. Box 7611
Washington, D.C. 20044
                                                            (202) 532-3080

1  executive departments and agencies, including the Secretaries of the Army and the Interior, to

2  "identify and exercise any lawful emergency authorities available to them, as well as all other

3  lawful authorities they may possess, to facilitate the identification, leasing, siting, production,

4  transportation, refining, and generation of domestic energy resources." *Id.*

5      Among other directives, the EO requires the Corps to identify planned or potential

6  actions to facilitate the Nation's energy supply that may be subject to "emergency Army

7  Corps permitting provisions," and to "use, to the fullest extent possible and consistent with

8  applicable law, the Army Corps emergency permitting provisions to facilitate the Nation's

9  energy supply." *Id.* The EO also directs agencies to "use, to the maximum extent permissible

10 under applicable law, the ESA regulation on consultations in emergencies, to facilitate the

11 Nation's energy supply." *Id.* at 8435. Since then, Corps districts have issued, with Corps

12 division approval, district-specific special processing procedures tailored to the declared

13 emergency (the "District Emergency Procedures"). *See* Ex. I, ECF No. 55-9.

14     Citing the EO, Interior has also adopted alternative procedures for complying with

15 NEPA and ESA Section 7, describing how project applicants may request to be covered by

16 the procedures and providing written request forms. *See* Ex. J, ECF No. 55-10. In order for the

17 alternative NEPA and ESA procedures to apply, a project applicant must submit a request in

18 writing and the appropriate official within the Department of the Interior must approve the

19 request. *Id.* at 2–5, 9–11. The NEPA alternative arrangements provide procedures for

20 expedited review of certain energy-related projects implicating the EO. *Id.* at 2. If the project

21 applicant's request is approved, the agency must prepare an environmental assessment within

22 approximately 14 days, or for projects with significant environmental effects, an

23 environmental impact statement within 28 days. *Id.* at 3.

24     Interior's alternative procedures for ESA Section 7 consultation are based on the U.S.

25 Fish and Wildlife Service's determination under 50 C.F.R. § 402.05(a) that alternative

26 procedures for certain energy-related projects implicating the EO are consistent with the

27 requirements of Sections 7(a)–(d) of the ESA. *Id.* at 9. Accordingly, federal action agencies

28 approved to use the alternative procedures must informally coordinate with the Service in

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

1   accordance with 50 C.F.R. § 402.05(a). The alternative procedures further state, "As soon as

2   practicable under the circumstances, following termination or expiration of the national

3   energy emergency, the Federal action agency shall follow 50 CFR 402.05(b) and provide the

4   information necessary to initiate consultation. FWS shall evaluate the information and deliver

5   either a biological opinion or letter of concurrence to the Federal action agency, as appropriate

6   . . . ." *Id.* at 10.

7       Following the EO, the ACHP posted information "providing advice on the availability

8   of existing emergency provisions in the Section 106 regulations" to undertakings implicating

9   the EO. Ex. K, ECF No. 55-11, at 2. The advice stated that it was each agency's responsibility

10  to determine what actions would be subject to the terms of the EO. *Id.* By advice, the ACHP

11  also extended the period to "run for the duration of the Presidential declaration" in the EO.

12  Ex. K, ECF No. 55-11 at 2.

13  **VI.    The Complaint**

14      On January 30, 2026, the States filed the First Amended and Supplemental Complaint

15  ("FAC") challenging the EO, as well as the Corps', ACHP's, and Interior's "implementation"

16  of the EO. *See* ECF No. 55. The Complaint sets forth eight claims alleging ultra vires acts by

17  the President and the agencies (Count 1), APA violations by the agencies (Counts 2 through

18  7), and ESA violations by the Corps and Interior (Count 8).

19                              **ARGUMENT**

20  **I.    The States Lack Article III Standing to Bring Any of Their Claims.**

21      Plaintiff States lack standing to bring their claims. To demonstrate standing, a plaintiff

22  "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct

23  of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

24  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). No standing can arise from a challenge to

25  procedures or advice unconnected "from any concrete application that threatens imminent

26  harm to [the plaintiff's] interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

27  The States have failed to establish standing and thus, all claims should be dismissed.

28

Defs.' Motion to Dismiss                          U.S. Department of Justice
Case No. 2:25-cv-00869-JNW             Environment and Natural Resources Division
                                                        P.O. Box 7611
                                    8                   Washington, D.C. 20044
                                                        (202) 532-3080

1    A.    The Corps and Interior Have Not Caused the States Any Injury.

2         To establish injury in fact, a plaintiff must show "an invasion of a legally protected

3    interest" that is "concrete and particularized" and "actual or imminent, not conjectural or

4    hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). If a

5    plaintiff's alleged injuries are forward-looking, the plaintiff must show "a material risk of

6    future harm" that is "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594

7    U.S. 413, 435 (2021).

8         **1.** As to the Corps, the States allege two distinct types of injury. First, they claim that

9    the use of emergency procedures will cause the Corps to issue Section 404 permits without a

10   thorough evaluation of the risks and benefits, causing harm to the States' natural resources.

11   *See* FAC ¶¶ 154–71. Second, the States allege that they will expend resources to provide

12   water quality decisions and comments on pending permits on a tight deadline, and that

13   minimized federal review will require them to conduct their own environmental reviews. *See*

14   FAC ¶¶ 185–91.

15        **a.** Turning to the States' first theory, the Complaint primarily alleges that the Corps

16   may, for some future permit review, adopt emergency procedures that abridge the States'

17   participation in the permit review process by (1) compelling the States to provide Section 401

18   certifications on a compressed timeframe, *see* FAC ¶¶ 156, 161; and (2) completing ESA

19   consultations only after issuing a permit, *see id.* ¶¶ 130, 139, 179–82, 227. But the States do

20   not allege that any Corps district has in fact done so for any particular permit application, only

21   that the Corps *may* do so in the future. *See id.* ¶ 156. Indeed, the States concede that District

22   Emergency Procedures provide that the districts will follow the Corps' Section 401

23   certification regulations and guidance. *Id.* ¶ 188.

24        Even more than a year after the EO, the States allege nothing more than speculative

25   future injuries from the procedures. First, the amended complaint cites two projects in

26   Washington that require Section 404 permits, Cascade Renewable Transmission LLC

27   Columbia River Project and Electron Hydro, LLC's bladder diversion and infrastructure

28   project. *See id.* ¶¶ 166–69. But the proponent of the Columbia River Project has withdrawn

Defs.' Motion to Dismiss                          U.S. Department of Justice
Case No. 2:25-cv-00869-JNW               Environment and Natural Resources Division
                                                          P.O. Box 7611
9                              Washington, D.C. 20044
                                                        (202) 532-3080

the Section 404 application. *Id.* ¶ 166. And the States allege that the Electron Hydro Project would require a Section 401 certification from Washington but make no suggestion that the Corps has curtailed Washington's evaluation in any way. *Id.* ¶¶ 167–69. In other words, the States do not allege that any procedures were changed *at all* for these projects. Second, the amended complaint describes two projects in Wisconsin that allegedly demonstrate its injury, the Nemadji Trail Energy Center and the Ashland to Ironwood Transmission Line. *See id.* ¶¶ 170–71. In neither case do the States identify what rights the Corps allegedly abridged, nor do they link the emergency procedures adopted by that district to any claimed injury. *See id.* And, in fact, Wisconsin issued a Section 401 certification for the Nemadji project in 2023, and the St. Paul District of the Corps issued a Section 404 permit in July of 2025. *See* Vesperman Decl. ¶ 3; *see Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (on a 12(b)(1) motion, a defendant may contest "the truth of the plaintiff's factual allegations . . . by introducing evidence outside the pleadings"). Similarly, the Ashland to Ironwood Transmission Line is proceeding under a Regional General Permit, and Wisconsin issued its 401 certification for *that* permit in 2022. *See* Vesperman Decl. ¶ 4. Wisconsin is entitled to no additional process with respect to these projects. No other State even attempts to demonstrate an injury from any District Emergency Procedures. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross," and "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint.").

The States' attempt to rely on a future procedural violation relies on some future agency action, which makes their theory speculative and not imminent. The concrete interest they point to, a purported harm to natural resources, *see* FAC ¶ 154, relies on an attenuated chain of speculative events: that the Corps will eventually apply emergency procedures to an application; that in doing so, the Corps will unlawfully impede the a State's ability to participate in that proceeding; that the Corps will allow discharge or fill that it would not have allowed if it had reviewed the application under the standard procedures; and that the difference between the discharge or fill allowed under emergency procedures and that which

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

10

1  would have been allowed under the standard procedures harms a natural resource in an actual,

2  concrete way.

3      **b.** As a backup position, the States contend that they will expend additional resources

4  to conduct additional environmental reviews and submit comments during the public notice

5  period for any individual permit application on an expedited timeline. *See* FAC ¶¶ 185–91.

6  But these harms are either speculative or self-inflicted and, thus, not traceable to the Corps.

7  *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to

8  complain about damage inflicted by its own hand."). The assertion that the States may decide

9  to supplement the Corps' environmental reviews is entirely speculative, and the States do not

10 identify any particular Corps permit decisions for which a Corps district did not perform a

11 required review *and* the States prepared any supplemental review. *See Clapper v. Amnesty

12 Int'l*, 568 U.S. 398, 409 (2013). And while the States allege that "the Corps has set seven-day

13 comment periods" for some permit applications in Washington, FAC ¶ 190, they do not

14 identify any such projects, nor do they allege Washington is commenting on or would

15 comment on such projects.

16     Moreover, a decision by the States to provide additional environmental review or

17 expend additional resources to submit comments during the public comment period cannot

18 support their standing here. A party cannot "manufacture its own standing" by spending either

19 money or time and energy engaging with and opposing the agency's actions. *Food & Drug

20 Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024); *see also Washington v. HHS*,

21 482 F. Supp. 3d 1104, 1119 (W.D. Wash. 2020) (administrative costs voluntarily incurred in

22 response to agency rule not traceable to agency action).

23     **2.** The States' purported injury from Interior's alternative procedures for NEPA

24 compliance and ESA consultation is similarly speculative. The States allege that the Bureau of

25 Land Management (BLM) approved the Wildcat Facility for loading rail cars with oil in Utah,

26 which is not one of the Plaintiff States, using the alternative arrangements for NEPA

27 compliance. FAC ¶ 172. They further allege that the rail cars would travel through Colorado,

28 thereby raising the potential for environmental harm in Colorado, which is one of the Plaintiff

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

11

1    States. *Id.* ¶ 173. But the States fail to challenge the Wildcat Facility[4] or even allege how

2    BLM's application of alternative arrangements is the cause of any such potential injuries.

3    Absent such allegations, there is no causal link between the alternative arrangements and

4    potential harm to the States.

5          Moreover, aside from these legal hurdles, Colorado's alleged injuries from the Wildcat

6    Facility are speculative and not supported by BLM's analysis in the EA for the project. As

7    BLM explained in the EA that it prepared for the project, the scope of the analysis included

8    the impacts associated with the installation and operation of the facility itself, truck traffic on

9    an access road, and the transport of rail cars from the Wildcat Facility to a nearby rail yard,

10   the Martin Yard. Wildcat Loadout Facility Right-of-Way Amendment EA (July 2025) at 3.1.[5]

11   The scope of analysis did not include the potential downstream environmental impacts of

12   the transport of oil after it was transported to the Martin Yard because "the level of train

13   traffic downrail of the Martin Yard, and the level of downstream refining are instead driven

14   by independent market conditions (such as the price of oil) and technological advancements,

15   not the operation of the Wildcat Loadout Facility." *Id.* Because the level of train traffic is not

16   caused by BLM's approval of the Wildcat Facility, Colorado cannot claim that the approval of

17   the facility caused it an injury sufficient for standing. *See TransUnion*, 594 U.S. at 423 (to

18   have standing, a plaintiff must demonstrate "that the [alleged] injury was likely caused by the

19   defendant"). And even if BLM's approval did cause an increase in traffic, the States' theory—

20   which seemingly relies on the risk of "derailments, spills, or other accidents," FAC ¶ 173—is

21   speculative and not imminent.

22         On ESA consultation, the States' allegations are even more hypothetical. A review of

23   the States' claims about alternative/emergency procedures and ESA violations confirms the

24

25   _____

26   [4] Nor have the Plaintiffs challenged the approval of the Wildcat Facility in any other lawsuit, which undermines their assertion that they are harmed by the authorization of the facility.

27   [5] The EA for the Wildcat Facility is available at:

28   https://eplanning.blm.gov/Documents/?id=a1c232ef-a7f2-f011-8407-001dd803d7d3&spid=9a653e91-a8f2-f011-8407-001dd806295a (last visited Feb. 23, 2026).

Defs.' Motion to Dismiss                                    U.S. Department of Justice
Case No. 2:25-cv-00869-JNW                    Environment and Natural Resources Division
                                                                    P.O. Box 7611
Washington, D.C. 20044
                                                                    (202) 532-3080

1   States' lack of standing. *E.g.*, FAC ¶¶ 210, 227, 238, 255, 290. The States do not identify

2   actual injury, such as "take" of a listed species, resulting from any allegedly unlawful or

3   delayed ESA consultation attributable to such procedures. *See id.* ¶ 182.

4         The States also allege that the Corps' and Interior's procedures violate the ESA's

5   requirements for agencies to ensure their actions are not likely to jeopardize listed species or

6   adversely modify their critical habitat, 16 U.S.C. § 1536(a)(2), and to avoid irreversible or

7   irretrievable commitments of resources until consultation has been completed, *id.* § 1536(d).

8   FAC ¶¶ 287–88. But the ESA applies to "affirmative" agency actions, like building a road or

9   dam, that are not alleged here. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021–

10  23 (9th Cir. 2012). And the States do not specify the supposedly unlawful "action" or agency

11  commitment of resources that resulted from the Corps' and Interior's procedures or how, as a

12  result of the procedures, that action or commitment injured the States.  The States express

13  concern for theoretical harm to listed species in connection with three projects in Washington

14  and Wisconsin, FAC ¶¶ 163, 168, 171, but then fail to trace actual or imminent harm to an

15  allegedly delayed ESA consultation due to the procedures. Accordingly, all claims against the

16  Corps and Interior should be dismissed for lack of jurisdiction.

17        B.    The Complaint Does Not Allege That the Council Has Caused Any Concrete
18              <u>Injury Either to a Historic Property or to the States.</u>

19        The same is true with respect to the claims against the Council. The Council's main

20  role under Section 106 review is to "comment" on an agency's undertaking. 54 U.S.C. §

21  306108. That duty is a limited one. *See Waterford Citizens' Ass'n*, 970 F.2d at 1290 ("[T]he

22  total response required of the [Council] is quite limited."). In all events, the amended

23  complaint does not allege that the Council has, in relation to any particular undertaking, failed

24  to provide legally required commentary or has provided commentary that is in any way

25  legally inadequate or inappropriate.

26        Neither the statute nor the regulations implementing Section 106 gives the Council the

27  authority to approve, disapprove, or modify a proposed undertaking, and the complaint does

28  not allege that the Council has authority to do so or has in fact attempted to do so.

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

1    The regulations require the Council to review and approve proposed agency

2    emergency procedures, 36 C.F.R. § 800.12(a), but the States have not alleged or identified any

3    ACHP-approved emergency procedures, or suggested that any such procedures has done any

4    harm either to a historic property or to the States.

5    The States' main grievance appears to be the Council's advice regarding the

6    applicability of the existing regulations (*i.e.*, the expedited seven-day comment period) to the

7    emergency situation under the EO when requested by an agency. 36 C.F.R. § 800.12(b)(2).

8    FAC ¶¶ 148–52, 200, 264–67, 272–83. The States also take aim at the Council's advising

9    responsible agencies that it will accept emergency requests for comment for the duration of

10   the President's declared emergency. *See id*. But the States nowhere allege that, with respect to

11   a specific undertaking, use of the expedited comment procedure has caused any injury to a

12   historic property or to the States. Indeed, they do not identify any agency action that has made

13   use of the supposedly unlawful advice, let alone one that has harmed a historic property in a

14   way that injures the States' interests.

15   The States allege no injury-in-fact attributable to the Council. The complaint describes

16   a few specific projects, but none involves historic properties or decision-making by the

17   Council.

18   The States' claims against the Council (parts of Count 1, and all of Counts 6 and 7)

19   should be dismissed for want of jurisdiction.[6]

20   **II.    The States Do Not Allege "Final Agency Action."**

21   Judicial review under the APA is limited to "final agency action." 5 U.S.C. § 704. This

22   requirement has two aspects. First, it is "axiomatic that Plaintiffs must identify an 'agency

23   action' to obtain review under the APA." *Whitewater Draw Nat. Res. Conservation Dist. v.*

24   *Mayorkas,* 5 F.4th 997, 1010 (9th Cir. 2021) (citation omitted). Under the APA, agency action

25   is "'circumscribed' and 'discrete,' such as 'a rule, order, license, sanction [or] relief.'" *Id.*

26   _____

27   [6] New Mexico also has failed to provide the requisite notice of intent to sue to raise ESA

28   claims, and so it should be dismissed as to ESA claims. 16 U.S.C. § 1540(g)(2) (ESA notice
     requirement); Ex. B, ECF No. 55-2 (notice, which excludes New Mexico).

Defs.' Motion to Dismiss                          U.S. Department of Justice
Case No. 2:25-cv-00869-JNW              Environment and Natural Resources Division
                                                       P.O. Box 7611
                          14                      Washington, D.C. 20044
                                                       (202) 532-3080

1  (citation omitted). The Supreme Court has explained that the "limitation to discrete agency

2  action precludes . . . [a] broad programmatic attack" on agency activities. *Norton v. S. Utah*

3  *Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"). Second, an agency action must be "final."

4  Finality turns on "whether the agency has completed its decisionmaking process, and whether

5  the result of that process is one that will directly affect the parties." *Franklin v.*

6  *Massachusetts*, 505 U.S. 788, 797 (1992). If a challenged action is not final, the Court lacks

7  jurisdiction to review it, and the claim must be dismissed. *See Rattlesnake Coal. v. EPA*, 509

8  F.3d 1095, 1104–05 (9th Cir. 2007).

9        Here, the States attempt a broad programmatic challenge against the agencies for

10  incorporating the EO into their operations. Moreover, the States fail to identify any

11  determination by the agencies that has immediate legal consequences. Thus, Counts 2 through

12  7 should be dismissed. *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir.

13  2013) (day-to-day operations that merely implement operational plans are not final agency

14  actions).

15        A.    <u>The States' Attempt to Mount a Programmatic Attack on the Agencies Fails.</u>

16        The States impermissibly target agencies' policies. The States allege the agency

17  actions are the "Corps Implementing Actions," "ACHP's decision to issue the ACHP

18  Emergency Provisions," and "Interior's decision to issue the Alternative Arrangements." FAC

19  ¶¶ 208, 217, 236, 245, 263, 272.  But framing the agencies' optional procedures and advice as

20  "actions" and "decisions" does not obscure that the States are actually challenging the

21  agencies' general performance of their respective statutory responsibilities. The "continuing

22  (and thus constantly changing) operations" of the agencies in performing their duties, such as

23  reviewing permit applications and engaging in ESA consultations, are not challengeable as a

24  single discrete "agency action." *Lujan*, 497 U.S. at 890–91 (rejecting challenge to so-called

25  program involving at least 1,250 individual determinations); *see also* FAC ¶ 125 (referencing

26  688 potential permitting actions).

27        In the case of the Corps, the States challenge a "national policy from [Corps]

28  headquarters to process emergency permit applications without following applicable statutory

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
15                    Washington, D.C. 20044
(202) 532-3080

1   and regulatory safeguards." *See* FAC ¶ 140. But a generalized national policy to implement a

2   statutory scheme with reference to an executive order by adopting dozens of sets of

3   emergency procedures that apply flexibly according to the nature of the permit application at

4   hand is exactly the kind of programmatic challenge *Lujan* forbids. *See* 497 U.S. at 890–91.

5   That the States find evidence of this alleged policy in a variety of small-bore steps taken by

6   the Corps—emails from Corps districts to the States, changes to the Corps database, "and

7   other related action[]"— emphasizes that any such "policy" does not qualify as a discrete

8   action. FAC ¶ 140. The APA "does not authorize plaintiffs to pile together a mish-mash of

9   discrete actions into a 'program' and then sue an agency to force broad policy changes to this

10  'program.'" *Navajo Nation v. Off. of Navajo & Hopi Indian Relocation*, 631 F. Supp. 3d 776,

11  790 (D. Ariz. 2022) (cleaned up).

12          In the case of ACHP, the Council's "decision" does no more than create a framework

13  for action. The Council's general regulations regarding disasters or declared emergencies, 36

14  C.F.R. § 800.12, only provides procedures for interested agencies. And the Council's decision

15  to extend those procedures through the life of the EO is procedural guidance without any

16  immediate effect. *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1196 (9th Cir. 1997)

17  ("The APA . . . insulates from immediate judicial review the agency's preliminary or

18  procedural steps.") .

19          Interior's "decision" also merely sets forth potentially available alternative procedures

20  for how the agency will proceed with expedited NEPA compliance and ESA consultation

21  under some circumstances and if use of the procedures is approved.

22          B.      <u>The States Are Not Challenging a Final Agency Action.</u>

23                  1.      *The Agencies Have Not Consummated Their Decisionmaking*

24                          *Processes.*

25          The States have not shown that any actions are final. The decisionmaking process is

26  not consummated until and unless the agency issues a decision or takes a specific action under

27  the emergency procedures. *See Whitewater Draw*, 5 F.4th at 1008 (finding an agency's

28  manual implementing NEPA was not final agency action because the manual "describes how

Defs.' Motion to Dismiss                                        U.S. Department of Justice
Case No. 2:25-cv-00869-JNW                        Environment and Natural Resources Division
                                                                          P.O. Box 7611
                        16                                         Washington, D.C. 20044
                                                                        (202) 532-3080

1  [the agency] will implement NEPA, but it does not prescribe any action in any particular

2  matter").

3          To start with the Corps, the alleged "national policy" and District Emergency

4  Procedures do not represent the "'consummation' of the agency's decisionmaking process."

5  *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also Whitewater Draw*, 5 F.4th at 1008–09

6  (guidance that "facilitates the *beginning* of the NEPA review process" is not final agency

7  action). After all, project proponents do not apply to Corps districts under the Clean Water

8  Act for emergency permitting procedures; they apply for permit authorization to discharge

9  dredge or fill material. And Seattle District's procedures, for example, do not set out an

10  inflexible set of steps applied to each and every energy project within its jurisdiction. Rather,

11  the district will tailor the procedures to each project. *See* Ex. I, ECF No. 55-9, at 5 ("Seattle

12  District will fulfill as many standard procedures . . . as are reasonably tailored to the energy

13  emergency situation . . . ."), 6 ("Seattle District will make reasonable efforts tailored to the

14  energy emergency . . . to explain the rationale for the procedures and to receive comments

15  from interested" parties). Only once a permit is issued—assuming all other jurisprudential

16  requirements are met—will there be a final agency action subject to challenge under the APA,

17  including with respect to the type of procedures the Corps put in place and used in approving

18  the particular permit. By contrast, the District Emergency Procedures do not conclude any

19  decisionmaking process but merely set out the process the Corps districts will follow to

20  consider an ongoing or future permit application.

21          Same for Interior's process. As an optional process that requires a written request and

22  Interior's approval, Interior's alternative NEPA and ESA procedures have no immediate

23  effect. Ex. J, ECF No. 55-10, at 2–3 ¶¶ 2, 4, and 9 ¶¶ 2–3. If approved for use, they are just

24  one contingent, preliminary step in a larger and ongoing decisionmaking process—hardly the

25  consummation of a process. Even a request by an action agency to follow them will not

26  necessarily result in the issuance of an EA, EIS, letter of concurrence, or biological opinion

27  under the alternative procedures, much less result in a decision by an action agency to

28  authorize a project proposal. For example, Interior might not approve the use of the alternative

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

17

1    procedures by an Interior bureau; a project applicant might choose not to move forward with

2    the proposed project under the alternative procedures; or the action agency, having considered

3    the EA, EIS, letter of concurrence, or biological opinion that evaluates the proposed project,

4    might decline to authorize the project. The alternative procedures acknowledge that the

5    consultation process will culminate in a concurrence or biological opinion, but the procedures

6    themselves are not a final decision. *See* Ex. J, ECF No. 55-10, at 10 ¶ 5 ("As soon as

7    practicable under the circumstances, . . . [the Service] shall evaluate the information and

8    deliver either a biological opinion or letter of concurrence to the Federal action agency, as

9    appropriate . . . ."); 50 C.F.R. § 402.05(b). Likewise, establishing procedures for using NEPA

10   alternative arrangements does not constitute a final decision that alternative arrangements will

11   be used in any individual instance. The alternative NEPA and ESA procedures do no more

12   than describe the process and provide a written request form for project applicants. *See* Ex. J,

13   ECF No. 55-10, at 2–5, 9–11.

14       As for the ACHP, the Council provided advice regarding the existence of 36 C.F.R. §

15   800.12 to federal agencies that may propose undertakings that fall within the EO. It is the

16   responsibility of the agency, not the Council, to decide whether to follow the emergency

17   procedures under 36 C.F.R. § 800.12 in fulfilling its responsibilities under Section 106 of the

18   NHPA and making its decision regarding a historic property. The Council has done no more

19   than advise interested agencies as to the prospective applicability of Section 800.12

20   procedures. *See* Ex. K, ECF No. 55-11, at 2.

21       Because the procedures and advice "ha[ve] not bound [the agencies] to any particular

22   decision," they are "not the consummation of the agency's decisionmaking process."

23   *Whitewater Draw*, 5 F.4th at 1009 (cleaned up).

24           2.    *The Agencies Have Not Established Legally Binding Obligations.*

25       Nor do the agencies' documents create any "rights or obligations" from which "legal

26   consequences will flow" to the parties. *Bennett*, 520 U.S. at 177–78. For this independent

27   reason, the APA claims must be dismissed.

28

Defs.' Motion to Dismiss                                U.S. Department of Justice
Case No. 2:25-cv-00869-JNW                    Environment and Natural Resources Division
                                                           P.O. Box 7611
                        18                          Washington, D.C. 20044
                                                        (202) 532-3080

1    The District Emergency Procedures are inherently interlocutory—they merely describe

2    how a district may tailor the procedures used to process certain permit applications and do not

3    "impose an obligation, deny a right, or fix *some* legal relationship as a consummation of the

4    administrative process." *Whitewater Draw*, 5 F.4th at 1009. Rather, the States' rights and

5    interests could only be impaired (if at all) after the Corps district completes applicable review

6    procedures and ultimately issues or denies a permit. And "an agency action is not final when

7    subsequent agency decision making is necessary to create any practical consequences." *S. Cal.*

8    *All. Of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 837 (9th Cir. 2021). Indeed, if

9    an agency decision to implement a set of flexible procedures qualified as reviewable final

10    agency action, then permitting agencies would be hamstrung by challenges from parties

11    dissatisfied with the direction of agency proceedings. The Corps' flexible and discretionary

12    emergency procedures gave rise to no legal consequences and, thus, are not final agency

13    action.

14    The same holds true for Interior's alternative NEPA and ESA procedures. In merely

15    setting forth the optional process for requesting to be covered by the alternative procedures

16    and describing the process that occurs (based on existing regulations) if Interior approves their

17    use, the alternative procedures do not themselves impose obligations, deny rights, or fix legal

18    relationships, as they make no predetermination about the outcome of the NEPA process or

19    ESA consultation process, let alone the decisionmaking processes that review and

20    consultation under those statutes support, and establish no legal rights on the part of project

21    applicants.

22    So too with the Council. As discussed in Section I(B) above, the Council's advice, and

23    any comments it might provide on agency proposals submitted pursuant to that advice, do not

24    establish legally binding obligations affecting agencies' proposed undertakings or the

25    potential effects on historic properties. Plaintiffs have failed to challenge a final agency action

26    and Counts 2 through 7 should be dismissed.

27

28

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

19

**III.    The States' Challenge Is Not Ripe for Review.**

Plaintiffs' challenge to the Corps' emergency procedures and Interior's alternative procedures must also be dismissed as unripe. As an initial matter, the claims are not constitutionally ripe, because the amended complaint does not allege an injury that is concrete and particularized, as well as actual or imminent. *See supra* at I; *Stockton v. Brown*, 152 F.4th 1124, 1142 (9th Cir. 2025).

Nor are the claims prudentially ripe. To determine whether an administrative action is ripe for review, courts must consider whether: (1) delayed review would cause hardship to the plaintiffs; (2) judicial intervention would inappropriately interfere with further administrative action; and (3) the courts would benefit from further factual development of the issues presented. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Idaho Rivers United v. U.S. Army Corps of Eng'rs*, No. C14-1800JLR, 2016 WL 498911, at *10 (W.D. Wash. Feb. 9, 2016) (holding that challenge to Corps "decision-making framework" was not ripe). All three factors support dismissal because the claims are nothing more than abstract disagreements over administrative policies.

**A.    Delayed Review Would Not Cause the States Any Hardship.**

A court must consider whether withholding review presents "adverse effects of a strictly legal kind" and whether the administrative action affects the plaintiffs' primary conduct. *Ohio Forestry*, 523 U.S. at 733–34.

The States have not pleaded, and cannot show, that withholding judicial review at this stage causes them any hardship. The States have not identified any way that the emergency procedures could impose adverse legal effects on them. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 152–53 (1967); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 166 (1967). The procedures do not "command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations" for the States. *Ohio Forestry*, 523 U.S. at 733. Rather, at this juncture, the States merely allege that the Corps directed its district offices to establish special emergency procedures and

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

20

provided a "procedures and guidance" template for the districts. FAC ¶ 129. The districts then adopted emergency procedures that each district tailors to particular permit applications. Ex. I, ECF No. 55-9, at 5, 6. Nor do the States challenge any alleged procedural harm, such as a failure to complete an EIS or conduct an ESA consultation with the Services. *See Ohio Forestry*, 523 U.S. at 737. In fact, the Interior alternative procedures provide that ESA consultations will still be completed. Ex. J, ECF No. 55-10, at 10. Rather, the States challenge documents that precede any procedural obligation the agencies may have.

> **B.**      The Court's Intervention Would Interfere with Administrative Action, While Judicial Review Would Benefit from Further Factual Development.

As mentioned above, the Corps issues most permits on a district-by-district basis. And under the Corps' regulations, district engineers have discretion in determining "special processing procedures in emergency situations." 33 C.F.R. § 325.2(e)(4). The District Emergency Procedures provide for flexible application depending on the particulars of any given permit application. Nothing in the record can predict what procedures each Corps district will apply to any specific project. ESA consultations and NEPA reviews are also necessarily tailored to the particular federal action at hand. Thus, the agencies should have the opportunity to refine their policies while there is further factual development. Additional facts would help the court determine whether any of the States' interests are actually harmed and will aid in resolution. *See Toilet Goods Ass'n*, 387 U.S. at 164 (judicial review "is likely to stand on a much surer footing in the context of a specific application" of the agency's policy). Indeed, permits issued under the emergency procedures may not cause harm to any of the States. Moreover, additional factual development would also present the Court with a more robust administrative record for specific permits, biological opinions, letters of concurrence, and NEPA documents that could be alleged in the future to have resulted from using the Corps' emergency procedures and Interior's alternative procedures. Until then, the States' challenges are premature and should be dismissed.

Defs.' Motion to Dismiss
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

21

1    **IV.    The Court Should Reject the States' Ultra Vires Claim.**

2          Finally, the States throw the "Hail Mary pass" of an "ultra vires" claim. *Nuclear*

3    *Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (*NRC*). Such claims are "strictly limited."

4    *Id.* Ultra vires review is available "only when an agency has taken action entirely in excess of

5    its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (quotation marks

6    omitted). "Ultra vires review is also unavailable if, as is usually the case, a statutory review

7    scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial

8    review . . . ." *Id.* (cleaned up).

9          A.    <u>The President Must Be Dismissed from this Case.</u>

10          The States' claim against the President suffers from separate and independent

11   problems: there is no cause of action against the President, the States may not obtain—and the

12   Court may not order—equitable relief directly against the President for his official conduct,

13   and the States fail to state a claim.[7]

14          There is no implied equitable cause of action to review presidential actions. Although

15   courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by

16   . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015),

17   the availability of such relief depends on whether it "was traditionally accorded by courts of

18   equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999). Here,

19   there is no tradition of equitable relief against the President. *See Mississippi v. Johnson,* 71

20

21

22   _____

23   [7] To the extent that the amended complaint asserts a claim that the EO is ultra vires because it
     does not declare an actually existing emergency, *see* FAC ¶¶ 91–115, that claim fails because
24   the Presidential declaration of a national emergency is a nonjusticiable political question. *See*
     *United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) ("[F]ederal courts have
25   historically declined to review the essentially political questions surrounding the declaration
     or continuance of a national emergency." (citation omitted)); *California v. Trump*, 407 F.
26   Supp. 3d 869, 890 (N.D. Cal. 2019) ("[T]here is no precedent for a court overriding a
     President's discretionary judgment as to what is and is not an emergency."), *aff'd sub nom*
27   *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020), *vacated on other grounds sub nom Biden*
     *v. Sierra Club*, 142 S. Ct. 56 (2021).
28

Defs.' Motion to Dismiss                                    U.S. Department of Justice
Case No. 2:25-cv-00869-JNW              Environment and Natural Resources Division
                                                              P.O. Box 7611
                                 22                        Washington, D.C. 20044
                                                            (202) 532-3080

1    U.S. (4 Wall) 475, 501 (1867) (federal courts lack jurisdiction to "enjoin the President in the

2    performance of his official duties").

3            Moreover, the Supreme Court has held that causes of action available against other

4    government officials should not be extended to the President absent a clear statement by

5    Congress. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (declining to assume that

6    *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of

7    the United States"); *Franklin*, 505 U.S. at 800–01 (declining to find cause of action against

8    the President under the APA "[o]ut of respect for the separation of powers and the unique

9    constitutional position of the President"). Accordingly, in the absence of an express statutory

10   cause of action against the President or a tradition of recognizing such suits as a matter of

11   equity, there is no basis for the Court to infer authority to impose equitable relief against the

12   President here.

13           Moreover, the States cannot identify an express statutory prohibition the EO

14   transgresses. Indeed, the EO *mandates* that agencies implement them "consistent with

15   applicable law." 90 Fed. Reg. at 8434, 8435; *see also Trump v. Am. Fed'n of Gov't Emps.*,

16   145 S. Ct. 2635 (2025) (Sotomayor, J., concurring in grant of stay) (noting that challenged

17   Executive Order directs agency action "consistent with applicable law").

18           Plaintiffs also lack the requisite waiver of sovereign immunity to bring a claim against

19   the President. The United States is immune from suit except to the extent Congress

20   unequivocally and expressly waives that immunity. *Lane v. Pena*, 518 U.S. 187, 192 (1996).

21   In suits against the federal government, section 702 of the APA typically provides that waiver,

22   but it is unavailable in suits against the President. *See Franklin*, 505 U.S. at 801.

23           B.    <u>The States Fail to State an Ultra Vires Claim.</u>

24           First, the claim must be dismissed because it simply "dress[es] up a typical statutory-

25   authority argument as an ultra vires claim." *NRC*, 605 U.S. at 682. Yet the States do not

26   identify any "specific prohibition" explicitly forbidding the President and the agencies from

27   taking the actions at issue. *NRC*, 605 U.S. at 681; *see* FAC ¶¶ 199–201.

28

Defs.' Motion to Dismiss                           U.S. Department of Justice
Case No. 2:25-cv-00869-JNW                   Environment and Natural Resources Division
                                                         P.O. Box 7611
Washington, D.C. 20044
                                                      (202) 532-3080

1    Second, APA review of final decisions applying the agencies' emergency procedures

2    will generally be available. Courts also have declined to review ultra vires claims where the

3    plaintiffs' APA claim failed for lack of final agency action. *See Cal. Sportfishing Prot. All. v.*

4    *U.S. Bureau of Reclamation*, 1:15–cv–00912-LJO-BAM, 2015 WL 6167521, at *10–11 (E.D.

5    Cal. Oct. 20, 2015). Because the States' APA claims all suffer from lack of finality, *see* supra

6    at II(B), this Court should likewise dismiss the ultra vires claim.

7                                  **CONCLUSION**

8         For these reasons, the States' Complaint should be dismissed in full.

9

10   Dated: March 5, 2026              Respectfully submitted,

11

12                                     ADAM R.F. GUSTAFSON
                                       Principal Deputy Assistant Attorney General

13
                                       BRADLEY CRAIGMYLE
14                                     Deputy Assistant Attorney General

15                                     */s/ Jeffrey Hughes*
                                       _____
16                                     PETER DYKEMA (DC Bar # 419349)
                                       JEFFREY HUGHES (NY Bar # 5367214)
17                                     SANYA SHAHRASBI (DC Bar # 1671001)
                                       United States Department of Justice
18                                     P.O. Box 7611
                                       Washington, D.C. 20044
19                                     Tel:    (202) 532-3080 (Hughes)
20                                     Email:  peter.dykema@usdoj.gov
                                               jeffrey.hughes@usdoj.gov
21                                             sanya.shahrasbi@usdoj.gov

22                                     *Attorneys for Defendants*

23

24

25

26

27

28

Defs.' Motion to Dismiss                     U.S. Department of Justice
Case No. 2:25-cv-00869-JNW          Environment and Natural Resources Division
                                                      P.O. Box 7611
                            24                  Washington, D.C. 20044
                                                     (202) 532-3080

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE

I hereby certify that, according to the count of Microsoft Word, this memorandum contains 8,399 words in compliance with Local Civil Rule 7(e)(4).

I further certify that the parties met and conferred regarding this motion on February 24, 2026 in compliance with Chambers Procedure 5.6.


*/s/ Jeffrey Hughes*
Jeffrey Hughes

Certificate of Compliance
Case No. 2:25-cv-00869-JNW

U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080

1