**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, STATE OF CALIFORNIA, et al, | NO. 2:25-cv-00869 |
| Plaintiffs, | DECLARATION OF SARA AMINZADEH, DEPUTY SECRETARY FOR FEDERAL AFFAIRS, CALIFORNIA NATURAL RESOURCES AGENCY |
| v. | |
| DONALD TRUMP, et al, | |
| Defendants. | |

I, SARA AMINZADEH, hereby declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would competently testify to the matters set forth below.

2. I am currently employed by the California Natural Resources Agency ("CNRA") as the Deputy Secretary for Federal Affairs.

3. As Deputy Secretary for Federal Affairs, I advocate for California's environmental and natural resource interests in federal policy and decision-making. I lead federal relations on CNRA's behalf and work to advance federal policies and investments to

DECLARATION OF SARA
AMINZADEH ISO PLAINTIFFS'
RESPONSE TO MOTION TO DISMISS--
NO. 2:25-CV-00869

1

advance affordable clean energy, effective management of coastal and ocean resources, and elevate California's other natural resources priorities. In the scope of these duties, I evaluate proposed and enacted federal policy and legislative changes for consistency with California's environmental laws, policies and priorities. I also help coordinate and advance federal policy and funding objectives on behalf of the California Coastal Commission, California Coastal Conservancy, California State Lands Commission and California Department of Fish and Wildlife, in partnership with our policy deputies. I also serve as alternate for CNRA to the Governor's Military Council.

4. CNRA is vested with authority to protect, manage, and restore California's environment and its natural, cultural, and historic resources. *See* Cal. Gov't Code §§ 12802, 12805.

5. CNRA oversees twenty-six departments, conservancies, and commissions responsible for stewarding particular resources and geographies, including the California Coastal Commission and the California Department of Fish and Wildlife. Cal. Gov't Code § 12805.

6. The California Coastal Commission regulates the use of land and water resources within California's coastal zone, inter alia, to guarantee shoreline public access and recreation and conserve the marine environment, including for commercial and recreational fishing. Cal. Pub. Res. Code §§ 30299-30237, 30330.

7. The California Department of Fish and Wildlife regulates fishing in California waters, including marine sport and commercial fishing. Cal. Pub. Res. Code §§ 702, 7055-7059.

8. California holds sovereign ownership of waters and submerged lands in public trust for the benefit of its people; public trust uses include navigation, commerce, fishing, and recreation. *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal. 3d 419, 434 (1983).

9. California's coastal communities and resources, including marine resources, are affected by offshore activities subject to federal approvals, such as permits for offshore oil and gas extraction.

10. CNRA relies on the environmental review process prescribed by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, to protect California's coastal communities and marine resources by commenting on the reasonably foreseeable impacts of, and reasonable alternatives to, proposed federal offshore projects.

11. NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for every major federal action significantly affecting the environment. The EIS is a "detailed statement" of "reasonably foreseeable environmental impacts of the proposed agency action" and a "reasonable range of alternatives to the proposed agency action." 42 U.S.C. § 4332(2)(C).

12. NEPA further requires that federal agencies publish a Notice of Intent ("NOI") for every project requiring preparation of EIS, which solicits public comment on "alternatives or impacts and on relevant information, studies, or analyses" on the proposed action. 42 U.S.C. § 4336a(c).

13. Furthermore, the United States Department of the Interior's ("DOI") NEPA procedures provide that "[d]uring the process of preparing an [EIS]," the official responsible for making a decision on a proposed action must request the comments of "State, Tribal, or local government officials that may be affected by the proposed action" and should "seek to provide 30 days, to the extent practicable." U.S. Dep't of the Interior, Handbook of National Environmental Implementing Procedures (2025), https://www.doi.gov/media/document/doi-nepa-handbook.

14. For these requirements to have any meaningful effect, the public, including CNRA, must be afforded reasonable opportunity to provide comment on impacts and

alternatives and relevant information to guide informed decisions by federal agencies on proposed projects.

15. On March 18, 2026, the Bureau of Ocean Energy Management ("BOEM"), within the United States Department of Interior ("DOI"), published in the Federal Register an NOI to prepare an EIS on the application by DCOR, LLC for authorization to use well stimulation treatments, including hydraulic fracturing, in sixteen oil and gas wells on Platform Gilda, located in the outer continental shelf in the Santa Barbara Channel, approximately nine miles offshore Ventura, California. 91 Fed. Reg. 13,063 (March 18, 2026). A true and correct copy of the NOI is attached to this declaration as Exhibit A.

16. The NOI stated that the EIS would be prepared consistent with "DOI's alternative arrangements to comply with NEPA during a national energy emergency." *Id*.

17. The NOI provided a public comment period ending March 30, 2026. The alternative arrangements recommend a ten-day public comment period on NOIs. *Id*. at 13,064. CNRA assumes that BOEM followed that recommendation but, because ten days from the publication of the NOI fell on a Saturday, it extended the comment period to end the following Monday.

18. The NOI invitation for comments stated, "All interested parties . . . may submit written comments on the scope of the Platform Gilda WST EIS, significant issues, reasonable alternatives, potential mitigation measures, and the types of oil and gas activities of interest in the proposed lease sale areas." *Id*. at 13,065. Notably, the invitation did not solicit comment on "relevant information, studies, or analyses with respect to the proposed agency action," as required by NEPA.

19. BOEM's standard practice has been to include in each NOI an announcement of a public scoping meeting to determine the extent of impacts to be studied in the EIS; indeed, the alternative arrangements direct that NOIs should announce a public meeting during EIS preparation.

20. However, the NOI published in the Federal Register did not announce any public meeting; instead, it included a link to a BOEM website for "[i]nformation regarding the scoping process"; only by following the link could the public find information about a public meeting.

21. The lack of information regarding a public meeting in the NOI led CNRA to believe that no meeting was being held. If the NOI had included a meeting announcement, CNRA or its impacted agencies and departments could have participated to inform BOEM of the specific reasonably foreseeable impacts to California's sovereign interests identified in this declaration.

22. The NOI identified only two project alternatives, approval of the proposed well stimulation treatments at Platform Gilda—designated the preferred alternative—and a no-action alternative. The NOI also provided a lengthy list of potential impacts resulting from approval of the well stimulation treatments for the EIS to study, stating: "Potential impacts to resources may include impacts on air quality; water quality; geologic resources/seismicity; benthic communities and habitats; fishes and invertebrates; marine mammals and sea turtles; economic factors; and cultural, historical, and archaeological resources. . . . BOEM expects potential impacts . . . from routine air emissions, discharges and wastes, vessel traffic, noise, and lighting. Additional impacts may occur from accidental events, such as unintentional releases into the environment, response activities, or vessel strikes and collisions." *Id*. at 13,065.

23. The Santa Barbara Channel where Platform Gilda is located lies within the California Current Large Marine Ecosystem, where cold, nutrient-rich waters rise from ocean depths to the surface, fueling phytoplankton growth that supports diverse and abundant populations of invertebrates, fish, seabirds, and marine mammals.

24. This ecosystem is protected by the California Coastal Sanctuary Act, Cal. Pub. Res. Code §§ 6240 *et seq*., which prohibits oil and gas extraction in all state waters subject to

tidal influence, with narrow exceptions; and California's Marine Protected Areas, Cal. Pub. Res. Code § 36710, which established 124 marine protected areas where fishing and other commercial activity is restricted or prohibited in recognition of unique ecological and recreational interests.

25. This ecosystem also supports marine recreational and commercial fisheries, the latter of which produced 178 million pounds of catch worth nearly $200 million in 2024, representing a significant share of national seafood production.

26. Marine aquaculture along the California coast increasingly contributes to the state and national economies; the United States Department of Energy is funding efforts to develop and expand marine aquaculture in California for production of shellfish, and algae for use as food and biofuel; current and planned marine aquaculture sites are located in the Santa Barbara Channel.

27. As acknowledged in the NOI, well stimulation treatment at Platform Gilda may result in reasonably foreseeable impacts to California's marine ecosystems and fisheries.

28. Exploration and infrastructure—including platforms, pipelines and cables—supporting well stimulation treatment at Platform Gilda may result in loss of productive fishing grounds and reduced catch rates.

29. California is one of the nation's most seismically active regions, and hydraulic fracturing at Platform Gilda could increase the risk of seismic events, including large earthquakes that could result in oil spills and other harms to California's marine ecosystems and coastal public lands, such as Southern California's world-class beaches.

30. Well stimulation treatment at Platform Gilda may result in discharge of drilling debris, fluids, and wastewater; increased vessel traffic; and development of onshore and nearshore infrastructure. Such impacts could significantly degrade water quality and harm marine ecosystems and fisheries and coastal lands.

31. Well stimulation treatment at Platform Gilda may also result in oil spills. In 2015, a pipeline transporting oil onshore from Platform Holly in the Santa Barbara Channel ruptured, and the resulting oil spill caused a dramatic decline in the volume and value of local fish catch. Likewise, an oil spill resulting from well stimulation treatment at Platform Gilda could have devastating impacts on California's fisheries, fishing economy, and the diversity of marine species, and it could also interfere with public recreation on California beaches and coastal waters.

32. As acknowledged in the NOI, well stimulation treatment at Platform Gilda may result in reasonably foreseeable adverse impacts to air quality, posing reasonably foreseeable risks to nearby coastal communities. In the past, oil produced from Platform Gilda has been transported to onshore processing facilities in Ventura County. Eight thousand Ventura County residents live within 2,500 feet of oil infrastructure and are exposed to toxic, carcinogenic pollutants like benzene and hydrogen sulfide. Reasonably foreseeable adverse air quality impacts from well stimulation treatment at Platform Gilda would add to the cumulative health risks already burdening these communities.

33. Furthermore, the California coast along the Santa Barbara Channel is integral to national security and defense. The channel coast is the home of Naval Base Ventura County and Vandenburg Space Force Base, and the Department of Defense conducts daily training, testing, and security operations on the Channel's coast and waters. Reasonably foreseeable additional infrastructure to support well stimulation treatment at Platform Gilda, increased vessel traffic, and oil spills could interfere with Department of War activities, reducing military readiness and threatening national security and the security of California's territory and people.

34. Finally, California Native American tribes have inhabited and stewarded California's coast and ocean since time immemorial. Tribes, as the original stewards of the land and water, have deep placed traditional ecological knowledge that is critical for the

stewardship and care of the coast and ocean. Well stimulation at Platform Gilda would have reasonably foreseeable adverse effects on tribal cultural and natural resources.

35. CNRA timely submitted a comment on the NOI identifying the aforementioned reasonably foreseeable significant impacts and urging the BOEM to conduct a comprehensive evaluation of potential impacts to marine ecosystems, fisheries, California public lands, communities, and military readiness. A true and correct copy of CNRA's comment letter is Exhibit B to this declaration.

36. Nonetheless, the brief comment period on the NOI deprived CNRA of reasonable opportunity to provide comment on reasonably foreseeable impacts of, and reasonable alternatives to, the proposed well stimulation treatment at Platform Gilda. For example, the twelve-day comment period on the NOI provided extremely limited time for CNRA to coordinate among the many agencies it oversees to survey the well stimulation treatment's numerous potential impacts across varied locations and subject matter. CNRA includes many departments, boards, commissions, and councils responsible for natural resource management, including the Department of Conservation (which includes the California Geologic Energy Management Division), the Department of Fish and Wildlife (which includes the Office of Spill Prevention and Response), the Department of Parks and Recreation, the State Coastal Conservancy, the California Coastal Commission, the California Energy Commission, the California State Lands Commission, the San Francisco Bay Conservation and Development Commission, the Fish and Game Commission, the Native American Heritage Commission, and the Ocean Protection Council.

37. The twelve-day comment period also deprived CNRA of a reasonable opportunity to identify "relevant information, studies, or analyses" that could meaningfully inform BOEM's decision on the well stimulation treatment project; indeed, the NOI invitation for comment made no mention of this requirement. *See* 42 U.S.C. § 4336a(c). CNRA did not

have adequate time to review the relevant science and include such information in its submission within the time allotted for public comment.

38. Without the most up to date science, BOEM will not be able to fully consider the impacts of the proposed well stimulation treatment at Platform Gilda. For example, California's offshore waters have a wide variety of geologic hazards that warrant careful characterization and analysis prior to placement of offshore oil and gas facilities. Hydraulic fracturing from wells at Platform Gilda could exacerbate California's high likelihood of earthquakes and tremors, by triggering man-made earthquakes. This phenomenon is known as "induced seismicity" and is more likely in areas with existing faults. Disposal of fluids from oil and gas production, mining, construction, disposal of waste fluids, and impoundment of large reservoirs can cause induced seismicity. All these hazards may impact offshore hydraulic fracturing operations, including pipelines and drilling platforms, increasing the risk of an oil spill.

39. Additionally, CNRA did not have adequate time to assess and notify the Governor's Military Council of impacts at the intersection of natural resources and military readiness. The Ventura coast and ocean is an integral part of Department of War training to ensure mission readiness and is supported by Naval Base Ventura County (including Point Mugu and Port Hueneme) and Vandenberg Space Force Base. Hydraulic fracturing from wells at Platform Gilda presents significant additional risk to both military operations and readiness activities. Any impediment to the training, testing or mobility of these forces due to hydraulic fracturing from Platform Gilda or failures poses both unnecessary and unacceptable risk to naval operations, power projection and national security.

40. The truncated process under DOI's alternative arrangements for environmental review of the proposed well stimulation treatment at Platform Gilda impermissibly shifted the burden for analyzing impacts and alternatives from federal agencies to the public, including CNRA.

41. The NOI's failure to announce a public meeting during EIS preparation, as required by the alternative arrangements, deprived the public, including CNRA, of opportunity to respond to BOEM's analysis of environmental impacts and alternatives.

42. On April 13, 2026, only 14 days after the comment period closed on the NOI, BOEM released an EIS ("Gilda EIS"). The Gilda EIS analyzed a proposed action using a hydraulic fracking method not disclosed in the NOI, referred to as "frac packing," the no-action alternative, and development of new production wells.

43. CNRA has not yet had adequate time to fully review the Gilda EIS, but initial review has identified several concerns about the adequacy of the impacts analysis, including induced seismicity and impacts from releases of well stimulation fluids on marine resources.

44. The Gilda EIS acknowledges that Platform Gilda lies within a seismically active zone, that large earthquakes have regularly occurred in the Santa Barbara Channel that have potential to damage offshore infrastructure, and that hydraulic fracturing can cause earthquakes. Gilda EIS at 4-2, 4-33.

45. The Gilda EIS concludes that the proposed frac packing would not result in induced seismicity, relying in part on the notion that previous hydraulic fracturing conducted at Platform Gilda and other platforms in the area did not cause induced seismicity. *Id*. at 4-33.

46. However, as the Gilda EIS notes, frac packing has "some key differences from standard hydraulic fracturing." *Id*. at 2-6. Nowhere does the Gilda EIS appear to disclose what kind of hydraulic fracturing was previously performed  to allegedly guard against induced seismicity, or identify any data specifically evaluating whether frac packing has potential to cause induced seismicity.

47. The Gilda EIS appears to have failed to adequately analyze the reasonably foreseeable impacts of frac packing on induced seismicity. BOEM should have conducted a thorough analysis on induced seismicity as urged by CNRA, rather than an abbreviated and incomplete analysis conducted under DOI's alternative arrangements.

48. The Gilda EIS acknowledges well stimulation fluids could be released into the marine environment either through accidental spillage or ocean discharge of water produced as part of oil and gas recovery. *Id.* at 4-38 to 39. The Gilda EIS further concedes that the full effects of releases on marine organisms are unknown because the EIS does not contain information on how toxic released chemicals are to those organisms: "The toxicity of well stimulation treatment chemical constituents has the potential to affect marine organisms. However, due to the lack of toxicity data for many constituents of well stimulation chemicals, the effects within the pelagic [i.e., open-water] zone are not fully characterized." *Id*. at 4-39 to 40.

49. Nonetheless, the Gilda EIS concludes that release of well stimulant fluids "are not expected to occur at concentrations that would result in adverse effects to marine organisms" and are "unlikely to result in measurable population-level effects" due to rapid dilution in ocean water and Platform Gilda's ocean discharges complying with its National Pollution Discharge Elimination (NPDES) permit, which was issued in 2014. *Id*. at 4-40.

50. This conclusion rests on an invalidated 2016 programmatic environmental assessment for well stimulation treatments in the southern California Outer Continental Shelf prepared by Argonne National Laboratory, *id*., which was invalidated by the Ninth Circuit, *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mngt.*, 36 F.4th 850 (9th Cir.), and a NPDES permit issued in 2014. *See* Gilda EIS at 2-10 to 11; EPA Permit No. CAG28000.

51. The Gilda EIS's reliance on a ten-year old, invalidated environmental review document to minimize the potential significant impacts of releases of chemicals whose toxicity has not been fully characterized shows that the Gilda EIS failed to adequately analyze the reasonably foreseeable impacts of releases of well stimulation fluids on marine resources. BOEM's decision to conduct an abbreviated and incomplete analysis under DOI's alternative arrangements rather than a thorough analysis of impacts on marine resources as urged by CNRA therefore substantially risks harm to California and its resources.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 5, 2026, in KENTFIELD, CALIFORNIA.

_____
SARA AMINZADEH