The Honorable Jamal Whitehead

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON, et al.,

                Plaintiffs,

     v.

DONALD TRUMP, et al,

              Defendants.

NO.  2:25-cv-00869

DECLARATION OF LYNDON C. LEE IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

**DECLARATION OF LYNDON C. LEE**

I, Lyndon C. Lee, declare that I am over 18 years of age and am competent to testify. I have personal knowledge of the facts stated below, and under penalty of perjury, declare as follows:

**I.     SUMMARY**

1.     I have forty-five years of experience in wetland and river science, federal, state and local permitting processes (including permitting for emergencies), and design and construction of projects that mitigate environmental impacts.

2.     In my experience, emergency permitting procedures exist to respond to imminent and unforeseen situations with little ability to anticipate, avoid, minimize, or mitigate environmental impacts. Regulators are deferential to the entities responding to the emergency, especially since the timing and processes in play are insufficient to gather information on key issues, consult with experts, or evaluate alternatives.

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

1

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

3.      Based on my experience and the facts of this case, it is my opinion that the emergency procedures the U.S. Army Corps of Engineers and Department of Interior are using for their preferred energy projects markedly increase the risks of environmental harm from projects subject to those procedures.

4.      The risk that using emergency procedures results in overlooking environmental impacts is particularly severe in this case given that Interior, the Corps, and the expert agencies that they rely on have lost approximately 20-30% of their staff since January 2025. This is a significant loss of the institutional memory and expertise necessary for a successful environmental review in any circumstance. The consequences are worse here, as agencies are being asked to do more with fewer internal resources and less outside expertise and information normally gained through the consultation and public comment processes.

## II.      BACKGROUND AND QUALIFICATIONS

5.      I am an ecosystems ecologist with specialties in wetland and river science. I am certified as a Senior Professional Wetland Scientist (#385) by the Society of Wetland Scientists. My Curriculum Vitae is included as Exhibit A of this Declaration.

6.      My academic training is as follows:

- Ph.D. (April 1983) - College of Forest Resources, University of Washington, Seattle, Washington. Majors: Ecosystem Ecology, Wetland & River Science.

- M.Sc. (March 1979) - School of Forestry, University of Montana, Missoula, Montana. Majors: Forest Ecology, Silviculture.

- B.S. (December 1974) - Tufts University and School of Forestry, University of Montana, Missoula, Montana. Majors: Forest Ecology/Silviculture.

7.      Since 1990, I have worked mostly as the Principal Ecologist and President of L.C. Lee & Associates, Inc. and Director of the National Wetland Science Training

DECLARATION OF LYNDON C. LEE          2
NO.  2:25-CV-00869

Cooperative. My work emphasizes the application of best available science and design to projects that occur in wetland, river, and forested ecosystems. In this context, my work focuses on (a) design and construction of wetland, river, and forest restoration projects, and (b) development and implementation of practical management programs for wetlands, rivers, and forested ecosystems.

8.      My scientific interests are focused on responses of wetland, river, and forested ecosystems to perturbations, assessment of site-specific and cumulative impacts to waters/wetland ecosystems, design and construction of waters/wetlands and forested ecosystem restorations, and management of the movement and fate of contaminants in waters/wetlands ecosystems.

9.      Over the past 45 years, I have obtained broad and multi-level experience with Clean Water Act (CWA), Endangered Species Act (ESA), and other permitting processes. For example, I have assisted companies to design their projects and seek permits that comply with all U.S. Federal, state, and local regulatory requirements. I also have worked as a consulting ecologist for various agencies evaluating permit applications. And I have consulted as an expert investigating environmental impacts after permits were issued.

10.      In these capacities, I have worked on over one hundred projects nationwide including over a dozen emergency projects. Many of the projects that I have worked on also involve impacts to endangered species and their habitats.

11.      The facts and data I considered in forming my opinions set forth in this declaration are the First Amended Complaint and exhibits (filed January 30, 2026); the Notice of Intent to Sue for Violations of the ESA and exhibits (dated July 18, 2025); the spreadsheets of Corps permit applications subject to emergency procedures (attached to the Declaration of Hannah Connor, filed May 6, 2026); and the materials contained in Exhibit B (Materials Considered). My past experiences over the course of 45 years in environmental science and permitting also inform my opinion here.

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

3

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

## III.    FEDERAL, STATE, AND LOCAL PERMITTING PROCESSES ARE DESIGNED TO WORK TOGETHER TO AVOID, MINIMIZE, AND MITIGATE ENVIRONMENTAL IMPACTS

12.    Federal and associated state and local permitting processes routinely rely on experienced staff and experts within the lead and supporting agencies to carefully review permit applications, consult with expert agencies, and manage public interest review processes to successfully identify environmental impacts and reasonably avoid, minimize, and/or mitigate those impacts.

13.    In the normal course, staff at regulatory agencies will receive documentation from the applicant about the project. Staff will do an initial review to ensure the application is complete and adequately detailed. Often, applicants have an incentive to gloss over details or attempt to minimize the potential, type, and scope of impacts in their application materials. During initial reviews, agency staff will routinely spot issues and identify areas where information is missing, insufficient, or where potential impacts have not been identified or addressed.

14.    Experienced regulatory agency staff may have adequate knowledge to spot issues. In other cases, staff may consult with specialists within or external to the agency. These consultations often include private sector or academic scientists to understand the size, scope, and significance of impacts to ecosystems, humans, plants, and animals.

15.    After the initial review, staff is often required to consult with other expert agencies. For example, the National Marine Fisheries Service or U.S. Fish and Wildlife Services will consult on endangered species impacts. The Advisory Council on Historic Preservation will consult on impacts to historic or cultural resources. These consultations draw in the best available scientific, engineering, and operational expertise on important public interest issues.

16.    Public notice and comment serves as an information-gathering step and an important check on agency actions. Other federal agencies, state and local entities, tribes, or

DECLARATION OF LYNDON C. LEE          4          ATTORNEY GENERAL OF WASHINGTON
NO.  2:25-CV-00869                                        Environmental Protection Division
                                                              800 Fifth Avenue STE 2000
                                                                Seattle, WA 98104
                                                                 (206) 464-7744

environmental organizations with scientific expertise or local knowledge use comment periods to offer information about which permitting staff or consulting agencies may have been unaware.

17. Through the agency initial reviews, consultation with expert agencies, and public comment, permitting processes can successfully balance environmental protection, the public interest, and the needs of a project.

18. For example, I worked on a project involving replacement of a wastewater treatment facility in California. Contrary to normal ocean discharges, the project proposed to discharge treated wastewater inland, into a stream, affecting an endangered frog. Public comment presented a novel alternative design. This precedent-setting design was the safest, most environmentally-friendly option, successfully balancing the project needs and endangered frog habitat. In the end, the project won multiple awards for its ingenuity.

19. In another example, I worked on a project involving construction of a university campus. After a thorough review and several rounds of public meetings, we selected an old farm in Bothell, Washington as the project site. During the design process, an interdisciplinary team worked with several federal, state, and City of Bothell agencies to minimize impacts to endangered species, and to waters/wetlands, and to mitigate unavoidable impacts and also meet the university's program needs. In the end, we designed a space that accommodated the campus buildings while also restoring a salmon stream and historic floodplain wetland ecosystem. We found this solution only after a great deal of public input combined with application of the best available science to plan the restoration. Here is a picture of the near final project[1]:

---

[1] Overview of the University of Washington/Cascadia Community College Construction (circa 2001), Bothell, Washington

DECLARATION OF LYNDON C. LEE
NO. 2:25-CV-00869

5



## IV. EMERGENCY PROCEDURES INCREASE THE RISK ENVIRONMENTAL CONSEQUENCES WILL BE OVERLOOOKED

20.      The use of emergency permitting procedures markedly increase the likelihood that direct, indirect, cumulative, and temporal environmental impacts, including impacts of significance, will be overlooked in Corps and Interior decision-making processes.

21.      Emergency permitting processes have been developed for situations where a natural disaster, explosion, spill, or other unforeseen circumstance risks serious harm to human health, safety, or infrastructure. While emergency responses are sometimes necessary, they leave little time for decision-making processes that could avoid or minimize environmental impacts. Even the best-intentioned and experienced actors will err when responding under pressure, as they usually lack time or information to identify key issues, consult with experts, or evaluate alternatives. The result is often emergency actions that are poorly planned and executed.

22.      With these timing and informational deficits, regulators tend to defer to the entities responding to the emergency. Agency staff reasonably assume the responding entities know more about how to quickly respond within the context of their operations.

23.      For example, I assisted with an emergency response for an explosion that dumped large amounts of pollutants into a Louisiana bayou. The bayou was a tributary to the

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

6

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

tidally influenced waters and fringe wetlands of a lake. A few days after the explosion, the company installed barriers in the bayou in an attempt to prevent further contamination. In the rush to respond, the company did not anticipate the fact that strong tidal flows would break the barriers, which happened within hours. The barriers also were installed too late, as many pollutants had already escaped into the lake ecosystem. In the end, the emergency response was both ineffective and worsened the overall impacts. The company had cleared wetland vegetation to install the barriers, concentrated pollutants in the wetlands adjacent to the bayou, and stranded fish in that polluted area.

24.    Finally, when "emergency" procedures are used for indeterminant or long-term spans of time, they become "background" conditions. They allow for complacency, where environmental reviews can easily be forgotten, poorly planned or designed, or delayed in a manner that renders them ineffective or even harmful to the natural resources in play.

## V.    DEFENDANTS' WIDESPREAD USE OF EMERGENCY PROCEDURES INCREASES THE RISK THAT ENVIRONMENTAL CONSEQUENCES WILL BE OVERLOOKED

25.    Defendants' emergency procedures involve accelerated timelines, truncated reviews, elimination of, delayed, or superficial consultation with expert agencies, and limited opportunity for public comment, if any. Defendants are simultaneously experiencing significant staffing reductions, resulting in considerable losses of institutional knowledge and scientific expertise. All these factors make it likely that environmental impacts are being overlooked and agencies are making uninformed or under-informed decisions. Valuable opportunities to avoid, minimize, or mitigate those impacts are lost.

### *Impacts of Lack of Public Comment*

26.    Under the Corps' emergency procedures, public comment is not required and, if offered, is limited to fifteen days. I reviewed many public notices that required only seven days for public comment (see Exhibit B).

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

7

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

27.    Similarly, Interior's emergency procedures limit public comment to approximately ten days, if at all, and do not require public comment on draft environmental impact statements.[2]

28.    Fifteen days (or less) will not allow interested members of the public, including other agencies, tribes, scientific groups, or advocacy groups to recognize the opportunity or need for comment, mobilize their members and constituents, review proposed projects, vet their opinions and recommendations, and then prepare adequate comments on these projects.

29.    Because agency decision-makers often receive valuable information on potential impacts and viable alternatives through the public comment process, limiting comment opportunities will increase the risk of environmental harm.

*Impacts of Deferred ESA Consultations*

30.    The Corps and Interior are also routinely deferring consultation under the ESA using 50 C.F.R. § 402.05. The spreadsheet[3] of Corps emergency permit actions lists 542 emergency permitting actions with "ESA sub actions" listed, and 147 of those occurred in plaintiff states. Additional examples of projects subject to emergency procedures, including deferred ESA consultation, are found in the States' Notice of Intent to Sue for ESA violations.[4]

31.    The emergency consultation examples that I reviewed consist of the Corps sending the Services a standardized email with minimal or no project-specific information, to which the Service responds by listing generalized best management practices and suggesting that the Corps initiate consultation "as soon as practicable after the emergency is under control, if an adverse effect has occurred."

32.    This practice is consistent with Interior's directive to the U.S. Fish and Wildlife Service to delay ESA Section 7 consultations at the applicant's request until after the energy

---

[2] *See* First Amended Complaint, Dkt. 55, Ex. J.
[3] *See* Ex. D to Declaration of Hannah Connor.
[4] *See* First Amended Complaint, Dkt. 55, Ex. B.

DECLARATION OF LYNDON C. LEE                8                ATTORNEY GENERAL OF WASHINGTON
NO.  2:25-CV-00869                                            Environmental Protection Division
                                                             800 Fifth Avenue STE 2000
                                                             Seattle, WA 98104
                                                             (206) 464-7744

emergency is terminated. Per Interior's directive, the agency may proceed with the proposed action without first completing consultation under the ESA.[5]

33.    In my opinion, this procedure completely short-circuits required ESA procedures and associated species and habitat protections especially as the energy emergency has no clear end date. Defendants' failure to consult with expert agencies on potential impacts to endangered species before approving projects almost guarantees harm to endangered species.

34.    The impacts on endangered species from the agencies' emergency procedures are likely significant. For example, Washington, Oregon, and California support many different populations of endangered fish, especially salmonids, and their critical habitat. The waters of the United States and ecosystems within them (which the Corps regulates) are, by definition, environmentally sensitive areas. Scientific literature has amply documented the limited resistance of these areas to the outside disturbances that Corps permit applicants often propose. This speaks to the need to adequately plan, design, execute, monitor, and adaptively manage protections to species and their habitats well in advance of and during operations, with the assistance of highly trained and certified professionals. Despite this context, the Corps is using emergency procedures for energy activities in or near these aquatic ecosystems, including in critical habitat for endangered species, as shown in the figures below.

35.    Figures 1-3, below, show the location of emergency permit projects near critical river ecosystems that support endangered fish in Washington, Oregon, and California. These maps were created using the GPS coordinates of Corps emergency permitting actions pursuant to Executive Order 14156, as reflected in Exhibit D to the Declaration of Hannah Connor. Those coordinates were then overlayed with maps of critical habitat for several important endangered species in the region from U.S. Fish and Wildlife Service and National Marine Fisheries Service.

---

[5] *See* First Amended Complaint, Dkt. 55, Ex. J.

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

9

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

36.     As these figures demonstrate, the Corps has processed, or identified for processing, numerous projects in or near listed critical habitat for endangered species throughout the West Coast. Under the emergency procedures, however, the Corps is deferring or delaying the required consultation under the Endangered Species Act. Even more worrisome, many of these permit applications have no "ESA/Essential Fish Habitat Subactions" listed, indicating they were not flagged even for emergency deferred consultation procedures.

*Figure 1. Federal energy emergency projects/ESA Critical habitat map – Washington*



DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

10

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744



● Executive Order 14182 - Energy emergency projects with ESA/Essential Fish Habitat Subactions

● Executive Order 14182 - Energy emergency projects without ESA/Essential Fish Habitat Subactions

Salmon Chinook - Puget Sound

Salmon Chum - Hood Canal summer run

Salmon Chinook - Lower Columbia River

Salmon Chinook - Puget Sound

Salmon Chinook - Snake River fall run

Salmon Chinook - Upper Columbia River spring run

Salmon Chinook - Upper Willamette River          Steelhead - Lower Columbia River

Salmon Chum - Columbia River                     Steelhead - Middle Columbia River

Salmon Coho - Lower Columbia River               Steelhead - Puget Sound

Salmon Coho - Oregon Coast                       Steelhead - Snake River Basin

Salmon Sockeye - Ozette Lake                     Steelhead - Upper Columbia River

Salmon Sockeye - Snake River                     Steelhead - Upper Willamette River

**Figure 2**. Federal energy emergency projects/ESA Critical habitat map - Oregon

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744



**Figure 3.** Federal energy emergency projects/ESA Critical habitat map – Northern California

DECLARATION OF LYNDON C. LEE
NO. 2:25-CV-00869

12

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

**Figure 4**. Federal energy emergency projects/ESA Critical habitat map – Southern California



Rana draytonii (California Red-Legged Frog) Critical habitat

Ambystoma californiense (California Tiger Salamander Central Valley/East Bay) Critical habitat

Ambystoma californiense (California Tiger Salamander Santa Rosa Plain) Critical habitat

Salmon Chinook - Sacramento River winter run

Salmon Chinook - California Coastal

Salmon Chinook - Central Valley spring run

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

- Steelhead - Northern California
- Salmon Chinook - Sacramento River winter run
- Salmon Coho - Central California Coast
- Steelhead - California Central Valley
- Steelhead - Central California Coast
- Steelhead - South Central California Coast
- Steelhead - Southern California

37.     As one example, the Corps is using emergency procedures to permit maintenance operations for a very old, degraded hydroelectric water diversion structure in the Puyallup River in Washington. *See* Ex. B at 19. That diversion system has, in the past, resulted in large and chronic discharges of fill and pollutants harmful to fish. It has fragmented the continuity or connections among upstream and downstream reaches of the river, profoundly damaging fish species abilities to move within the river system, and their overall survival and the integrity of their habitat. The Corps' use of emergency procedures, including truncated ESA reviews, are unlikely to address the significant environmental risks from the diversion system and ongoing operations there. This will likely result in continued mortality of endangered fish and significant degradation of their listed critical habitats.

### *Impacts of Truncated Time Limits for Decision*

38.     Corps and Interior staff are also responsible for reviewing other likely environmental impacts and considering alternatives under their regulations and the National Environmental Policy Act. However, under the emergency procedures, the Corps must reach a decision on a permit application within thirty business days unless extenuating circumstances arise.[6] Interior staff must prepare an environmental assessment within fourteen days of receiving the application, or, if there are significant impacts, within 28 days of publishing a notice of intent to prepare an environmental impact statement.[7]

---

[6] *See* First Amended Complaint, Ex. H at 21
[7] *See* First Amended Complaint, Dkt. 55, Ex. J.

DECLARATION OF LYNDON C. LEE          14
NO.  2:25-CV-00869

39.     Expedited procedures increase the likelihood that regulatory agency staff are unable to adequately investigate environmental impacts and possible alternatives. Here, the likelihood is even greater because of staffing cuts at Interior, the Corps, and the National Marine Fisheries Service.

40.     According to data from the U.S. Office of Personnel Management,[8] since January 2025, Interior has lost at least 20,119 employees, or 29% of its total workforce.[9] Interior has hired new employees to fill only a percentage of these lost positions. Accounting for those new hires, Interior still has a total loss of 11,247 employees or 16% of its workforce. While the new hires will help, they cannot replace the many years of institutional knowledge and experience that goes away when an agency loses one-third of its staff.

41.     The expert agencies that the Corps and Interior consult with regarding effects on endangered species have faced similar losses. The U.S. Fish and Wildlife Service, a subagency of Interior responsible for ESA consultations, has lost at least 1,538 employees, or 17 % of its total 2024 workforce (even when accounting for new hires). A recent analysis published in *Science* found a nearly 15% loss in the number of Science, Technology, Engineering, and Mathematics (STEM) Ph.Ds employed at the Fish and Wildlife Service since December 2024.[10]

42.     The National Oceanic and Atmospheric Association, which includes the National Marine Fisheries Service (responsible for ESA consultations), lost 2,473 employees, or 20% of their total workforce. The same *Science* analysis found the loss of STEM Ph.Ds employed at NOAA reached nearly 20% since January 2025.[11]

---

[8] *Workforce Changes*, OPM (Feb. 2026), https://data.opm.gov/explore-data/analytics/workforce-changes (numbers based on OPM's "Separations and accessions since January 20, 2025" tool)

[9] *Workforce Size & Composition*, OPM (Feb. 2026), https://data.opm.gov/explore-data/analytics/workforce-size-and-composition (2024 workforce numbers based on OPM's "The federal civilian workforce over time" tool)

[10] Monica Hersher & Jeffrey Mervis, *U.S. government has lost more than 10,000 STEM Ph.D.s since Trump took office,* Science (Jan. 26, 2026), https://www.science.org/content/article/u-s-government-has-lost-more-10-000-stem-ph-d-s-trump-took-office

[11] *Id.*

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

15

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

*Risk of Overlooking Individual and Cumulative Impacts*

43.    "Cumulative impacts" refer to the incremental impacts of the decision when added to other past, present, and reasonably foreseeable future actions. These incremental impacts can result from individually minor, but collectively significant, actions occurring over a period of time or in a given space. For instance, "minor" impacts may occur close together in time or geography, such that the ecosystem lacks time or space to recover between events. Alternatively, several small, seemingly unrelated impacts may result collectively in decreases in the size and connectivity of functioning ecosystems. This results in the fragmentation and degradation of ecosystem structure and functioning. Finally, the total effect of these individual actions may result in environmental harm that is far greater than the sum of individual acts.

44.    Defendants' emergency procedures markedly increase the risk that they will fail to adequately consider significant individual and cumulative environmental impacts from their decisions. Potential impacts here include degradation of water quality, harm to several classes of endangered species (e.g. whale, fish, frog, and tiger salamander populations), and harm to, or elimination of, ESA-protected critical habitat.

45.    For instance, I reviewed public notices for Corps permit applications that appear to entirely exclude or minimize consideration of alternatives or strategies to avoid impacts to wetlands or wildlife:

- A mining facility that will impact 18.87 acres of wetlands and 9,870 linear feet of stream and potentially harm six species of endangered bats and their habitats[12]

---

[12] *See* Public Notice, *Williamson Energy*, MVS-2023-30 (June 12, 2024), available at: https://www.mvs.usace.army.mil/Portals/54/docs/regulatory/publicnotices/MVS-2022-30%20Mach%20Mine%20RDA4%20PN.pdf (attached in Ex. B); Declaration of Hannah Connor, Ex. D (indicating permit was approved with emergency procedures)

DECLARATION OF LYNDON C. LEE                    16                ATTORNEY GENERAL OF WASHINGTON
NO.  2:25-CV-00869                                                      Environmental Protection Division
                                                                            800 Fifth Avenue STE 2000
                                                                               Seattle, WA 98104
                                                                                (206) 464-7744

- An oil and gas pipeline tunnel that will impact waters of the United States, including wetlands, shorelines, and endangered bats, plovers, and fish[13]

- A mining facility that proposes to permanently discharge dredged and/or fill material into 5.76 acres of six wetlands, 4.16 acres of four ponds, and 3,252 linear feet of four intermittent streams, potentially affecting endangered bats and their habitat[14]

- A pipeline project that may temporarily or permanently impact up to 426.6 acres of waters of the United States and affecting several marine aquatic species and essential fish habitat.[15]

46.    These are just a few examples from the limited documentation that is publicly available, but are indicative of pervasive failures in the Corps' use of emergency procedures to identify and prevent environmental impacts.

47.    As the energy emergency stretches on, the possibility that emergency procedures cause significant direct, indirect,  cumulative, and temporal impacts becomes virtually guaranteed.

48.    I reach this conclusion for several reasons. First, from my review of the records, project impacts are occurring or shall be allowed to occur in ways that, given lack of up-front environmental reviews and diminishing agency staff, are unknown in type, scope, timing, and magnitude.

---

[13] *See* Public Notice, *Enbridge Energy, LP*, LRE-2010-00463-56-A19 (April 15, 2025), available at: https://media.defense.gov/2025/Apr/15/2003689654/-1/-1/0/PUBLIC%20NOTICE%20DETROIT%20DISTRICT,%20PERMIT%20APPLICATION%20NO.%20LRE-2010-00463-56-A19.PDF, attached in Ex. B at 154. In addition to that notice, I also reviewed the Final Environmental Impact Statement for this project, which is available here: https://www.line5tunneleis.com/draft-eis-copy/

[14] *See* Public Notice, *Kimble Company*, LRH-2025-0096 (Apr. 3, 2026), attached in Ex. B at 146

[15] *See* Public Notice, *Texas Connector Pipeline*, SWG-2025-00115 (Apr. 21, 2025), attached in Ex. B at 140.

DECLARATION OF LYNDON C. LEE              17
NO.  2:25-CV-00869

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

49.     Second, project proponents are being asked to address or remedy impacts after-the-fact.[16] This is effectively a blank check to determine that no adverse effects occurred and take no remedial action. If the agency has not already performed a detailed environmental review identifying the possibility for impacts and establishing an environmental baseline in advance, it will have great difficulty identifying whether any effects occurred after the fact.

50.     Third, even if the impacts from an energy action are obvious, they are likely to be forgotten in the mix of the project designs, accelerated permitting, project work executions, and agency staff turnover.

51.     Finally, the requirement that applicants conduct reviews or address after-the-fact effects as soon as practicable after the energy emergency ends sets the agencies up for failure. What is "practicable" in any given circumstance (emergency or not) is highly contested operationally and legally, so permittees may not agree with the agencies on necessary measures to take after-the-fact. Consequently, delays or failures to reach agreement on "practicable" responses or timelines to address impacts that occurred during an "emergency" of indeterminate duration will have real and significant deleterious cumulative impacts. Meaningful remedies and/or mitigation strategies to address impacts will likely never materialize.

## VI.     CONCLUSION

52.     In conclusion, Defendants' emergency procedures short-circuit the standard permitting process in multiple ways. As a result, these procedures ensure the Defendants' permitting process will fail to identify, prevent, or mitigate damage to the environment. Because these procedures are being employed in sensitive ecosystems across the country, the risk of irreparable environmental degradation is very significant.

---

[16] *See* alternative-procedures-section-7-consultation-2025-04-23-signed_1.pdf;

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869

18

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

DATED this 4th day of May, 2026.



_____

LYNDON C. LEE, Ph.D., SPWS

DECLARATION OF LYNDON C. LEE
NO.  2:25-CV-00869                                    19

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744